1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

8   ANGELO PANTANO,

9          *Petitioner*,                                    3:08-cv-00685-ECR-VPC

10  vs.                                                     ORDER

11

12  WILLIAM DONAT, *et al.*,

13         *Respondents*.

14

15          This represented habeas matter under 28 U.S.C. § 2254 comes before the Court for

16  a final decision on the merits.

17                                      ***Background***

18          Petitioner Angelo Pantano seeks to set aside his 2004 Nevada state judgment of

19  conviction, pursuant to a jury verdict, of sexual assault of a minor under the age of 14.  He is

20  serving a life sentence with the possibility of parole after 20 years.

21          In its published decision on direct appeal, the Supreme Court of Nevada summarized

22  the principal trial evidence as follows:

23                  Respondent Angelo Pantano digitally penetrated his
                seven-year-old female cousin, D.D., while visiting at her home in
24              Las Vegas.  Several days elapsed before D.D. disclosed the
                incident.  Ultimately, after D.D.'s mother discovered the child's
25              stained underwear, D.D. indicated that Pantano had digitally
                penetrated her "kiki," a term she used for her vagina.
26
27                  The mother later asked D.D. to repeat to her father what
                she had said about the incident. D.D.'s initial failure to respond
28              evoked the father's concern that someone had inappropriately
                touched her at school.  When he asked her if that had been the

1
2
3
4
5
6
7

case, D.D. implicated Pantano.  Because Pantano would not have had access to D.D. at the school, and because she remained reluctant to describe the incident, her father more specifically inquired as to whether someone had been touching her in a sexual manner.  To this, D.D. responded in the affirmative as follows: "he [Pantano] stick [sic] his finger in my kiki, Daddy."  The father asked her three further times if she was sure about the accusation and received uniform affirmative responses.  When asked why D.D. did not report the incident sooner, she responded that Pantano had warned her that she would be in trouble if she did so.  Shortly thereafter, the parents reported the matter to the Las Vegas Metropolitan Police Department (LVMPD).

8
9
10

As part of the initial investigation, LVMPD Detective Rick Given took a further statement from the child confirming the incident.  Detective Given also took a voluntary statement from Pantano, during which Pantano confessed to digitally penetrating the child.  He further admitted to touching D.D.'s buttocks with his penis while masturbating behind her in her bed.

11
12
13
14
15
16
17
18

The State charged Pantano with sexual assault with a minor under the age of 14 for the digital penetration, and lewdness with a child under the age of 14 for the penile contact.  At a pretrial hearing, the district court conducted a statutory reliability determination under NRS 51.385, discussed infra, regarding D.D.'s hearsay statements to her mother, father, and Detective Given.  The district court permitted use of all three sets of statements at trial, concluding that they were sufficiently reliable under the statute.  D.D. testified regarding the digital penetration at a preliminary hearing and at trial, but she failed to confirm the facts underlying the lewdness charge.  When asked at trial on cross-examination and redirect if she had spoken to anyone regarding the incident, she either responded negatively or that she could not remember.

19
20
21
22
23

*Pantano v. State* 122 Nev. 782, 785-86, 138 P.3d 477, 479-80 (2006).  Petitioner has not demonstrated by clear and convincing evidence to the contrary in the state court record that the state supreme court's summary of the trial evidence was incorrect.  The foregoing summary of the evidence thus is presumed to be correct.  *See,e.g., Sims v. Brown,* 425 F.3d 560, 563 n.1 (9th Cir. 2005).

24

### *Generally Applicable Standard of Review*

25
26
27
28

The Antiterrorism and Effective Death Penalty Act (AEDPA) imposes a "highly deferential" standard for evaluating state-court rulings that is "difficult to meet" and "which demands that state-court decisions be given the benefit of the doubt."  *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011).  Under this standard of review, a federal court may not grant

1   relief merely because it might conclude that the state court decision was incorrect.  131 S.Ct.

2   at 1411.  Instead, under 28 U.S.C. § 2254(d), the court may grant relief only if the state court

3   decision: (1) was either contrary to or involved an unreasonable application of clearly

4   established law as determined by the United States Supreme Court based on the record

5   presented to the state courts; or (2) was based on an unreasonable determination of the facts

6   in light of the evidence presented at the state court proceeding.  131 S.Ct. at 1398-1401.

7        A state court decision is "contrary to" law clearly established by the Supreme Court only

8   if it applies a rule that contradicts the governing law set forth in Supreme Court case law or

9   if the decision confronts a set of facts that are materially indistinguishable from a Supreme

10  Court decision and nevertheless arrives at a different result.  *E.g.*, *Mitchell v. Esparza*, 540

11  U.S. 12, 15-16 (2003).  A state court decision is not contrary to established federal law merely

12  because it does not cite the Supreme Court's opinions.  *Id.*  Indeed, the Supreme Court has

13  held that a state court need not even be aware of its precedents, so long as neither the

14  reasoning nor the result of its decision contradicts them.  *Id.*  Moreover, "[a] federal court may

15  not overrule a state court for simply holding a view different from its own, when the precedent

16  from [the Supreme] Court is, at best, ambiguous."  540 U.S. at 16.  For, at bottom, a decision

17  that does not conflict with the reasoning or holdings of Supreme Court precedent is not

18  contrary to clearly established federal law.

19       A state court decision constitutes an "unreasonable application" of clearly established

20  federal law only if it is demonstrated that the state court's application of Supreme Court

21  precedent to the facts of the case was not only incorrect but "objectively unreasonable."  *E.g.,*

22  *Mitchell*, 540 U.S. at 18; *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004).

23       To the extent that the state court's factual findings are challenged, the "unreasonable

24  determination of fact" clause of Section 2254(d)(2) controls on federal habeas review.  *E.g.,*

25  *Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004).  This clause requires that the federal

26  courts "must be particularly deferential" to state court factual determinations.  *Id*.  The

27  governing standard is not satisfied by a showing merely that the state court finding was

28  "clearly erroneous."  393 F.3d at 973.  Rather, AEDPA requires substantially more deference:

1
2
3
4

> . . . . [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

5   *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

6   Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct

7   unless rebutted by clear and convincing evidence.

8   The petitioner bears the burden of proving by a preponderance of the evidence that

9   he is entitled to habeas relief.  *Pinholster*, 131 S.Ct. at 1398.

10                                    ***Discussion***

11   ***Ground 1: Confrontation Clause – "Facial Challenge" to N.R.S. 51.385***

12   In Ground 1, petitioner alleges that he was denied rights to confrontation, due process,

13   and a fair trial because N.R.S. 51.385 allegedly is unconstitutionally overbroad, essentially

14   because the statute provides for the admission of hearsay in some circumstances that

15   allegedly would violate the Confrontation Clause under the standards set forth in *Crawford*

16   *v. Washington*, 541 U.S. 36 (2004).

17   The Supreme Court of Nevada rejected the corresponding claim along with related

18   claims presented to that court on direct appeal on the following grounds:

19   > *Constitutionality of NRS 51.385*

20   > Pantano challenges the constitutionality of NRS 51.385
21   > facially and as applied based on the United States Supreme
     > Court decision in *Crawford v. Washington*.

22   > NRS 51.385 provides in pertinent part:

23   > 1. In addition to any other provision for
24   > admissibility made by statute or rule of court, a
     > statement made by a child under the age of 10
25   > years describing any act of sexual conduct
     > performed with or on the child or any act of physical
26   > abuse of the child is admissible in a criminal
     > proceeding regarding that act of sexual conduct or
27   > physical abuse if:

28   > (a) The court finds, in a hearing out of the
     > presence of the jury, that the time, content and

                                    -4-

circumstances of the statement provide sufficient circumstantial guarantees of trustworthiness; and

(b) The child testifies at the proceeding or is unavailable or unable to testify.

2. In determining the trustworthiness of a statement, the court shall consider, without limitation, whether:

(a) The statement was spontaneous;

(b) The child was subjected to repetitive questioning;

(c) The child had a motive to fabricate;

(d) The child used terminology unexpected of a child of similar age; and

(e) The child was in a stable mental state.

As demonstrated above, this statute permits introduction of statements made by a child declarant describing sexual conduct or physical abuse as an exception to the hearsay rule if (1) a court holds a hearing outside the jury's presence to assess the circumstances surrounding the trustworthiness of such statements, (2) the child testifies at the hearing or is unavailable or unable to testify, and (3) the court finds such statements sufficiently trustworthy.

In *Bockting v. State*, relying upon the 1980 United States Supreme Court decision in *Ohio v. Roberts*, this court upheld the constitutionality of NRS 51.385.  *Roberts* concluded that a trial court may admit hearsay statements without violence to the Confrontation Clause of the Sixth Amendment when the hearsay declarant is unavailable for cross-examination, if "(1) the statement satisfies the indicia of a 'firmly rooted' hearsay exception; or (2) the statement reflects 'particularized guarantees of trustworthiness.'"  In *Bockting*, this court determined that, despite the declarant's unavailability, NRS 51.385 survived constitutional muster under the second *Roberts* criterion because the statute requires district courts to determine if the "'time, content, and circumstances of ... [hearsay] statement[s] provide sufficient circumstantial guarantees of trustworthiness.'"

In *Crawford v. Washington*, decided in 2004, the United States Supreme Court overturned *Roberts* with regard to testimonial hearsay.  Under *Crawford*, if a hearsay statement of an unavailable declarant is "testimonial" in nature, the statement is admissible only if the defendant had prior opportunity to cross-examine the declarant concerning it.  Therefore, under *Crawford*, when the declarant is unavailable, reliability assessments of testimonial hearsay cannot survive scrutiny under the Confrontation Clause without actual confrontation.

The Court provided the following illustrations of testimonial hearsay: (1) ex parte in-court testimony, or its functional equivalent, such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or "'similar pretrial statements that declarants would reasonably expect to be used prosecutorially'"; (2) "'extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions'"; (3) "'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial'"; and (4) statements made to law enforcement in the course of interrogations.

NRS 51.385 implicates *Crawford*'s holding because the statute permits a district court to assess the reliability of a child-declarant's statements, rather than requiring assessment by means of cross-examination. We recognized this implication in *Flores v. State*, in which we stated that "our prior ruling in *Bockting*, holding that NRS 51.385 is constitutional under *Roberts*, cannot survive analysis under *Crawford*."

Our recognition of this constitutional dilemma does not end our analysis of the instant matter. The Court in *Crawford* also stated that, "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." Notwithstanding D.D.'s presence and testimony at trial, Pantano asserts that several of D.D.'s nonresponsive answers during cross-examination effectively rendered her unavailable for confrontation purposes. From this, he reasons that introduction of her prior statements through the testimony of others renders NRS 51.385 unconstitutional as applied to him. We disagree.

In *Delaware v. Van Arsdall*, the United States Supreme Court stated that "'the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" Further, "[w]hen a witness gives 'testimony that is marred by forgetfulness, confusion, or evasion ... the Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose these infirmities through cross-examination.'"

We conclude that Pantano had an adequate opportunity to cross-examine D.D. The fact that she answered negatively or "I don't know" when asked on cross-examination to identify to whom she spoke regarding the incident does not render the cross-examination ineffective. If anything, such testimony served to undermine her testimony and that of the surrogate witnesses.

We therefore further conclude that D.D.'s availability for cross-examination at trial defeats Pantano's "as-applied" challenge to NRS 51.385 and renders immaterial the testimonial nature of her statements to others regarding the assault. Having said this, we now take this opportunity to clarify *Flores* regarding

1
2
3
4
5
6
7
8

the circumstances under which NRS 51.385 does and does not pass constitutional muster. First, subject to general rules of admissibility, a district court may properly admit a statement under this statute when a competent child witness testifies, regardless of whether the hearsay statement at issue is testimonial. Here, as noted, the child was competent to testify as to her allegations against Pantano. Second, if the hearsay statement is nontestimonial, a district court may exercise its discretion under NRS 51.385 to admit the statement, even though the child does not testify. Finally, per *Crawford* and *Flores*, when testimonial hearsay is at issue, admission of a child-victim's hearsay statement under NRS 51.385 violates confrontation rights when the victim is unavailable and the defendant has not had a prior opportunity to cross-examine. Accordingly, NRS 51.385 is not facially unconstitutional in all of its applications.

9
10

122 Nev. at 480-83, 138 P.3d at 787-91 (citation footnotes omitted).

11
12
13
14

The state supreme court's rejection of petitioner's claim or claims in this regard was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court at the time of the court's July 20, 2006, decision on direct appeal.

15
16
17
18
19
20
21
22

Petitioner maintains that N.R.S. 51.385 is unconstitutional and overbroad "on its face" because it allows the introduction of testimonial hearsay so long as the statement is reliable and trustworthy regardless of whether or not the child testifies or was subject to prior cross-examination. As discussed, *infra*, as to Ground 2, the victim testified at trial, although petitioner challenges whether she nonetheless was "available" for purposes of *Crawford*. On Ground 1, petitioner maintains that because of the above alleged "facial unconstitutionality" of the statute, "the improper admission of evidence through an unconstitutional statue violated Pantano's rights to due process, confrontation, and a fair trial."[1]

23
24
25

Petitioner's "facial" challenge to this evidentiary statute for "overbreadth" has no valid underpinning in clearly established United States Supreme Court constitutional doctrine. It would be one thing to hold, on the claim discussed *infra* under Ground 2, that a defendant

26
27
28

_____

[1]#46, at 6; see also #20, at 12 (Petitioner maintains: "A conviction obtained by the admission of evidence through an unconstitutional statute cannot stand.") Petitioner contends that the state supreme court's holding – that the statute survives scrutiny because is not facially unconstitutional in all of its applications – is contrary to *Crawford*.

was denied his right to at least confrontation if evidence in fact was admitted at *his* trial that violated the Confrontation Clause.  It would be quite another to hold that a defendant can overturn his conviction because an *evidentiary* statute was "facially overbroad and/or unconstitutional" without regard to whether the evidence admitted at *his* trial in fact violated the Confrontation Clause.  And that in truth is what petitioner argues in the "facial challenge" in Ground 1.  He is urging that the alleged "overbreadth" of the law renders the introduction of the evidence at his trial unconstitutional because the statute allegedly is not constitutional as written in all of its applications.  See also #22, Ex. 36, at 27-28 (direct appeal brief).

Petitioner does not cite a single decision of the United States Supreme Court overturning a conviction based upon a holding that an evidentiary statute was "facially unconstitutional" and "overbroad" under the Confrontation Clause without regard to whether the evidence actually introduced at the defendant's trial was admitted in violation of the Confrontation Clause. *Crawford* clearly made no such holding.  There is no Supreme Court authority holding that the introduction of otherwise *arguendo* constitutionally admissible evidence is rendered unconstitutional because it was admitted through a statute that was in some other respect unconstitutional because it allegedly allows other evidence in other cases that violates confrontation rights.

There is no such authority with good reason, because established Supreme Court constitutional doctrine instead leads inexorably to the contrary conclusion.

It is a firmly entrenched fundamental principle of constitutional doctrine that "a person to whom a statute may constitutionally be applied may not challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court." *New York v. Ferber,* 458 U.S. 747, 767 (1982).

As the Supreme Court repeatedly has instructed, "facial challenges" for "overbreadth" are restricted to *First Amendment* challenges, and then only in narrow circumstances:

> Prototypical exceptions to this traditional rule are First Amendment challenges to statutes based on First Amendment overbreadth.  "At least when statutes regulate or proscribe speech ... the transcendent value to all society of constitutionally protected expression is deemed to justify allowing 'attacks on

overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity.'" *Gooding v. Wilson*, 405 U.S. 518, 520-521, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972)(quoting *Dombrowski v. Pfister*, 380 U.S. 479, 486, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965)).   "This is deemed necessary because persons whose expression is constitutionally protected may well refrain from exercising their right for fear of criminal sanctions provided by a statute susceptible of application to protected expression."  *Gooding v. Wilson, supra*, at 520-521, 92 S.Ct. 1103.  *See also Thornhill v. Alabama*, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940).

. . . . .

But the allowance of a facial overbreadth challenge to a statute is an exception to the traditional rule that "a person to whom a statute may constitutionally be applied may not challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court." *Ferber, supra*, at 767, 102 S.Ct. 3348 (citing *Broadrick, supra*, at 610, 93 S.Ct. 2908). This general rule reflects two "cardinal principles" of our constitutional order: the personal nature of constitutional rights and the prudential limitations on constitutional adjudication. 458 U.S., at 767, 102 S.Ct. 3348.  "By focusing on the factual situation before us, and similar cases necessary for development of a constitutional rule, we face 'flesh and blood' legal problems with data 'relevant and adequate to an informed judgment.'"  *Id.*, at 768, 102 S.Ct. 3348 (footnotes omitted).

Even though the challenge be based on the First Amendment, the overbreadth doctrine is not casually employed. "Because of the wide-reaching effects of striking down a statute on its face at the request of one whose own conduct may be punished despite the First Amendment, we have recognized that the overbreadth doctrine is 'strong medicine' and have employed it with hesitation, and then 'only as a last resort.'"  *Id.*, at 769, 102 S.Ct. 3348 (citing *Broadrick, supra*, at 613, 93 S.Ct. 2908). "'[F]acial overbreadth adjudication is an exception to our traditional rules of practice and . . . its function, a limited one at the outset, attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves from "pure speech" toward conduct and that conduct - even if expressive - falls within the scope of otherwise valid criminal laws....'"  458 U.S., at 770, 102 S.Ct. 3348 (quoting *Broadrick, supra*, at 615, 93 S.Ct. 2908).  *See also Board of Airport Comm'rs of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987).

*Los Angeles Police Dept. v. United Reporting Publishing Corp.*, 528 U.S. 32, 38-40 (1999).

Petitioner has not invoked – either in this Court or significantly for exhaustion purposes in the state supreme court – the First Amendment on this claim.  Nor has he articulated any related First Amendment interests.  Clearly, no such interests are implicated on this claim.

1      Petitioner's "facial challenge" for "overbreadth" thus never even gets out of the starting

2   gate, whether on deferential AEDPA review or even on *de novo* review.  There simply is no

3   constitutional doctrinal underpinning for a "facial challenge" to an evidentiary statute for

4   "overbreadth" based upon the fact that a statute allegedly may violate the Confrontation

5   Clause in some circumstance or circumstances not then presented to the reviewing court.

6      To be sure, some lower federal courts and state courts, as in the Nevada *Bockting*

7   case, will address an issue of whether an evidentiary statute is unconstitutional "on its face"

8   or "facially" under the Confrontation Clause.  However, such inquiry is directed not to whether

9   the statute is "overbroad" and allows for the admission of both constitutional and

10  unconstitutional evidence.  Rather, such inquiry is directed to whether the statute is *wholly*

11  unconstitutional, "on its face," in all of its potential applications, which of course necessarily

12  also would include the particular application to the case then before the bar.  Petitioner cannot

13  validly morph that quite distinct "facial" validity inquiry – conducted in lower court opinions –

14  into clearly established federal law as determined by the United States Supreme Court

15  holding that an evidentiary statute that *arguendo* permits the introduction of unconstitutional

16  evidence in other situations not then before the court is "facially unconstitutional" for

17  "overbreadth."   Petitioner thereby necessarily references wholly inapposite constitutional

18  doctrine that instead recognizes a viable overbreadth challenge only for First Amendment

19  challenges, not Confrontation Clause claims.

20     Accordingly, even on a *de novo* review, the amorphous "facial challenge" for

21  "overbreadth" in Ground 1 would be at best surplusage and at worst frivolous.  If the evidence

22  actually admitted at petitioner's trial was admitted in violation of the Confrontation Clause,

23  then a "facial" challenge to the statute is surplusage vis-à-vis the challenge to his own

24  particular conviction.  If, on the other hand, the evidence actually admitted at petitioner's trial

25  was *not* introduced in violation of the Confrontation Clause, then there is no nonfrivolous

26  federal constitutional claim by which the otherwise constitutional admission of the evidence

27  is rendered unconstitutional because the evidentiary statute allegedly would permit the

28  unconstitutional admission of other evidence in other situations in other trials.

-10-

1   *A fortiori*, on deferential AEDPA review, the state supreme court's rejection of such a

2   "facial challenge" for "overbreadth" indisputably was neither contrary to nor an unreasonable

3   application of clearly established federal law.

4   Ground 1 therefore in truth does not state, much less present, a viable ground for

5   federal habeas relief, based upon alleged "facial unconstitutionality" for "overbreadth."[2]

6   ### Ground 2:  Confrontation Clause – "As-Applied" Challenge

7   In Ground 2, petitioner alleges that he was denied rights to confrontation, due process,

8   and a fair trial because allegedly testimonial out-of-court statements by the child victim to her

9   father and to a detective were admitted at trial.  Petitioner contends principally: (a) that the

10  child was "unavailable" for purposes of the Confrontation Clause analysis under *Crawford*

11  because her responses in her trial testimony allegedly were so vague and inadequate that

12  effective cross-examination was not possible, allegedly thereby rendering her "unavailable;"

13  and (b) that the child's statements not only to the investigating detective but also to her father

14  were "testimonial" statements for purposes of Confrontation Clause protection under

15  *Crawford*.

16  The Supreme Court of Nevada rejected the corresponding claim or claims presented

17  to that court on the following grounds:[3]

18          . . . .  The Court in *Crawford* . . . stated that, "when the
        declarant appears for cross-examination at trial, the Confrontation
19      Clause places no constraints at all on the use of his prior
        testimonial statements."  Notwithstanding D.D.'s presence and
20      testimony at trial, Pantano asserts that several of D.D.'s
        nonresponsive answers during cross-examination effectively
21      rendered her unavailable for confrontation purposes. From this,
        he reasons that introduction of her prior statements through the
22      testimony of others renders NRS 51.385 unconstitutional as
        applied to him.  We disagree.

23

24  _____

25  [2]In the amended petition and reply, petitioner also refers to the specifics of his particular case, but in
    doing so he cross-references to his discussion of Ground 2.  To the extent, if any, that petitioner presents any
26  as-applied claim in Ground 1 as to the specifics of his particular case, such claim is wholly redundant of the
    claims in Ground 2 and thus is disregarded as a separate claim.  The only non-redundant claim in Ground 1,
    the facial challenge for overbreadth discussed in the text, plainly is without merit.

27

28  [3]For ease of reference and context, the Court sets forth the previously-quoted holding particularly on
    the "unavailability" issue and adds newly-quoted material herein with the holding on the "testimonial" issue.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

In *Delaware v. Van Arsdall*, the United States Supreme Court stated that "'the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" Further, "[w]hen a witness gives 'testimony that is marred by forgetfulness, confusion, or evasion ... the Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose these infirmities through cross-examination.'"

We conclude that Pantano had an adequate opportunity to cross-examine D.D.  The fact that she answered negatively or "I don't know" when asked on cross-examination to identify to whom she spoke regarding the incident does not render the cross-examination ineffective. If anything, such testimony served to undermine her testimony and that of the surrogate witnesses.

We therefore further conclude that D.D.'s availability for cross-examination at trial defeats Pantano's "as-applied" challenge to NRS 51.385 and renders immaterial the testimonial nature of her statements to others regarding the assault. . . . .

*Testimonial hearsay*

Despite the immateriality in this case of the testimonial nature of D.D.'s hearsay statements, we will address the issue of whether D.D.'s statements to her father were testimonial, given the likelihood that this issue will arise in future cases.

Pantano asserts that D.D.'s father questioned her to elicit evidence. From this, Pantano analogizes D.D.'s responses to her father's questioning to responses given to questions by law enforcement, which *Crawford* characterized as testimonial.

We reject Pantano's analogy between statements made to D.D.'s father and statements made to law enforcement. A parent questioning his or her child regarding possible sexual abuse is inquiring into the health, safety, and well-being of the child. To characterize such parental questioning as the gathering of evidence for purposes of litigation would unnecessarily and undesirably militate against a parent's ability to support and nurture a child at a time when the child most needs that support. We therefore conclude that D.D.'s statements to her father were nontestimonial in nature.

The State concedes that D.D.'s statements to Detective Given are testimonial. However, in line with the above, the district court acted within its discretion in admitting these statements because the child victim testified and the district court assessed these statements for reliability under NRS 51.385. We therefore discern no error with regard to Detective Given's testimony.

122 Nev. at 482-83, 138 P.3d at 790-91 (footnotes omitted).

-12-

1    The state supreme court's rejection of this claim was neither contrary to nor an
2  unreasonable application of clearly established federal law as determined by the United
3  States Supreme Court.

4    On the availability issue, the Supreme Court rarely has addressed what it means to be
5  "unavailable" for Confrontation Clause purposes.  *See,e.g., Hardy v. Cross*, 132 S.Ct. 490
6  (2011)(per curiam); *Meras v. Sisto*, 676 F.3d 1184, 1191 (9th Cir. 2012)(Bea, J., concurring).
7  There are no Supreme Court decisions intimating, much less holding, that a witness may be
8  "unavailable" for Confrontation Clause purposes even though they actually take the stand and
9  testify, albeit allegedly too vaguely to allow allegedly effective cross-examination.

10    The more general – or undeveloped – that a rule is in Supreme Court jurisprudence,
11  the more leeway that the state courts have in reaching outcomes in particular applications.
12  It is not an unreasonable application of clearly established federal law for a state court to
13  decline to apply a specific legal rule that has not been squarely established by the Supreme
14  Court.  *See,e.g., Harrington v. Richter*, 131 S.Ct. 770, 786 (2011).

15    Here, as noted by the state supreme court, established principles of Confrontation
16  Clause law cut directly against petitioner's argument.   As the Ninth Circuit recently
17  summarized the relevant principles in the Supreme Court's jurisprudence:

18            . . . "'[t]he Confrontation Clause includes no guarantee that
     every witness called by the prosecution will refrain from giving
19     testimony that is marred by forgetfulness, confusion, or evasion.'"
     *United States v. Owens*, 484 U.S. 554, 558, 108 S.Ct. 838, 98
20     L.Ed.2d 951 (1988) (quoting *Delaware v. Fensterer*, 474 U.S. 15,
     21–22, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985)(per curiam)).  All the
21     Confrontation Clause requires is the ability to cross-examine the
     witness about his faulty recollections. *Id.*; *see also Crawford v.*
22     *Washington*, 541 U.S. 36, 59 n. 9, 124 S.Ct. 1354, 158 L.Ed.2d
     177 (2004) ("Finally, we reiterate that, when the declarant
23     appears for cross-examination at trial, the Confrontation Clause
     places no constraints at all on the use of his prior testimonial
24     statements.").

25  *United States v. Romo-Chavez*, 681 F.3d 955, 961 (9th Cir. 2012).

26    Particularly given the unqualified statement in *Crawford* that the Confrontation Clause
27  places "no constraints at all" on the use of a declarant's prior testimonial statements when the
28  declarant testifies at trial, the state supreme court's rejection of petitioner's claim clearly was

-13-

1   neither contrary to nor an unreasonable application of clearly established federal law as
2   determined by the United States Supreme Court.  This Court has substantial doubts as to
3   whether petitioner's novel "unavailability" argument would carry the day even on a *de novo*
4   review.  The argument plainly does not carry the day on highly deferential merits review under
5   AEDPA.[4]

6        If petitioner cannot prevail on the unavailability issue on federal habeas review under
7   AEDPA, that in truth is the end of the matter with regard to the claims in Ground 2.  As
8   *Crawford* reflects, if the child victim was "available" and testified, the Confrontation Clause
9   placed no constraints on the admission of her prior statements, even if the prior statements
10  *arguendo* were "testimonial" under *Crawford*.

11       In any event, on the "testimonial statement" issue, the state supreme court's rejection
12  of petitioner's claim regarding the victim's statements to her father also was neither contrary
13  to nor an unreasonable application of clearly established federal law.

14       In *Crawford*, the Supreme Court held that admission of an out-of-court "testimonial"
15  statement by a witness, is barred by the Confrontation Clause of the Sixth Amendment unless
16  the witness is unavailable and the defendant had a prior opportunity to cross-examine the
17  witness.  *See* 541 U.S. at 52, 59 & 68-69.  However, quite clearly, "not all hearsay implicates
18  the Sixth Amendment's core concerns" under *Crawford*.  541 U.S. at 51.  Sixth Amendment
19  protections instead apply only to out-of-court statements that were "testimonial" in nature.
20  541 U.S. at 52.

21       / / / /

22

23      _____

24       [4]The Court does not tacitly adopt petitioner's characterization of the then eight-year-old child victim's
        testimony as its own.  The child victim in fact provided definitive testimony on a number of specific points
25      regarding the sexual assault, as to which petitioner was convicted; and she adhered to that testimony on
        cross-examination and redirect.  However, as chronicled by petitioner, she gave inconclusive responses on
26      other points, including in particular regarding the lewdness charge on which petitioner ultimately was not
        convicted and further regarding with whom she talked about the sexual assault incident.  See #22, Ex. 18, at
27      12-31.  The salient point under previously-established Confrontation Clause case law is that any deficiencies
        in her testimony were subject to exploration, and were explored, on cross-examination.  Under established
        Supreme Court jurisprudence, that is "[a]ll that the Confrontation Clause  requires."  *Owens*, 484 U.S. at 558.
28      Petitioner's claim runs against, rather than with, the grain of established Confrontation Clause case law.

1    Significantly, the *Crawford* Court did not provide a definitive guide as to what

2 statements were and were not "testimonial."  As the Ninth Circuit has observed:

3               . . . .   The [*Crawford*] Court identified "[v]arious
     formulations" that had been offered to define the "core class of
4    'testimonial' statements." *Crawford*, 541 U.S. at 51, 124 S.Ct.
     1354. One of these formulations included statements "made
5    under circumstances which would lead an objective witness
     reasonably to believe that the statement would be available for
6    use at a later trial." *Id.* at 52, 124 S.Ct. 1354 (internal quotation
     marks omitted).  But the Court did not adopt this formulation, or
7    any other. It left "for another day any effort to spell out a
     comprehensive definition of 'testimonial,'" and held only that,
8    "[w]hatever else the term covers, it applies at a minimum to prior
     testimony at a preliminary hearing, before a grand jury, or at a
9    former trial; and to police interrogations." *Id.* at 68, 124 S.Ct.
     1354. This left the term susceptible to a broad range of
10   reasonable applications. *See Yarborough v. Alvarado*, 541 U.S.
     652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004).  Indeed, the
11   Court acknowledged that its "refusal to articulate a
     comprehensive definition [would] cause interim uncertainty."
12   *Crawford*, 541 U.S. at 68 n. 10, 124 S.Ct. 1354.

13 *Meras*, 676 F.3d at 1188.

14    In its June 19, 2006, decision in *Davis v. Washington*, 547 U.S. 813 (2006), the

15 Supreme Court again expressly declined to establish "whether and when statements made

16 to someone other than law enforcement personnel are 'testimonial.'"  547 U.S. at 823 n.2.

17    Accordingly, at the time of the July 20, 2006, decision in question by the Supreme

18 Court of Nevada,[5] the Supreme Court not only had left the term "testimonial" largely

19 undefined, if further had expressly left open the question of "whether and when statements

20 made to someone other than law enforcement personnel are 'testimonial.'  Clearly, the state

21 supreme court's rejection of petitioner's claim that the child's statements to her father were

22 not "testimonial" under the inchoate standard left by *Crawford* was neither contrary to nor an

23 unreasonable application of clearly established federal law.  *Accord Alberni v. McDaniel*, 458

24 F.3d 860, 866 (9th Cir. 2006)(constitutional principle could not be regarded as clearly

25 established where the Supreme Court had expressly declared the issue an open question).

26 _____

27        [5]In applying the AEDPA deferential standard of review, "clearly established federal law as determined
   by the United States Supreme Court" refers to the law at the time of the state-court decision on the merits.
28 *Greene v. Fisher*, 132 S.Ct. 38 (2011).

-15-

1    Petitioner urges that the child's statements to her father were testimonial under
2    *Crawford* because "they were more than casual [remarks] made during casual conversation."[6]
3    He relies in this regard upon federal appellate decisions rejecting claims that statements were
4    testimonial in situations where the statements were made during casual conversation between
5    friends or family members.   This Court is not sanguine that the lower federal courts in
6    question thereby were stating a rule that noncasual statements between family members thus
7    were "testimonial" under *Crawford*.   In all events, however, the decisions of lower federal
8    courts do not constitute "clearly established federal law as determined by the United States
9    Supreme Court" on AEDPA review.  There is no Supreme Court precedent – and was no such
10   precedent at the time of the state supreme court's July 20, 2006, decision – holding that a
11   statement to a family member that are more than casual remarks during casual conversation
12   are testimonial statements under *Crawford*.   Nor was the state supreme court required by
13   then-existing Supreme Court jurisprudence to conclude that, objectively, a young child in the
14   victim's situation reasonably would believe that her statements to her father would be
15   available for use later at a trial, assuming that a child of that age reasonably would know of
16   and contemplate such things.

17       The state supreme court's rejection of petitioner's "testimonial statement" argument as
18   to the child's statements to her father thus was neither contrary to nor an unreasonable
19   application of United States Supreme Court precedent at the time of the court's decision.[7]

20       Ground 2 therefore does not provide a basis for federal habeas relief.   Petitioner
21   cannot prevail on the "unavailability" issue on deferential review, and that issue wholly
22   undercuts his claim.  Petitioner further cannot prevail on the "testimonial statement" issue with
23   respect to the child's statements to her father, even if he otherwise could prevail on the
24   "unavailability" issue.

25

26   _____

27       [6]#46, at 10.

28       [7]Patano did not contend that the child's statements to her mother were testimonial.  *See* 122 Nev. at
     791 n.2, 138 P.3d at 483 n.2.

-16-

***Ground 3:  Jury Possession of Excluded Transcript of Confession***

In Ground 3, petitioner alleges that he was denied rights to confrontation, due process and a fair trial because the jury was given copies of a transcript of his confession in spite of a trial court ruling that the transcript, as distinguished from an audio recording of the statement played at trial, was not admissible.

The Supreme Court of Nevada summarized the relevant facts and held as follows regarding the corresponding claims presented to that court:

> The district court also permitted the playing of an audiotaped interview between Detective Given and Pantano regarding the incident.  As part of this procedure, the court also permitted the prosecution to distribute copies of an uncertified transcript of the interview for the limited purpose of allowing the jury to read along while the taped version was played.  The transcript, however, was not admitted into evidence.  After hearing final arguments and the court's instructions, the jury returned verdicts of guilty on both charges.
>
> Prior to the reading of the verdicts following deliberations, the defense noticed that several jurors were in possession of the excluded transcript.  Unsure as to how to proceed, the defense waited until after rendition of the verdicts before moving for a mistrial.
>
> Following a hearing on the mistrial motion, the district court found that the transcript contained an admission relating to the lewdness charge that was not included in the audiotape due to a copying error.  Because the portions of the tape played at trial did not contain the admission, and because the State introduced no other evidence in support of the lewdness count, the district court granted a mistrial as to the lewdness count only. The district court eventually dismissed the separate charge after the State elected not to pursue it further.
>
> . . . . .
>
> *Jury's possession of excluded transcript during deliberations*
>
> As stated, the district court restricted its mistrial order to the lewdness verdict.  Pantano argues that the continued possession of the excluded transcript infected the deliberations on both charges and, accordingly, that the district court should have granted a mistrial as to the entire case.  In addition to the portion of the written statement omitted from the tape, he asserts that the transcript contained excessive blanks and omissions not reflected on the tape, and improperly failed to reflect the inflection of his voice in response to several questions soliciting admissions.  More specifically, Pantano asserts that the tape accurately reflects one "I did" response as interrogative, whereas

-17-

the transcript erroneously reflects the same "I did" response in the declarative voice.

Under *Winiarz v. State*, "[t]he determination of whether reversible prejudice has resulted from jurors' consideration of inadmissible evidence in a given case 'is a fact question to be determined by the trial court, and its determination will not be disturbed on appeal in the absence of a showing of an abuse of discretion.'"  Relevant considerations in such an analysis include (1) "'whether the issue of innocence or guilt is close, [(2)] the quantity and character of the error, and [(3)] the gravity of the crime charged.'"

Because Pantano failed to include the tape or transcript of his confession in the record on appeal, we must resolve this claim of error based upon Detective Given's testimony at trial. That testimony recounted Pantano's confession to sexual assault, which confirmed D.D.'s accusations to her parents and in open court.

We conclude that the district court's limited mistrial ruling satisfies the *Winiarz* criteria.  First, as noted, the evidence adduced as to the sexual assault count finds more than adequate support in D.D.'s testimony and Pantano's confession, as conveyed in Detective Given's testimony.  Second, the quantity and character of the error appears slight, given that the jury heard the tape with the accurate voice inflections and was previously exposed to the excluded transcript, without objection, during the playing of the tape. Third, although the gravity of a sexual assault charge is serious indeed, it does not appear that the sexual assault verdict was in any way influenced by the lewdness admission or by any of the alleged blanks or omissions.  Finally, Pantano offers no concrete theory that the lewdness confession somehow infected deliberations on both charges. Accordingly, any prejudice relating to the sexual assault verdict resulting from the jury's possession of the excluded transcript was harmless beyond a reasonable doubt.

Based upon this record, we conclude that the district court properly acted within its discretion in granting a mistrial as to the lewdness count only.

122 Nev. at 786-87 & 791-93, 138 P.3d at 480 & 483-84 (citation footnotes omitted).

The state supreme court's implicit rejection of petitioner's constitutional claims on the merits was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court.[8]

---

[8]*Cf. Fenenbock v. Director*, 681 F.3d 968, (9th Cir. 2012)(implicit ruling on constitutional claim).  The Court further notes that on direct appeal petitioner argued the *Winiarz* case applied by the state supreme

(continued...)

-18-

1    At the outset, review under § 2254(d)(1) is limited "to the record that was before the

2 state court that adjudicated the claim on the merits."  *Pinholster*, 131 S.Ct. at 1388.  Here,

3 petitioner did not include a copy of either the transcript or the tape of the statement in the

4 record presented on appeal to the Supreme Court of Nevada, which is the court that

5 adjudicated the claims on the merits.  Federal habeas review thus is restricted under §

6 2254(d)(1) to the same record presented to the state supreme court on appeal when it

7 adjudicated the claims.[9]  The transcript, Exhibit 85 in this matter, therefore may not be

8 considered by this Court in applying the standard of review under § 2254(d)(1).

9    Turning to review of the constitutional claims, the state supreme court's implicit

10 rejection of the Confrontation Clause claim was neither contrary to nor an unreasonable

11 application of clearly established federal law as of the time of the court's July 20, 2006,

12 decision.  The alleged statements in question were Pantano's own statements.  Their

13 presentation to the jury, regardless of whether or not presented in a manner consistent with

14 the trial court's ruling, therefore did not necessarily implicate Confrontation Clause protections

15 under clearly established federal law on July 20, 2006.  *See,e.g., Romo-Chavez*, 681 F.3d at

16 961 (challenged translations were construed as defendant's own statements and thus did not

17 implicate Confrontation Clause).[10]

18 ──────────────

19    [8](...continued)

20 court as a case applying the enunciated standard "in light of the confrontation clause and due process
implications."  See #22, Ex. 36, at 37.  Petitioner has not contended here in the district court that the claim

21 instead is subject to *de novo* review.

22    [9] *See also* 131 S.Ct. at 1400 ("'must be assessed in light of the record the court had before it'")("must
overcome the limitation of § 2254(d)(1) on the record that was before that state court"); *id.*, at 1402 n.11 ("has

23 failed to show that the California Supreme Court unreasonably applied clearly established federal law on the
record before that court"); *id.*, at 1404 n.14 ("Both parties agree that these billing records were before the

24 California Supreme Court.")  Nothing in *Pinholster* supports a view that federal habeas review extends to
materials *arguendo* in the state district court record that were not included in the record on appeal when the

25 state supreme court adjudicated the claims on the merits.

26    [10]Judge Berzon questioned the viability of the underlying Ninth Circuit case law following upon 2009
and 2010 decisions of the United States Supreme Court.  681 F.3d at 962 n.1 (Berzon, J., concurring).

27 However, in this case, the reviewing court must look instead to the law as it stood at the time of the state
supreme court's July 20, 2006, decision.  *Greene, supra.*  Judge Berzon acknowledged that *Crawford* alone

28                                                                                                        (continued...)

1    Petitioner further has not demonstrated that the state supreme court's implicit rejection

2  of his due process and fair trial claims further was either contrary to or an unreasonable

3  application of clearly established federal law as determined by the United States Supreme

4  Court.  Petitioner relies upon an assortment of federal appellate decisions arising in what

5  petitioner maintains are analogous situations in federal criminal cases and/or pre-AEDPA

6  federal habeas cases decided on *de novo* review.  Petitioner does not identify any controlling

7  Supreme Court decisions concerning the right to a due process or to a fair trial in apposite

8  circumstances that were contrary to the state supreme court's decision or that were

9  unreasonably applied in rejecting his claims.[11]

10    The rights to due process and a fair trial guarantee that a criminal defendant will be

11  treated with "'that fundamental fairness essential to the very concept of justice.'"  *E.g., United*

12  *States v. Valenzuela-Bernal*, 458 U.S. 858, 872 (1982)(quoting prior authority).  In order to

13  find such a denial of the rights to due process and a fair trial, the reviewing court "'must find

14  that the absence of that fairness fatally infected the trial [such that] the acts complained of

15  must be of such quality as necessarily prevents a fair trial.'"  *Id.*  Trial errors "rise to the level

16  of due process violations only when they so infect the fairness of the trial as to make it 'more

17  spectacle or trial by ordeal than a disciplined contest.'"  *Id.*

18    / / / /

19

20    [10](...continued)

21  likely would not have been enough to overturn the prior circuit precedent, and he of course was writing a
concurring rather than a majority opinion.

22    [11]Petitioner begins the reply on Ground 3 with extended argument and case citation seeking to

23  establish that the presentation of the transcript to the jury violated his rights to an impartial jury and to a jury
trial under the Sixth Amendment.  #46, at 13-14.  No such legal claims were alleged in Ground 3 in the

24  counseled amended petition.  Petitioner may not use the federal reply to amend the petition.  *E.g., Cacoperdo
v. Demosthenes*, 37 F.3d 504, 507 (9th Cir.1994).  The only way to add what in truth are new legal claims to

25  Ground 3 is by a properly-filed amended petition.  At this juncture, under Rule 15(a) of the Federal Rules of
Civil Procedure, petitioner can amend the petition only with respondents' written consent or by obtaining

26  leave of court to amend.  Significantly, neither was obtained, despite repeated rejections by this Court of similar
attempts by the Federal Public Defender in prior habeas cases to *de facto* amend the petition by adding new

27  claims in the reply.  Habeas pleading is not notice pleading, either as to the underlying facts or as to the legal
theories relied upon.  Additionally, it does not appear that these belated new legal claims were exhausted.

28  The late-breaking added legal claims are disregarded herein.

1    Even without regard to deferential review under AEDPA, the circumstances under

2    which such a violation will be found are limited.  As the Supreme Court explained in *Dowling*

3    *v. United States*, 493 U.S. 342 (1990):

4

5           Beyond the specific guarantees enumerated in the Bill of
     Rights, the Due Process Clause has limited operation.  We,
     therefore, have defined the category of infractions that violate

6    "fundamental fairness" very narrowly.   As we observed in
     *Lovasco, supra*, at 790, 97 S.Ct., at 2048;

7

8          "Judges are not free, in defining 'due
     process,' to impose on law enforcement officials
     [their] 'personal and private notions' of fairness and

9    to 'disregard the limits that bind judges in their
     judicial function.'  *Rochin v. California*, 342 U.S.

10   165, 170, 72 S.Ct. 205, 208, 96 L.Ed. 183 (1952)....
     [They] are to determine only whether the action

11   complained of ... violates those 'fundamental
     conceptions of justice which lie at the base of our

12   civil and political institutions,' *Mooney v. Holohan*,
     294 U.S. 103, 112, 55 S.Ct. 340, 341, 79 L.Ed. 791

13   (1935), and which define 'the community's sense of
     fair play and decency,' *Rochin v. California, supra*,

14   at 173, 72 S.Ct., at 210."

15   493 U.S. at 352-53.

16    Moreover, with regard to deferential review under AEDPA, as previously noted, the

17   more general that a rule is in Supreme Court jurisprudence, the more leeway that the state

18   courts have in reaching outcomes in particular applications.  *See,e.g., Harrington, supra*.  The

19   above-described standard for deprivation of rights to due process and a fair trial is as about

20   a general of a rule as there can be in this regard.

21    In the present case, petitioner's claim boils down to the contention that he was denied

22   fundamental fairness as to his sexual assault conviction because the jury saw:  (a) his alleged

23   statement in the transcript as to a charged lewdness offense as to which the state trial court

24   subsequently declared a mistrial and as to which he does not stand convicted; (b) the words

25   "I did" – that the jury heard on the tape – reflected in the transcript as – allegedly – an

26   affirmative declaration when the words instead were said as a question; and (c) allegedly

27   "excessive" omissions and blanks being reflected in the transcript that allegedly were not

28   reflected by the tape that the jury in fact heard.  The state supreme court hardly unreasonably

-21-

1   applied the general standard discussed above when it rejected petitioner's claims in essence

2   that the improper jury possession of the transcript "violate[d] those 'fundamental conceptions

3   of justice which lie at the base of our civil and political institutions."   Such matters hardly

4   denied Pantano due process and a fair trial, particularly given:  (a) that he admitted – in

5   uncontested undeniably declarative statements in his taped statement – that he sexually

6   assaulted the child victim; and (b) that the jury already had been allowed – without defense

7   objection – to follow along in the transcript when the tape was played.[12]

8          In the alternative, the Court reaches the same conclusion on *de novo* review.   For

9   substantially the reasons assigned above, the possession of the transcript in contravention

10  of the trial court's ruling did not deny petitioner fundamental fairness.[13]

11         The Court further notes in this regard that, if it were to consider the transcript, Exhibit

12  85 in this matter, on a *de novo* review, the transcript belies two central factual allegations

13  made by petitioner on this claim.

14

15         [12]See #22, Ex. 20, at 123; *id.*, Ex. 28, at 6.

16         [13]The pre-AEDPA decision upon which petitioner places principal reliance would not dictate the
17  outcome of this case even on *de novo* review, much less on deferential AEDPA review.

18         In *Dickson v. Sullivan*, 849 F.2d 403 (9th Cir. 1988), a deputy sheriff responsible for supervising the
    jury during trial stated to two jurors that the defendant had "done something like this before."   The state
19  appellate court held that the deputy's comment violated the defendant's Sixth Amendment right to
    confrontation but held that the error did not require reversal of the conviction.   The Ninth Circuit vacated the
20  conviction on federal habeas review applying a standard from federal criminal trials that a new trial was
    required following the comment if there was "a reasonable possibility that the extrinsic material *could* have
21  affected the verdict."   849 F.2d at 405 (emphasis in original).

22         As discussed in the text, the Confrontation Clause is inapplicable in *this* context under controlling
    Ninth Circuit law because the statements in question on the transcript are petitioner's own alleged
23  statements.   *Dickson* does not state an overarching principle – much less one applicable on deferential
    AEDPA review – of due process that an occurrence such as was involved in this situation mandates reversal
24  if there was "a reasonable possibility that the extrinsic material *could* have affected the verdict."   That is not
    the governing constitutional standard stated in the Supreme Court opinions discussed in the text, and it would
25  not be applied by this Court even on a *de novo* review.

26         On deferential review, *Dickson* even more clearly does not dictate the outcome in this case.   On such
    review, petitioner of course must demonstrate that the state court's rejection of his claim was contrary to or
27  an unreasonable application of clearly established law as determined by the United States Supreme Court.
    Citing a pre-AEDPA federal appellate case applying pre-AEDPA federal criminal appellate case law to a
28  habeas case does not carry petitioner's burden under AEDPA.

*First*, the transcript in fact shows Pantano's response as a *question, not* as a declarative statement.  In the trial court, defense counsel stated that the transcript showed the words as a declaration rather than a question.[14]  Trial counsel's argument was repeated on direct appeal,[15] but, as noted previously, petitioner did not include a copy of either the transcript or the tape in the record presented on appeal to the Supreme Court of Nevada.  What the transcript actually contains is the following: "I did?"[16]  The moving factual premise for this part of petitioner's claim is clearly and directly refuted by the actual record.[17]

*Second*, per the record presented to this Court, the challenged material regarding the lewdness count that allegedly was in the transcript but not on the tape was *not* the only evidence supporting the lewdness count, as petitioner maintains.[18]   According to the transcript, Pantano also admitted in another portion of his statement that his penis "was kinda touchin' her butt" as he was masturbating.[19]  Petitioner has not argued that other portions of the transcript, such as this particular statement, were not contained in the tape; and, similar

---

[14]#22, Ex. 28, at 4.

[15]#22, Ex. 37, at 50.

[16]#24, Ex. 85, at 56.

[17]The Court additionally would note that the "I did?" response was in response to a question as to whether petitioner put his finger inside the child victim's vagina.  At this point in his statement, petitioner still was equivocating and denying the sexual assault offense.  He later expressly admitted in his statement sufficient penetration of the child's vagina with his finger to constitute a sexual assault.  E.g., *id.*, at 60-64.  Even if, *arguendo*, the transcript instead had reflected "I did" rather than "I did?" any prejudice from such a mistranscription – which never happened – would have been wholly eliminated by petitioner's later confession to the crime.  But, in all events, petitioner's assertion that the transcript reflected "I did" is utterly refuted by the actual record presented to this Court.

Rule 11 of the Federal Rules of Civil Procedure requires that federal habeas counsel do more than merely parrot factual argument from state court filings without examining the actual record.  Arguing a factual point that is directly belied by the record is, at the very best, unpersuasive.

[18]See #46, at 22, line 19; 24, lines 8-9; & 25, lines 2-3.

[19]#24, Ex. 85, at 73.  On the same page, petitioner stated "I don't remember" when asked whether his penis touched the child's "butt crack."  However, his statement that his penis "was kinda touchin' her butt" was sufficient for a lewdness conviction.  The statements on page 73 of the transcript are not at the start or end of a changed tape.

-23-

to the state court direct appeal, petitioner has not provided this Court with a copy of the tape.[20] On the record presented to this Court, the evidence clearly preponderates that there was other, unchallenged evidence in petitioner's statement to support the set-aside lewdness conviction.  While Pantano perhaps persuaded the state trial court to declare a mistrial in part on the premise that there was no other evidence supporting the lewdness count, this Court, on *de novo* review, is not required to ignore what it sees with its own eyes in assessing the alleged collateral impact on the sexual assault conviction from the challenged statement as to the lewdness count being before the jury in the transcript.  The challenged passage that was in the transcript alone was duplicative of other evidence in Pantano's confession that even more strongly supported the lewdness count.

That would leave only the allegedly excessive omissions and blanks – as to a recorded statement that the jury listened to – as the sole remaining factual underpinning of the claim. On an *arguendo de novo* review, the Court has no difficulty at all holding that the jury's possession of a transcript with such allegedly "excessive" omissions and blanks did not "violate those fundamental conceptions of justice which lie at the base of our civil and political institutions."

Ground 3 does not provide a basis for federal habeas relief.

### Ground 4:  Alleged Prosecutorial Misconduct

In Ground 4, petitioner alleges that he was denied rights to due process and a fair trial because of prosecutorial misconduct.  He alleges in particular:  (a) that the prosecutor inappropriately sought to inflame the jury and appeal to their passions and emotions by urging jurors to convict Pantano to make the victim's parents "feel better" and improperly injected her personal opinion into the argument; (b) that the prosecutor inappropriately argued evidence that was never admitted which implied Pantano's guilt, disparaged defense counsel and the defense, talked about religious characters, and again injected her personal opinion; (c) that

---

[20]Petitioner – who is represented by counsel herein – at all times has the burden of proof on federal habeas review.  If he does not present all possibly available state court record material, then the case will be decided on the inferences supported by the material presented.

the prosecutor improperly elicited testimony from a State witness that lying to a suspect is legal, in an effort to bolster the witness' credibility; and (d) improperly elicited testimony referencing a prior bad act.

With regard to Grounds 4(a) and 4 (b), the Supreme Court of Nevada summarized the relevant facts and held as follows regarding the claims presented to that court:

> *Prosecutorial misconduct*

> *Closing arguments*

> Pantano argues that the prosecution made several improper statements during closing argument. The first prosecutorial statement with which Pantano takes issue was as follows: "There's no doubt he's guilty. This is a parent's worst nightmare. Make them feel better. Thank you." The State notes that the prosecutor made this statement after extensively discussing the evidence adduced against Pantano and that the prosecutor was entitled to comment on and interpret the evidence.

> Regardless of any logical or rhetorical connection that the State might wish to draw during closing argument, this type of comment is always improper.  With regard to the statement, "[t]here's no doubt he's guilty," the prosecutor improperly stated her personal opinion regarding Pantano's guilt.  Further, the two sentences following the statement of guilt were also improper because they urged the jury to convict on a basis other than the evidence.   In telling the jury that the crime committed is a "parent's worst nightmare" and asking the jury to aid the parents in their suffering through conviction, the prosecution improperly appealed to juror sympathies by diverting their attention from evidence relevant to the elements necessary to sustain a conviction.  Making D.D.'s parents feel better is not one of these elements.

> Despite the impropriety of these statements, we conclude that they were harmless beyond a reasonable doubt, given that D.D. testified to the acts underlying the alleged sexual assault and that Pantano confessed to them. Further, the district court sustained the defense's objection and instructed the jury to disregard the statements, which supplied Pantano with an adequate remedy. We do, however, admonish the prosecution to refrain from such commentary in the future.

> Pantano also takes issue with the State's comments made during its concluding remarks:

> > BY [State]: Most of what he [defense counsel] just said [argued] is inadmissible, inappropriate, and should never have been said.

-25-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

> [Defense]: Objection, Judge. If it was inadmissible, inappropriate, Your Honor would have sua sponte stopped me.
>
> [State]: Well—
>
> [Defense]: That's improper on her part.
>
> THE COURT: The Court will sustain the objection.
>
> [Defense]: Move to strike.
>
> BY [State]: If I had said anything about Daniel and the Christians—
>
> THE COURT: Granted.
>
> [State]: Sorry?
>
> THE COURT: Granted.
>
> BY [State]: If I had said anything about Daniel and the Christians, there would have been a mistrial. If I had started talking about, well, speculate about sperm on the panties, there would have been a mistrial, because you can't speculate. There was no DNA analysis done on the panties, so you can't speculate whether or not there was sperm there ....

The State made these statements in response to arguments by defense counsel that he felt like the proverbial "Daniel in the lions' den," in dealing with the State's case, and arguing that the State provided no toxicological evidence, *i.e.*, the presence of sperm or semen, in support of its case. Regardless of whether these arguments were "invited," we agree with Pantano's claims of error on this issue.

First, we view as improper the prosecution's rebuttal argument characterizing the defense's closing argument as inadmissible and inappropriate, because such argument improperly disparaged the defense. While the prosecution may object to a defense argument perceived as improper, it may not first argue to the jury, rather than the court, that the defense's argument was improper. We conclude, however, that Pantano received the remedy for this statement when the district court sustained his objection and granted his motion to strike.

Second, the defense polemics concerning "Daniel and the Christians" and the speculation about the lack of physical evidence does not justify the prosecution's continuation of a properly stricken line of argument. It is also improper to argue that the State would somehow not receive the same treatment as the defense under hypothetical situations, such as, "[i]f I had said

1
2
3     anything about Daniel and the Christians." Needless to say, there
      are other more effective ways to demonstrate that the State has
      met its burden of proof than to complain about something that
      has not occurred or that there is some inherent unfairness in the
      rules of trial engagement that negatively affects the State's ability
      to secure convictions in such matters.
4
5     Despite the impropriety of the State's arguments, we
      conclude that they were harmless beyond a reasonable doubt,
6     given D.D.'s testimony and Pantano's confession describing the
      assault.[FN27]

7                         FN27. Because we have applied a
8     harmless error analysis to these
      instances of prosecutorial
9     misconduct, some prosecutors may
      be tempted to continue use of the
10    arguments discredited in this opinion.
      We will not hesitate to refer such
11    misconduct in the future for bar
      discipline.

12    122 Nev. at 793-95, 138 P.3d at 484-85 (remaining footnotes omitted).

13         The state supreme court's rejection of petitioner's constitutional claims corresponding

14    to those in Ground 4(a) and 4(b) was neither contrary to nor an unreasonable application of

15    clearly established federal law as determined by the United States Supreme Court.

16         On federal habeas review of a state court conviction for constitutional error, the

17    standard of review for a claim of prosecutorial misconduct, is "'the narrow one of due process,

18    and not the broad exercise of supervisory power'" applied in federal criminal trials.  *See,e.g.,*

19    *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)(quoting *Donnelly v. DeChristoforo*, 416 U.S.

20    637, 642 (1974)).  "The relevant question is whether the prosecutor['s] comments 'so infected

21    the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Id*.

22    (quoting *Donnelly*, 416 U.S. at 643).

23         Petitioner proceeds essentially on the premise that the state supreme court's holding

24    that the prosecutor's comments were improper constituted the equivalent of a holding that the

25    comments violated due process, and he then challenges the court's conclusion that the error

26    constituted harmless error.

27         However, as this Court has observed multiple times in other cases, a conclusion that

28    prosecutorial argument was "improper" under federal decisions based on the exercise of

-27-

supervisory power in federal criminal trials and that make no pertinent constitutional holding, state court decisions applying state law standards, and/or the American Bar Association (ABA) Standards for Criminal Justice does not necessitate a conclusion that the "improper" argument violated rights to due process or a fair trial.  That is, a conceded "improper" argument does not necessarily "so infect the trial with unfairness as to make the resulting conviction a denial of due process."[21]

The Court need go no further to illustrate this point than the principal case relied upon by petitioner, *Hein v. Sullivan*, 601 F.3d 897 (9th Cir. 2010).  In *Hein*, the Ninth Circuit applied the due process standard under the aforementioned *Darden* and *Donnelly* Supreme Court decisions in conducting AEDPA review of a state court conviction.  The *Hein* panel clearly held that "[t]here were a number of instances of improper argument" in the State's closing. [22] The panel nonetheless did not conclude that the improper argument gave rise to a due process violation.  The court applied the prejudice analysis that is subsumed within the underlying due process analysis in *Darden* and *Donnelly*, not a harmless error analysis that potentially also could apply to a wholly state law impropriety.[23]

In the present case, a number of factors counsel strongly against a conclusion that the prosecutor's improper argument so infected the trial with unfairness as to make the resulting conviction a denial of due process.

First, the state trial court immediately sustained defense objections to the argument, and the court further expressly instructed the jury to disregard the comments vis-à-vis making the victim's parents feel better.

Second, while the prosecutor made undisputedly improper argument appealing to emotion, referring to her personal opinion, and disparaging defense counsel, she did not

---

[21] *See, e.g., Mario Lopes Benitez v. McDaniel*, No. 3:08-cv-00543-ECR-VPC, #70, at 12-15, 2012 WL 2151482, slip op., at *7-9 (D.Nev., June 13, 2012).

[22] 601 F.3d at 912-14.

[23] *Id.*, at 914-16.

1    misstate the evidence.  Petitioner urges that the prosecutor "improperly argued about 'sperm

2    on the panties' and DNA analysis when no such evidence existed."[24]  What the prosecutor

3    stated, however, in direct response to a defense argument, was: "There was no DNA analysis

4    done on the panties, so you can't speculate whether or not there was sperm there.  It's

5    something that you simply cannot consider."[25]  The prosecutor thus was not "argu[ing] about

6    'sperm on the panties' and DNA analysis," thereby implying that there was inculpatory

7    evidence "when no such evidence existed."  She instead was stating the very fact that *no*

8    *such evidence existed* and that the jury thus was not to consider it.  The prosecutor no doubt

9    engaged in "over the top" contentious rhetoric in other respects, as to which immediate

10   defense objection quite properly was sustained, but just as assuredly she did not misstate the

11   evidence.

12       Third, the evidence of guilt on the sexual assault charge was compelling.  Pantano

13   confessed to the crime.  And, while the child victim did not provide testimony supporting the

14   lewdness charge of which Pantano does not stand convicted, she did provide definitive

15   testimony on a number of specific points regarding the sexual assault of which he does stand

16   convicted.[26]

17       The undisputed impropriety of the prosecutor's statements under nonconstitutional

18   standards applicable to federal prosecutors, to Nevada state prosecutors under state law, and

19   under the ABA Standards of Criminal Justice, again, does not equate to a due process

20   violation in and of itself.  The state supreme court's rejection of petitioner's constitutional

21   claims was neither contrary to nor an unreasonable application of clearly established federal

22   law on the record presented to the state supreme court.  In this regard, the Court reiterates

23

24       [24]#46, at 20, lines 23-24.

25       [25]#22, Ex. 22, at 30-31.  Defense counsel had argued:  "I'll tell you something.  If there was sperm
26   DNA all over those panties, I wouldn't be standing here right now."  *Id.*, at 28.  Defense counsel's argument
     was close to, if not over, the line as well.

27
     [26]See discussion in note 4, *supra*, and trial transcript citations therein.  The Court is not persuaded by
28   petitioner's contrasting characterization of the then eight-year-old child victim's testimony as wholly unreliable.

that the more general that a rule is in Supreme Court jurisprudence, the more leeway that the state courts have in reaching outcomes in particular applications. *See, e.g., Harrington, supra.* As with the prior ground, the above-described standard under *Darden* and *Donnelly* for deprivation of rights to due process and a fair trial is as about a general of a rule as there can be in this regard.

Grounds 4(a) and 4(b) therefore do not provide a basis for federal habeas relief.[27]

With regard to Ground 4(c), the Supreme Court of Nevada summarized the relevant facts and held as follows regarding the claims presented to that court:

> *Testimony concerning propriety of subterfuge in police questioning*
>
> Pantano asserts that the prosecution improperly asked, and Detective Given improperly testified, that lying to a suspect was proper according to his training and this court's precedent. Pantano reasons that the prosecution improperly utilized this line of questioning to vouch for Detective Given's credibility and to convey inadmissible hearsay.
>
> Pantano failed to object to this testimony on the grounds he now claims. His counsel merely objected to the form of the question posed to the witness, rather than to its substance, which is generally insufficient to preserve the claimed error for appellate review[FN28] unless it rises to plain error affecting substantial rights.[FN29] We conclude that this testimony does not constitute plain error and whatever error that could be ascribed to it did not affect Pantano's substantial rights in light of D.D.'s testimony and Pantano's confession. Finally, beyond misleading a suspect concerning his constitutional rights, it is proper for police authorities to use certain types of subterfuge as part of custodial and noncustodial interrogations.
>
> FN28. *See Merica v. State*, 87 Nev. 457, 462, 488 P.2d 1161, 1163–64 (1971)(despite the defendant's objection below, the defendant's failure to specifically object on the grounds urged on appeal precluded appellate consideration on the grounds not raised below).

---

[27]Petitioner further urges that the prosecutor improperly disparaged defense counsel when she stated:  "Mr. Banks talks about all the lies, all the deceits, all the this, all the that, he yelled and hooted and hollered for how long about all the things that Detective Given said wrong."  #22, Ex. 22, at 34.  She made this comment in the course of responding to a defense argument that the detective's interview technique had been psychologically coercive because he lied to Pantano about DNA and fingerprint evidence that did not exist.  *Id.*  This "hoot and holler" statement, to which no objection was made, hardly is such as would "so infect the trial with unfairness as to make the resulting conviction a denial of due process."

1

2

3

4

> FN29.  *See Green v. State*, 119 Nev. 542, 545, 80 P.3d 93, 95 (2003)(under plain error review, this court examines whether an "error" occurred, whether it was "plain" or clear, and whether it affected the defendant's substantial rights); *see also Dzul v. State*, 118 Nev. 681, 688, 56 P.3d 875, 880 (2002).

5   122 Nev. at 793-95, 138 P.3d at 484-85 (remaining footnotes omitted).

6          At the outset as to this claim, respondents contend, without citation to supporting

7   authority, that petitioner "failed to exhaust the claim for review other than review of the

8   Nevada Supreme Court for plain error."[28]  Although exhaustion may not be waived, the

9   scheduling order directed respondents to present all procedural defenses in a single motion

10  to dismiss without consolidating procedural defenses with the merits.  As the Court repeatedly

11  has emphasized, there is nothing about an exhaustion defense such as the one belatedly

12  raised in the answer that could not have been ascertained at the time of the motion to

13  dismiss.[29]  In this case, counsel has buried an exhaustion defense, without any notice to the

14  Court of its late assertion, literally in the middle of a forty-seven page answer on an over

15  three-year-old case.  On the minimal argument made and the absence of supporting citation

16  presented at this late juncture, the Court concludes that the state supreme court addressed

17  the claim on the merits and that it is exhausted.  *Accord Walker v. Endell*, 850 F.2d 470, 473-

18  74 (9th Cir. 1987)(the panel held that the consideration of a claim as to which no

19  contemporaneous objection was made for plain error constituted an adjudication on the

20  merits, without stating that federal review then was only for plain error).

21          On the merits, the state supreme court's rejection of the claim corresponding to Ground

22  4(c) was neither contrary to nor an unreasonable application of clearly established federal law

23  as determined by the United States Supreme Court.  Petitioner relies on this ground on

24  Supreme Court and federal appellate decisions in federal criminal trials that appear to be

25  based on principles of supervisory authority rather than federal constitutional doctrine.  As the

26

27      [28]#41, at 23-24.

28      [29]See,e.g., *McCaskill v. Budge*, No. 3:08-cv-00687-ECR-WGC, #91, at 4-5.

-31-

1   Court has stated also repeatedly, a conclusion that prosecutorial argument was improper

2   under federal decisions based on the exercise of supervisory power in federal criminal trials

3   and that make no pertinent constitutional holding does not necessitate a conclusion that the

4   closing argument violated rights to due process or a fair trial.  Petitioner at bottom has failed

5   to present authority on this claim establishing that the state supreme court's rejection of the

6   claim was contrary to or an unreasonable application of clearly established federal law as

7   determined by the United States Supreme Court *applying federal constitutional standards*.[30]

8          The Court is not sanguine that it would overturn a conviction on the basis of the

9   challenged testimony even on a *de novo* review.  What the prosecutor sought to establish in

10  the testimony is indisputably true – a police officer can lie to a suspect in an effort to ferret out

11  the truth and elicit a confession.  Petitioner pejoratively characterizes this testimony as

12  "prosecutorial vouching for the witness," relying exclusively on federal criminal cases on direct

13  appeal involving closing argument rather than presentation of testimony.  However, what the

14  prosecutor was doing was responding to an extensive focus on this point during the defense

15  cross-examination and seeking to address the very argument in fact made in the defense

16  closing, that the confession should be disregarded because it was obtained through the use

17  of alleged psychological coercion and lies.  See #22, Ex. 21, at 9-18; #22, Ex. 22, at 13 & 24-

18  27.  It is highly questionable whether the testimony – to which no objection was made as to

19

20          [30]See text and note at note 21, *supra*.  In *United States v. Young*, 470 U.S. 1 (1985), the Supreme

21  Court held that the prosecutor's argument, although error, did not constitute plain error warranting overlooking
    the failure to make a timely objection.  The Court appears to have discussed fairness solely in the context of

22  applying the plain error standard of review.  Justice Brennan's separate opinion indeed repeatedly distinctly
    references review as an exercise of supervisory authority.  See 470 U.S., at 22 n.1, 24 n.3, 33 n.16 & 34

23  (Brennan, J., concurring in part and dissenting in part).  In all events, the Supreme Court found no plain error
    in *Young*, so citation to the case hardly establishes that the state supreme court unreasonably applied federal

24  *constitutional* law in not finding plain error in its case, under an exceedingly general standard of "fairness."
    *See Harrington, supra.*  The Ninth Circuit decision in *United States v. Molina*, 934 F.2d 1440 (9th Cir. 1991), is

25  subject to the same basic comments.  The First Circuit decision in *United States v. Manning*, 23 F.3d 570 (1st
    Cir. 1994), which is not binding in this circuit even on *de novo* review, expressly applied supervisory authority

26  review.  See 23 F.3d at 574 n.2.  If petitioner wishes to overturn a state court conviction under AEDPA for a
    constitutional prosecutorial misconduct violation, petitioner needs to demonstrate that the decision is contrary

27  to or an unreasonable application of Supreme Court authority applying federal constitutional law, not federal
    criminal decisions based on the exercise of supervisory authority that make no constitutional holding.  The

28  showing and argument made here fails to even begin to shoulder petitioner's burden under AEDPA.

substance – was objectionable in the first instance.  What it clearly was not was a matter that so infected the trial with unfairness as to make the resulting conviction a denial of due process, even without also taking into account the fact that Pantano confessed to the sexual assault with corroborating testimony by the then eight-year-old child victim on that offense.

Ground 4(c) does not provide a basis for federal habeas relief.

With regard to Ground 4(d), concerning testimony as to a prior bad act, the state high court denied this claim along with other claims in a blanket summary statement of denial.[31]

The deferential AEDPA standard of review applies fully to a summary rejection of a claim on the merits without assigned reasons.  *Harrington*, 131 S.Ct. at 784.  When a state court's decision is unaccompanied by an articulated explanation, the petitioner still must demonstrate that there was no reasonable basis for the state court to deny relief.  *Id.*  The state court's determination that a claim lacks merit precludes federal habeas relief under the AEDPA so long as fairminded jurists could disagree on the correctness of the state court's decision.  131 S.Ct. at 786.  When considering a summary state court denial of a claim, the federal habeas court thus "must determine what arguments or theories . . . could have supported . . . the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of" the United States Supreme Court.  *Id.*

During examination of the victim's mother, Leticia Shand, the prosecutor asked her about Pantano's familial relationship to her, as he was her nephew.  During this line of inquiry, the prosecutor asked whether Pantano ever would come over and  play with the kids at a point nearly a decade prior to the incident.  Defense counsel objected on the basis of relevancy as Shand embarked on a narrative that gave no immediately clear direction as to where it was heading.  The trial court overruled the objection, after which Shand stated, without any further questioning:  "His mom called me to get him in that house.  She told me to get him out in the house because she's scared of him."  #22, Ex. 18, at 36-37.

---

[31]*See* 122 Nev. at 796 n.30, 138 P.3d at 486 n.30 ("We have examined Pantano's other assignments of error and find them without merit.").

1    Defense counsel objected and counsel conferred with the trial court at the bench.

2  Coming off the bench conference, the court stated on the record that counsel had stipulated

3  that the last answer be stricken.  The court instructed: "Therefore, the jury will disregard it."[32]

4  Defense counsel in fact had not stipulated to merely striking the statement, however, and on

5  the next break counsel sought to make a record that he instead had requested a mistrial.[33]

6  The prosecution did not dispute that the defense had not stipulated to just striking the

7  testimony.[34]  Significantly, as well, defense counsel also acknowledged that "[c]learly, [the

8  prosecutor] didn't expect to hear that answer."[35]  After hearing the on-the-record argument,

9  the trial court denied the defense motion for a mistrial.

10    The only possibly applicable substantive standard on this claim is the general standard

11  of fundamental fairness under the Due Process Clause.  As noted herein, the more general

12  that a rule is in Supreme Court jurisprudence, the more leeway that the state courts have in

13  reaching outcomes in particular applications.  *See, e.g., Harrington, supra*.  While petitioner

14  presents this claim, at least on federal habeas review, as a prosecutorial misconduct claim,

15  the Court notes at the outset on this claim that there is absolutely no indication in the record

16  that the prosecutor intentionally elicited the testimony in question.  Every indicium in the state

17  court record, including defense counsel's express concession at the time, instead points to

18  the opposite conclusion.

19    Moreover, even if one were to assume, purely *arguendo*, that there actually was

20  prosecutorial misconduct involved in eliciting the testimony, despite the complete absence of

21  any evidence of same, there is no clearly established law in Supreme Court jurisprudence

22  establishing that the introduction of prior bad act evidence denies a defendant due process

23  of law.  The Supreme Court instead expressly reserved the question in *Estelle v. McGuire*,

24  _____

25    [32]*Id.*, at 37.

26    [33]*Id.*, at 48-56.

27    [34]*Id.*, at 51.

28    [35]*Id.*, at 51 & 53.

-34-

502 U.S. 62, 75 n.5 (1991).  The Ninth Circuit thus has held that a state supreme court therefore does not act unreasonably in concluding that the introduction of particular propensity evidence does not violate due process.  *See Alberni v. McDaniel*, 458 F.3d 860, 863-67 (9th Cir. 2006).

The Court thus is left on this claim with:  (a) a state court record, including an express defense concession, that reflects that the prosecutor did not intentionally elicit the testimony; (b) Supreme Court case law that does not establish now and did not establish at the time of the state supreme court's July 20, 2006, decision that introduction of alleged propensity evidence necessarily violates due process and denies a defendant a fundamentally fair trial; (c) the fact that the state trial court struck the testimony and expressly instructed the jury to disregard it; and (d) substantial evidence of petitioner's guilt of sexual assault, including his confession and corroborating testimony by the then eight-year-old child victim.

Against this backdrop, the state supreme court's rejection of the claim corresponding to Ground 4(d) was neither contrary to nor an unreasonable application of clearly established federal law, as fairminded jurists readily could conclude that no due process violation arose in these circumstances under controlling Supreme Court jurisprudence at the time of the state supreme court's decision.

Ground 4(d) not provide a basis for federal habeas belief.

The Court otherwise is not persuaded that the state court's rejection of the claims in Grounds 4(a) through (d) in combined cumulative effect was either contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court.  The claims are not substantially stronger in aggregate effect than they are when considered individually.

Ground 4 does not provide a basis for federal habeas relief.

### Ground 5:  Effective Assistance of Trial Counsel

In Ground 5, petitioner alleges that he was denied a right to effective assistance of trial counsel in violation of the Sixth and Fourteenth Amendments.  He alleges fifteen distinct instances of alleged ineffective assistance, which are described in more detail below.

-35-

1    On a claim of ineffective assistance of counsel, a petitioner must satisfy the

2  two-pronged test of *Strickland v. Washington*, 466 U.S. 668 (1984).  He must demonstrate

3  that: (1) counsel's performance fell below an objective standard of reasonableness; and (2)

4  counsel's defective performance caused actual prejudice.  On the performance prong, the

5  issue is not what counsel might have done differently but rather is whether counsel's

6  decisions were reasonable from his perspective at the time.  The  court starts from a strong

7  presumption that counsel's conduct fell within the wide range of reasonable conduct.  On the

8  prejudice prong, the petitioner must demonstrate a reasonable probability that, but for

9  counsel's unprofessional errors, the result of the proceeding would have been different.  *E.g.,*

10  *Beardslee v. Woodford*, 327 F.3d 799, 807-08 (9th Cir. 2003).

11    While surmounting Strickland''s high bar is "never an easy task," federal habeas review

12  is "doubly deferential" in a case governed by the AEDPA.  In such cases, the reviewing court

13  must take a "highly deferential" look at counsel's performance through the also "highly

14  deferential" lens of § 2254(d).  *Pinholster*, 131 S.Ct. at 1403 & 1410.

15    ***Ground 5(a):  Alleged Failure to Protect Speedy Trial Rights***

16    In Ground 5(a), petitioner alleges that he was denied effective assistance when trial

17  counsel allegedly failed to protect his constitutional and statutory rights to a speedy trial.

18    A complaint was filed in the justice court on May 29, 2003, and Pantano was arraigned

19  the next day on May 30, 2003.  During extensive proceedings in the justice court from that

20  date through October 2, 2003, the  justice court minutes do not reflect that Pantano requested

21  a speedy trial under either state law or the Sixth Amendment.[36]  Pantano waived any further

22  preliminary hearing on the latter date, and the matter therefore was bound over to the state

23  district court.

24    On October 16, 2003, Pantano was arraigned on an information in the state district

25  court.  Defense counsel brought to the court's attention that "[o]n the one hand my client

26  would like me to file a writ with some suppression issues, on the other hand he wants to a

27  ───────────────────

28    [36]See #21, Ex. 1, at electronic docketing pages 2-4.

1    speedy trial, and I've tried to explain to him . . . you can't have both of those things."  The

2    court explained the same thing to Pantano, that he could pursue the writ "or you can invoke

3    your speedy trial rights and have a speedy trial date set within the next 60 days but you can't

4    have both."  Pantano thereupon stated: "Speedy trial is my choice."  Nothing in the transcript

5    reflects that Pantano distinctly invoked a Sixth Amendment right to a speedy trial as opposed

6    to the state statutory right under N.R.S. 178.566 to a speedy trial "within 60 days after the

7    arraignment on the indictment or information" to which the judge instead was referring.  The

8    matter was set for a December 1, 2003, trial, with a November 25, 2003, calendar call.[37]

9           At a November 13, 2003, motion for bail reduction, defense counsel preliminarily raised

10   the matter that Pantano's desire for a speedy trial within the 60-day state period potentially

11   was hampering presentation of his defense.  Lab results, including DNA analysis, most likely

12   would not be back from the lab by the time of the scheduled trial date.   The defense

13   investigator further was in the hospital.  Counsel merely was broaching the topic.  He queried

14   preliminarily whether the circumstances might rise to the level possibly requiring a

15   competency determination following upon what at least was an unwise choice by Pantano.[38]

16          At the November 25, 2003, calendar call, defense counsel noted that his supervisor,

17   after meeting and speaking with Pantano, had a concern as to petitioner's competency.

18   Counsel further stated that he was not prepared to go to trial and felt that it would be

19   ineffective assistance to do so, as he believed, *inter alia*, that evidentiary matters and

20   suppression issues should be resolved first.  Counsel sought a continuance, but the court

21   observed that the existence of a competency issue required that the trial date be reset in all

22   events for a competency determination.   The trial setting was continued pending the

23   competency evaluation.  The transcript of the hearing does not contain any renewed request

24   by Pantano -- who had engaged in colloquy with the court earlier in the proceeding on another

25   issue – for a speedy trial, whether under the Sixth Amendment or state law.  #21, Ex. 12.

26   _____

27          [37]#21, Ex. 9, at 4-5.

28          [38]#21, Ex. 10, at 6-10.

1       When the matter came back before the trial court for a December 16, 2003, status

2  check, Pantano appeared through a new public defender, *i.e.,* the earlier referenced

3  supervisor.  Defense counsel advised the court that Pantano had been found competent.

4  Pantano did speak up at this proceeding, voicing the concern that "[i]sn't that waiving my

5  speedy trial if I – if they give me another attorney?"  The trial court stated that "we had to

6  freeze the case because of the competency issue" but that Pantano would remain in "an

7  invoked status" with regard to his original invocation of the 60-day statutory speedy trial right.

8  The trial date again was set for February 2, 2004.  Defense counsel represented that he

9  would complete the remaining steps necessary for trial preparation within that time.  Pantano

10  personally stated a desire for a quicker trial setting, but the court informed him that the

11  February 2 date was the next available and earliest possible setting.  The proceeding closed

12  with an express confirmation by Pantano and the court that he did not waive his speedy trial

13  rights.[39]

14       The matter came on for trial as scheduled on February 2, 2004.[40]

15       On the state post-conviction appeal, the Supreme Court of Nevada rejected the

16  corresponding claim presented to that court on the following grounds:

> . . . [A]ppellant claimed that his trial counsel was ineffective
> for failing to ensure his speedy trial rights.  Appellant failed to
> demonstrate that he was prejudiced.  Appellant failed to identify
> how the outcome of his trial would have been different had the
> trial been conducted earlier.  Therefore, the district court did not
> err in denying this claim.

21  #24, Ex. 82, at 4 (citation footnote omitted).

---

[39]#21, Ex. 13.  Petitioner alleges that the start of trial was delayed by the public defender's office substituting three different attorneys, that the delay was exacerbated because he had a conflict with the attorneys because they would not prepare for trial and instead insisted that he accept a plea offer, and that he continued to claim his actual innocence and invoke his constitutional right to a speedy trial.  #20, at 36. Petitioner does not cite to any portion of the state court record presented to the state supreme court on the state post-conviction appeal corroborating these factual allegations.

[40]The matter was called for trial that date, but the defense wanted to have a hearing on the child victim's competency to testify.  This hearing consumed the better part of the time available.  The trial judge finally was able to call the venire in later in the day and had them come back the next day to commence *voir dire*.  See #22, Ex. 16, at 2-5 & 132-34; #21, Ex. 1, at electronic docketing pages 8-10.

1      The state supreme court's rejection of this claim was neither contrary to nor an
2  unreasonable application of *Strickland* or other clearly established federal law.

3      At the outset, while petitioner frames the claim as one of a failure to protect Pantano's
4  state and federal speedy trial rights, petitioner presents no apposite authority establishing that
5  either his state or federal constitutional speedy trial rights in fact were violated.

6      With regard to the Nevada statutory speedy trial right, petitioner cites no Nevada case
7  law establishing that a state speedy trial violation occurred.  N.R.S. 178.566 refers to a sixty-
8  day period for a defendant "whose trial has not been postponed upon the defendant's
9  application."  Petitioner cites no Nevada state case law establishing that counsel in truth
10  allowed petitioner's statutory speedy trial right to be violated, particularly given the need to
11  pursue a competency evaluation once a question was raised as to competency.  While
12  Pantano may have voiced a desire for a speedy trial, in proceedings other than the November
13  25, 2003, proceeding, petitioner has cited no apposite Nevada state decisions establishing
14  that a state speedy trial violation in fact occurred under N.R.S. 178.566 on the procedural
15  history presented.

16      With regard to the Sixth Amendment speedy trial right, petitioner went to trial eight
17  months after his arrest and the initial charges in the justice court.  Such an interval of time
18  does not necessarily approach the threshold at which the Sixth Amendment speedy trial right
19  becomes implicated.  While petitioner cites to considerable general "boilerplate" law regarding
20  the Sixth Amendment speedy trial right in the abstract, he does not cite a single apposite case
21  establishing that Pantano's constitutional speedy trial right was violated in this case.  *Cf.*
22  *Doggett v. United States*, 505 U.S. 647, 651-52 & n.1 (1992)(noting that the lower courts had
23  found that post-accusation delay approaching a year generally was necessary to trigger a
24  Sixth Amendment speedy trial right inquiry).

25      Petitioner thus has not established by apposite citation that either his state statutory
26  or federal constitutional speedy trial right in truth was violated in this case.

27      Petitioner thus in essence claims that he was denied effective assistance of counsel
28  because trial counsel did not secure a quicker trial setting after he had invoked his state

statutory speedy trial right, albeit without a showing of an actual state or federal constitutional speedy trial violation in and of itself.

The state supreme court's conclusion that Pantano failed to present allegations tending to establish prejudice was not an objectively unreasonable application of *Strickland*.

Petitioner seeks to establish prejudice, first, on the premise that the child victim was being coached by her parents during the period before trial and therefore would not have given as definitive testimony had she testified earlier.  Petitioner seeks to maintain that the victim's testimony was deficient as maintained on the Confrontation Clause claims in Grounds 1 and 2 but nonetheless was more polished in other respects in this Ground 5(a).  He maintains that her responses were more polished in particular with respect to "certain questions and basic concepts such as honesty."[41]   Petitioner quotes from portions of the victim's July 8, 2003, preliminary hearing testimony that he maintains reflects an inability to distinguish between the truth and a lie.

The Court is not persuaded that petitioner has demonstrated a reasonable probability that, but for counsel's failure to secure an earlier trial setting, the result of the proceeding would have been different on account of the victim's testimony being substantially different. In the federal reply, petitioner quotes only selectively from the preliminary hearing testimony where the prosecutor sought to establish for the record that the child understood the difference between the truth and a lie.  Petitioner drops out the responses indicating that the child understood the difference.  Petitioner in particular drops out the critical final responses where the adult lawyer finally made a definitive connection with the child witness on the point in terms that she could relate to, and the child affirmed that she would tell the judge only what really happened and would not make anything up.[42]   When the child testified at trial, it was the third time that she had testified, including testimony on the very first day of trial when the defense challenged her competency to testify.  See #22, Ex. 16, at 119-132.  It is entirely

_____

[41]#46, at 25.

[42]#21, Ex. 4, at 80-82.

-40-

1   speculative that her answers at trial resulted from alleged coaching, if any, as opposed to

2   merely having been through the same basic line of inquiry as to truth and lies twice before in

3   the normal course of the proceedings.  Moreover, her testimony at trial was substantially the

4   same as her testimony at the preliminary hearing regarding the sexual assault.[43]

5        Petitioner further seeks to establish prejudice,  second, on the premise that the delay

6   "also resulted in the destruction of exculpatory evidence," *i.e.*, bedding and other items from

7   the crime scene.  Petitioner maintains that the bedding allegedly would have shown an

8   absence of semen and other DNA evidence, contrary to Pantano's confession where he

9   maintained that he masturbated and ejaculated during the offense, thus discrediting his

10  confession.[44]

11       This argument is a *non sequitur*.  Whether or not the trial was held sooner rather than

12  later had no causal relationship to whether alleged exculpatory evidence was destroyed.  The

13  trial could have been held on the day after petitioner's May 27, 2003, arrest and that would

14  not have resulted in evidence being preserved that theretofore had not been logged into

15  evidence by the police (although that likely would have precluded test results being available

16  on any such evidence).  One simply has nothing to do with the other.

17       Moreover, it is entirely speculative:  (a) that the bedding and other materials from the

18  May 3, 2003, incident still would have been available in their immediately post-incident

19  condition by the time of the police investigation, much less by the time of a defense request

20  made after Pantano's arrest on or about May 27, 2003; (b) that petitioner's statement to the

21  police that he ejaculated purportedly "all over the place" necessarily meant that his confession

22  would be disproved if his semen and DNA were not recovered from any such materials that

23  *arguendo* still would have been available;[45] and (c) what forensic examination in fact would

24

25       [43]Compare #21, Ex. 4, at 82-92 (preliminary hearing ) with #22, Ex. 18, at  16-19 (trial).  Further, as
     discussed *infra* as to Ground 5(l), petitioner's purported evidence of coaching itself is thin to nonexistent.

26

27       [44]#46, at 25.

28       [45]Pantano stated specifically that his semen "was spread all over everywhere," "was everywhere,"
                                                                                                    (continued...)

                                                     -41-

have shown if the post-offense condition of the materials had been preserved, as it is wholly speculative that such examination would have been materially exculpatory – based merely upon an absence of evidence of semen on particular material – rather than directly inculpatory.

According to the testimony at trial, the incident occurred on Saturday, May 3, 2003, but the victim's mother did not first learn of the incident until five days later on Thursday, May 8, 2003, when she found certain stained panties while doing laundry and questioned the victim. The mother did not immediately tell the father.  She then found blood-stained panties after having finished the rest of the laundry on the Friday.  She then told the father on the Saturday, now approximately a full week after the incident, and the sexual assault medical examination and police investigation thereafter ensued.  In light of this testimony, it is not only speculative but improbable that the bedding and other materials would have been preserved in their post-offense condition even at the beginning of the police investigation on May 10, 2003, much less when defense counsel became involved at the end of May.[46]

Even if, *arguendo*, the failure to secure an earlier trial setting had any logical or causal relationship to preservation of such evidence, petitioner has not established a reasonable probability that, but for counsel's failure to secure an earlier trial setting, the result of the proceeding would have been different on account of such evidence somehow being preserved by an earlier trial setting.  The claim of prejudice is grounded in pure speculation.

---

[45](...continued)
and "was all over."  He made these statements in the course of questioning as to whether he put his penis rather than his finger inside the child victim and whether his semen possibly might be found on or in her with her panties having been pulled down at the time. See #24, Ex. 85, at 66-67 & 73.  Pantano of course had an incentive to shade what he was saying in order to provide an explanation that did not involve actual penile penetration for his semen possibly being found on or inside the victim, as the officer was insinuating that there might be such evidence.  Purportedly disproving Pantano's inherently self-serving response by showing an absence of semen on bedding or other materials would not necessarily disprove his confession, in which he changed and shaded his account throughout.

[46]#22, Ex. 18, at 33-36 & 39-47; *id.*, Ex. 19, at 9-12.  The testimony about finishing the laundry on Friday is at 40 in Ex. 18.  Petitioner alleged on state post-conviction review that he told defense counsel on June 13, 2003, to secure the bedding materials.  See #24, Ex. 61, at 17.  It is speculative, and improbable, to the extreme that the evidence still would have been available at that time and/or would have proved what petitioner baldly alleges that it would have established.

-42-

1    Ground 5(a) therefore does not provide a basis for federal habeas relief.[47]

2    ***Ground 5(b):  Alleged Failure to Seek Suppression of Petitioner's Confession***

3    In Ground 5(b), petitioner alleges that he was denied effective assistance when trial

4    counsel:  (1) failed to seek to suppress his confession to the police on the grounds that it was

5    involuntary; and (2) failed to bring forth evidence to demonstrate that his statements to the

6    police were not corroborated by other physical and testimonial evidence.

7    ***Ground 5(b)(1)***

8    In Ground 5(b)(1), petitioner alleges that trial counsel should have challenged the

9    voluntariness of his confession because:  (a) the detective allegedly intimidated Pantano by

10   banging or slamming his fists on the table as "clearly indicated" by "thumps" on the audio

11   recording and transcript of the statement; (b) the detective allegedly raised a closed fist to

12   within a few inches of Pantano's face and said:  "Okay, well, just tell me, man.  Tell me.  Tell

13   me what happened."; (c) the detective lied to Pantano about having recovered his fingerprints

14   from inside the child victim and about DNA samples having been collected at the crime scene

15   and from the victim's body; and (d) the detective's alleged actions had an overbearing effect

16   on Pantano because he allegedly had been subjected to, witnessed, and/or heard of prior

17   police excessive force or other misconduct while in the Phillippines, San Diego, and Tijuana.

18   The Supreme Court of Nevada held as follows on the claim presented to that court:

19

20   . . . [A]ppellant claimed that his trial counsel was ineffective
     for failing to file a motion to suppress his confession. Appellant
     failed to demonstrate that his trial counsel was deficient or that he

21   was prejudiced. "The question of the admissibility of a confession
     is primarily a factual question addressed to the district court:

22   where that determination is supported by substantial evidence, it
     should not be disturbed on appeal."  Moreover, in determining

23   whether a confession is voluntary, the court looks at the totality of
     the circumstances.  During his interview by Detective Given,

24   appellant was informed that his interview was voluntary and that

25   ─────────────────

26   [47]Petitioner urges that because the state supreme court did not decide the performance issue, that
     issue is reviewed *de novo*.  However, a petitioner must establish both deficient performance and resulting

27   prejudice.  If petitioner fails to demonstrate one, the reviewing court, whether the state court or the federal
     court, need not address the other, whether on *de novo* or any other standard of review.  Petitioner failed to

28   satisfy the prejudice prong under *Strickland*, which ends inquiry on the claim.

-43-

1
2
3

        he could leave at any time. Thus, the circumstances indicate that appellant's confession was voluntary. As such, appellant failed to demonstrate that a motion to suppress had a reasonable likelihood of success.  Therefore, the district court did not err in denying this claim.

4
#24, Ex. 82, at 2-3 (footnotes omitted).

5
      The state supreme court's rejection of the claim corresponding to Ground 5(b)(1) was

6
neither contrary to nor an unreasonable application of *Strickland* or other clearly established

7
federal law.

8
      Petitioner's factual claims that the detective banged his fists on the table and held his

9
fist to within a few inches of his face at point in truth are based on nothing other than his own

10
self-serving *post hoc* assertions in his state post-conviction memorandum.[48]

11
      The transcript of the statement does indeed refer to "thumps" throughout.  However,

12
nothing in the transcript remotely reflects that these thumps were caused by an experienced

13
detective leaving a clearly audible record that he was physically intimidating an interviewee

14
into a confession.  Rather, the thumps start from the very first line of the transcribed material,

15
during a wholly mundane preliminary statement in a context where no rational person would

16
suggest that the detective would be pounding the table to intimidate the interviewee:

17
18
19

        This is Detective R. Given, P number 4890, (thumping sound) investigating a possible S/A under event number (thump) 030510-2592. Date and time is 5-28 of 03 (thump) at 1448 hours. We're here at 3010 West Charleston (thump) Boulevard, suite 120, (thump) Las Vegas, Nevada 89102. . . . .

20
#24, Ex. 85, at 1.  Nothing in the record remotely supports an inference that such thumps

21
were caused by a detective beating on the table – even as he stated his name, badge number

22
and street address – to intimidate Pantano.  Rather, a far more likely inference would be that

23
someone – such as perhaps a nervous Pantano – was drumming their fingers or otherwise

24
fidgeting too close to the microphone or recorder.  A motion to suppress based upon such

25
thumps would have received short shrift.

26
      / / / /

27
_____

28
    [48]#24, Ex. 61, at 19.

Moreover, on the face of the transcript of the statement, the interview technique in fact employed by the detective was fundamentally at odds with the "rubber hose" methodology reflected by Pantano's self-serving statements.  It is abundantly clear from the transcript that, throughout, the detective was seeing to coax, cajole and inveigle a statement from Pantano.[49]  Indeed, the statement specifically referred to by petitioner – "Okay, well, just tell me, man.  Tell me.  Tell me what happened."  – reads in the transcript clearly in that mode, with the detective coaxing and imploring Pantano to "just tell me, man . . . what happened."[50]  No one reading the transcript would come to a conclusion that base physical intimidation, rather than a seasoned interview technique, was being used to secure a confession from Pantano.

At trial, the jury heard the actual tape.  No argument was made to the jury that the recorded confession that they heard in open court was the product of physical intimidation, as purportedly "clearly indicated" by the multiple thumps heard on the tape.  Defense counsel sought to challenge the confession on other factual bases in closing argument, but not one whit of argument was presented to the jury that the detective used base physical intimidation rather than the interview technique reflected on the face of the transcript.[51]

Thus, the record in this Court belies, rather than tends to support, petitioner's bald self-serving *post hoc* assertion that the investigating detective banged on the table and held his fist inches from Pantano's face during the interview.  There was no probability that a motion to suppress premised upon such allegations would have led to the suppression of petitioner's confession.

---

[49] See,e.g., #24, Ex. 85, at 29-33 ("I don't want to blow this into anything big, huge")("not, not to make, to blow it into anything bigger than it is, is just say, you know what, this is what happened").

[50] *Id.*, at 56.  Counsel needs to provide correct record citations rather than unconfirmed record cites parroted from a *pro se* state court memorandum.

[51] E.g., #22, Ex. 22, at 25-26.  The Court notes again, as it observed as to Ground 3, that petitioner did not present a copy of the actual tape in the state court record exhibits on federal habeas review.  It also does not appear that a copy of the tape was presented to the state supreme court on either direct appeal or state post-conviction review.  Petitioner – who is represented by counsel herein – at all times has the burden of proof on federal habeas review.  If he does not present all possibly available state court record material, then the case will be decided on the inferences supported by the material presented.  The transcript plainly does not support an inference of physical coercion being applied.

1    Given that the record belied rather than supported the factual claim of physical

2    intimidation, what happened in Tijuana, San Diego and/or the Phillippines years before had

3    no significant bearing on the likely admissibility of the confession.  There was no probability

4    that such circumstances would have led to a grant of a motion to suppress in this case.

5    Petitioner's reliance upon the detective's subterfuge regarding the other evidence that

6    the police had as a basis for suppressing his confession flies in the face of long-established

7    law to the contrary.  *See,e.g., Frazier v. Cupp*, 394 U.S.731, 739 (1969); *see also Ortiz v.*

8    *Uribe*, 671 F.3d 863, 871 (9th Cir. 2011), *cert. denied*, 132 S.Ct. 1811 (2012)("this type of

9    'deception' is well within the range of permissible interrogation tactics necessary to secure a

10   lawful confession by the police").

11   For the first time in the federal reply, petitioner further relies upon the fact that he was

12   not given the *Miranda* warnings prior to or during his statement as a new basis for maintaining

13   that there was a reasonable probability that a motion to suppress would have been granted.[52]

14   The Court repeatedly has admonished federal habeas counsel that a habeas petitioner may

15   not raise a new legal claim for the first time in the reply.  Counsel instead must file a motion

16   for leave to amend the complaint.  In all events, petitioner's late-breaking *Miranda* argument

17   is wholly without merit.  *Miranda* applies only to custodial interrogations.[53]  Pantano plainly

18   was told at the outset of the interview that he could leave at any time.[54]

19   Finally, as discussed in more detail *supra* regarding Ground 5(a), it was *Pantano* who

20   personally not only made the decision – but indeed insisted – on invoking his state statutory

21   speedy trial right expressly in lieu of pursuing the suppression issue.  Petitioner attempts to

22

23   [52]#46, at 26-27.

24   [53]*Miranda* bars the admission of statements made during a custodial interrogation without the
     *Miranda* warnings first having been given.  *E.g., Yarborough v. Alvarado*, 541 U.S. 652, 660-61 (2004).  The

25   custody determination is fact specific and the ultimate inquiry is whether there is a formal arrest or restraint on
     freedom of movement of the degree associated with a formal arrest.  541 U.S. at 662.  The fact that police

26   may view the person being questioned as a suspect does not establish that the questioning is custodial.  *See
     id.*  Whatever reference defense counsel may have made to the absence of *Miranda* warnings during a

27   calendar call hearing, the issue simply was a nonstarter.

28   [54]#24, Ex. 85, at 2.

-46-

1    dismiss this fact by urging that "[e]ven assuming Pantano told counsel not to file a motion

2    because he was concerned about his speedy trial rights, defense counsel" had a professional

3    duty to pursue the motion.[55]  However, Pantano did not merely tell counsel not to file a motion

4    in some undocumented discussion.  He expressly personally elected on the record, after the

5    situation was explained to him by both counsel and the trial court, to invoke his speedy trial

6    right rather than pursuing the suppression issue.[56]

7         Under Nevada procedure, Pantano could not pursue a pretrial writ seeking to suppress

8    his conviction without waiving the 60-day statutory speedy trial period.  *See* N.R.S.

9    34.700(1)(b)(1).  As counsel and the trial judge explained to Pantano, there was not enough

10   time to pursue the writ while also invoking the 60-day rule.  After being so advised, Pantano

11   personally elected to invoke the 60-day rule rather than pursue the writ.  To be sure, there

12   was additional delay thereafter.  But the delay was for a competency determination, and a writ

13   to suppress the confession could not have been pursued while Pantano's competency was

14   being examined.  Thereafter, once he was determined to be competent, Pantano thereupon

15   immediately once again expressly and personally not only invoked, but again insisted, on the

16   60-day rule.  His actions necessarily precluded pursuit of a writ to suppress his confession

17   whether or not counsel would have wanted to pursue such a writ in his professional judgment.

18        Criminal defendants no doubt would favor a rule under which:  (a) the defendant

19   personally could make an election, against the advice of counsel, that necessarily precluded

20   certain action being taken by counsel; and (b) the defendant thereafter could overturn his

21   conviction based upon counsel's failure to pursue the action necessarily precluded by the

22   defendant's own personal election.  In all events, in the present case, the state supreme

23   court's holding that petitioner could not demonstrate prejudice from counsel's failure to seek

24   to suppress his confession was neither contrary to nor an unreasonable application of clearly

25   established federal law.  Ground 5(b)(1) thus does not provide a basis for habeas relief.

26   _____

27   [55]#46, at 27.

28   [56]See text, *supra*, at 36-39.

1     ***Ground 5(b)(2)***

2     In Ground 5(b)(2), petitioner alleges that counsel failed to contest the following alleged

3     particulars in his confession as not being corroborated by other evidence: (a) whereas he told

4     officers that he gave his cell phone to the victim's brother to play with, he did not own or

5     possess a cell phone at that time; (b) whereas he told officers that he arrived at the residence

6     at 5:30 a.m. and left at 2:00 p.m., the parents instead stated that he arrived at 9:00 a.m. and

7     left at 10:00 p.m., and another witness' testimony allegedly established that Pantano did not

8     have access to the child to commit the offense, which the child had stated occurred at

9     nighttime; (c) whereas Pantano told officers that he had ejaculated with his semen allegedly

10    being "just . . . all over," defense counsel failed to test the victim's underwear to establish that

11    the physical evidence allegedly would show that none of Pantano's DNA was present; (d)

12    whereas Pantano told officers that he kissed the victim, the State allegedly presented no

13    evidence to support Pantano's admission on this particular point; and (e) whereas Pantano

14    told officers that the victim's clothes, shorts, and/or panties had been removed to facilitate the

15    offense, the victim instead informed officers that her panties were on during the incident.

16    The Supreme Court of Nevada rejected the claim or claims presented to that court on

17    the following grounds:

18            . . . [A]ppellant claimed that his trial counsel was ineffective
       for failing to investigate whether appellant possessed a cell phone
19     at the time of the incident. Appellant claimed that he lied to the
       police about having a cell phone with him during the incident;
20     therefore, his trial counsel should have investigated to show that
       appellant did not have a cell phone at the time of the assault and
21     that would have shown his confession was false. Appellant failed
       to demonstrate that he was prejudiced. Appellant confessed to
22     the police that during the sexual assault, he distracted the victim's
       brother by allowing the brother to play a game on his cell phone.
23     In light of his confession, the victim's testimony and the physical
       evidence, appellant failed to demonstrate that such an
24     investigation would have resulted in a reasonable probability of a
       different outcome at trial.  Therefore, the district court did not err
25     in denying this claim.

26    #24, Ex. 82, at 7-8 (footnote omitted).

27    The state supreme court's express rejection of the claim with regard to the cell phone

28    allegation was neither contrary to nor an unreasonable application of *Strickland*.  The child

-48-

victim also testified that Pantano gave his cell phone to her brother to play with during the incident, so his statement to the police was not wholly uncorroborated.[57]  Moreover, there was no way to conclusively establish that Pantano had no cell phone in his possession.  Even if counsel called a witness from every conceivably possible cell phone carrier in May 2003 to testify that Pantano had no account with them,[58] that would not have established that Pantano otherwise did not have a borrowed phone in his possession or possibly a prepaid phone under no name or another name.  At bottom, Pantano's claim that he lied to the police about having a cell phone and that his entire confession therefore allegedly was false would have had to have been based either on his own self-serving testimony (and he did not testify at trial) or the testimony of others who would not have been able to conclusively rule out his possessing a cell phone without their knowing it (even if their testimony otherwise was found credible).  Trial counsel thus would have been expending considerable effort – in a case where Pantano was insisting on going to trial within state speedy trial time limits – trying to prove a negative that simply could not be conclusively proved.  All to support the most gossamer of inferences that because Pantano allegedly lied to the police about the collateral point of having a cell phone he therefore lied to the police about inserting his finger into the vagina of a seven-year-old child.  Clearly, his confession would not have been suppressed on this basis.  Nor was there a reasonable probability that such testimony would have changed the outcome at trial.  The state supreme court's holding that petitioner could not demonstrate prejudice from counsel's failure to pursue such a pointless avenue of defense was neither contrary to nor an unreasonable application of *Strickland*.[59]

---

[57] #22, Ex. 18, at 19.  The child also testified consistently at the July 8, 2003, preliminary hearing that her brother was playing with a cell phone during the incident that he got from Pantano. #21, Ex. 4, at 87.

[58] Such a list of every conceivably possible carrier would not necessarily have been restricted only to carriers available specifically in Las Vegas, given roaming capability.

[59] If Pantano had testified in support of this defense avenue, he essentially would have been testifying: "My confession demonstrably was false because I lied to the police about the collateral detail of having a cell phone, but I am not lying now when I state, facing conviction for a serious crime, that I did not have a cell
(continued...)

-49-

1    The state supreme court's implicit rejection of petitioner's remaining factual arguments

2    in this same general vein also was neither contrary to nor an unreasonable application of

3    *Strickland* or other clearly established federal law.

4    Petitioner's argument with regard to the time that he was at the victim's residence does

5    not appear to make logical sense, so the Court will quote the argument verbatim to assure

6    that it has addressed the argument as made:

7    . . . . Further, Pantano informed investigative officers he
    had arrived at Ms. Shand's apartment at approximately 5:30 a.m.

8    and left on same date at approximately 2:00pm. [sic] ([Ex. 85,] at
    19-20. In fact, two separate police reports immediately following

9    the allegations indicate Leticia Shand and Demetrice Dade [the
    victim's mother and father] stated that Pantano arrived at Ms.

10    Shand's apartment at 9:00am [sic] and left at approximately
    10:00pm [sic] on same date.   (Ex. 61, Exs. 3 & 4) Maria

11    Pantano's (Rosero) sworn affidavit states that she was then
    speaking to Leticia Shand on the telephone at approximately

12    10:00am [sic] on same date. Ms. Shand informed Maria Pantano
    that Pantano had arrived approximately one hour earlier and was

13    sleeping while DD and KD were then playing in the presence of
    Ms. Shand. (Ex. 61, Exh. 2) Thus, Pantano did not have access

14    to DD to commit the instant allegations.

15    . . . Pantano's statements to LVMPD Detective Given, if
    believed, would result in the alleged incidents occurring during

16    daylight hours.   In fact, DD's first transcribed statements to
    LVMPD detectives indicate she stated the alleged incident

17    occurred at "night time." (Ex. 61, Exh. 5.)

18    #20, at 38-39.

19    Pantano initially stated during the police interview that he was at the apartment from

20    "like four, five, three, four o'clock in the morning" until "like until afternoon like probably three

21    or four," such that he was playing with the children during the daytime.[60]  Petitioner stated this

22    approximately only one quarter of the way through the interview.  At this point, Pantano still

23    was denying that he had committed the crime, that he had touched the child inappropriately,

24

25    [59](...continued)

26    phone."  A conclusion that there was not a reasonable probability that such self-serving, and inferentially
    strained, testimony would have led to either the suppression of the confession or a different outcome at trial

27    clearly was neither contrary to nor an unreasonable application of *Strickland*.

28    [60]#24, Ex. 85, at 19-21.

-50-

1   or that he even was alone with the children at any time.  His stating, initially, that he was at

2   the apartment only during the daytime – in contrast to the evening when the incident occurred

3   – bespoke of an effort to avoid culpability.  Such a self-serving statement by an interviewee

4   who then was denying having committed the crime logically does not establish beyond

5   peradventure that he did not have access to the victim, any more than any of his other initial

6   denials did.  Nor did Pantano's initial statement as to the timeline demonstrate, logically or

7   otherwise, that his subsequent confession to the crime later in the interview necessarily was

8   false, which is what the claim in Ground 5(b)(2) purportedly concerns.

9        In any event, once Pantano did confess, he indicated to the detective, with some

10  hedging, that he thought that he committed the offense at nighttime.[61]  Pantano's ultimate

11  confession, as opposed to his initial denials, was consistent with the victim's statement to the

12  police.  Pantano's statements -- in their entirety and in full context -- thus do not establish that

13  he did not have access to the victim to commit the offense but instead corroborate the State's

14  evidence that he had such access, that he had such access at the relevant time, and that he

15  committed the offense.

16       Further, alleged statements by the mother and the father that Pantano was at the

17  apartment from 9:00 a.m. until 10:00 p.m. hardly would establish that Pantano did not have

18  access to the child at nighttime.  As the Court observed above, much of petitioner's claim in

19  this regard does not make appear to make logical sense.[62]

20       Nor would the statement alleged to have been made by Pantano's sister, Maria

21  Pantano (Rosero), establish that Pantano did not have access to the victim to commit the

22  offense.  According to the sister's alleged statement, the victim's mother said to her over the

23  telephone at 10:00 a.m. on the morning in question that Pantano then was sleeping and the

24  children were playing in her presence.  Such a statement, if admitted in the first instance over

25

26  _____

27       [61]#24, Ex. 85, at 74-76.

28       [62]See also the discussion of the actual content of the statements in the discussion of Ground 5(g),
     *infra*, at 70-71.

1 objections as to hearsay and relevance, would not establish that Pantano did not have access

2 to the child at all other times while he was there.  Such testimony would have had virtually nil

3 probative value, even if admitted over objection.[63]

4 Petitioner thus clearly cannot demonstrate prejudice under the *Strickland* standard

5 based on counsel's failure to pursue a defense based upon such timeline testimony as

6 allegedly establishing the falsity of his confession.[64]

7 Nor can petitioner demonstrate prejudice based upon counsel's failure to test the

8 victim's underwear for Pantano's semen and DNA.  Similar to the  discussion above as to

9 Ground 5(a), petitioner's statement to the police purportedly that he ejaculated "all over the

10 place"[65] does not establish that his semen necessarily would be present on the victim's

11 panties or present in sufficient quantity for forensic examination.  That is, a statement that

12 semen "was all over" does not categorically establish beyond all peradventure that each and

13 every possible surface that might thereafter be tested was covered in semen in sufficient

14 quantity for forensic examination.  Moreover, as discussed *infra* as to Ground 5(d)(1), it is not

15 established that the specific panties in evidence in fact even were the panties worn during the

16 

17     [63]The sister's affidavit actually attests that the telephone conversation occurred on May 4, 2003,

18 which actually would have been the day *after* the offense.  #24, Ex. 61, Ex. 2 thereto.  The Court assumes, *arguendo*, that she meant May 3, 2003.  Moreover, even if the testimony had been admitted over objection,

19 the witness was Pantano's natural sister.  Her testimony would have been subject to at least argument that her testimony was influenced by familial bias, which is not wholly irrelevant in determining whether there was

20 a reasonable probability that presenting such testimony would have changed the outcome at trial.  On its face, however, such testimony would not have changed the outcome even if the witness had been a wholly

21 disinterested witness.

22     [64]Nor would it appear that counsel rendered deficient performance by not presenting such a factually and conceptually flawed argument.

23 

24     [65]As the Court noted as to Ground 5(a), Pantano actually stated specifically that his semen "was spread all over everywhere," "was everywhere," and "was all over."  He made these statements in the course of questioning as to whether he put his penis rather than his finger inside the child victim and whether his

25 semen possibly might be found on or in her with her panties having been pulled down at the time.  See #24,

26 Ex. 85, at 66-67 & 73.  As noted as to Ground 5(a), Pantano of course had an incentive to shade what he was saying in order to provide an explanation that did not involve penile penetration for his semen possibly being

27 found on or inside the victim, as the officer was insinuating that there might be such evidence.  Purportedly disproving Pantano's inherently self-serving response by showing an absence of semen on the victim's

28 underwear would not necessarily disprove his confession, in which he changed and shaded his account throughout.

incident.[66]  Accordingly, *arguendo* establishing that Pantano's semen was not present on the panties worn at the time – much less the specific panties in evidence, which were not even necessarily the panties worn at the time – would not necessarily disprove his confession.  It is entirely speculative that such an examination would have been even marginally exculpatory – based upon an absence of semen on the panties tested, which did not necessarily disprove his confession – rather than instead directly inculpatory, by confirming Pantano's confession with direct physical evidence.[67]

Nor can petitioner demonstrate prejudice from trial counsel not pursuing an alleged discrepancy between his confession and the victim's statement regarding whether her panties were on or off at the time.  Petitioner maintains that Pantano told officers that the victim's clothes, shorts, and/or panties had been taken off during the offense but the victim instead informed officers that her panties were on during the incident.  Petitioner cites in this regard not to the victim's statement to the police but instead to her trial testimony.[68]  This argument is not supported by the record upon which petitioner relies.  *Both* Pantano *and* the victim stated or testified that her panties were pulled down.[69]  The victim's cited testimony was fully

---

[66]See text, *infra*, at 57-63.

[67]A defense decision to test the panties for semen and DNA thus would have been placing a bet with no compelling upside and considerable downside.  If the test results were negative, little would have been gained because an absence of semen and DNA on the panties would not necessarily have disproved Pantano's confession.  If the test results instead were positive for the presence of semen and/or specifically Pantano's DNA, then the evidence then would further corroborate his confession, helping the State prove its case.  Moreover, such evidence would establish that he not only inserted his finger into the child but also at least ejaculated on her or her pulled-down underwear, which would not have helped the defense.

What defense counsel instead did was argue that the State's failure to introduce evidence of the sheets and panties having semen on them undercut the State's case, closing with the assertion that "[i]f there was sperm DNA all over those panties, I wouldn't be standing here right now."  #22, Ex. 22, at 27-28.  Even if petitioner *arguendo* could establish prejudice, which he cannot, such a tactical decision to pursue the issue instead in that manner virtually is unassailable on the independent performance prong under the *Strickland* standard, whether on deferential review or instead on *de novo* review.

[68]See #20, at 39.

[69]See #22, Ex. 18, at 18 (child's testimony); #24, Ex. 85, at 58, 60-63, 67, 68, 71 & 73 (Pantano's confession); see also #21, Ex. 4, at 87 (child's preliminary hearing testimony);  #22, Ex. 18, at 33 (mother's
(continued...)

1   consistent with what Pantano stated in this regard.  There was no discrepancy with one

2   stating that her panties were "off" and the other stating that they were "on."  They instead both

3   stated that her panties had been "pulled down."  Moreover, even if there *arguendo* were such

4   an alleged inconsistency, there was not a reasonable probability that showing any such

5   *arguendo* inconsistency would have changed the outcome at trial.  Demonstrating such an

6   inconsistency would not necessarily demonstrate that the confession was false.

7       Finally, petitioner cannot demonstrate prejudice from trial counsel not pursuing a

8   defense based upon there being no other evidence – over and above  petitioner's own

9   express admission – establishing that he kissed the victim during the incident.  At bottom,

10  petitioner proceeds in Ground 5(b)(2) on the fundamentally flawed premise that if every jot

11  and tittle of his statement to the police is not corroborated by other evidence, then his

12  confession is demonstrably false.  Pantano's confession to the crime for which he stands

13  convicted -- sexual assault of a child under 14 – is corroborated by, *inter alia*, the victim's

14  testimony that Pantano inserted his finger in her vagina and by at least not inconsistent

15  results from the delayed medical exam.  Petitioner cites no apposite law establishing that the

16  State was required to independently corroborate his admission that he also kissed the victim

17  during the sexual assault in order to sustain a conviction.  His underlying premise on Ground

18  5(b)(2) – that if his statement was contradicted by or was not corroborated by other evidence

19  on any collateral point then his entire confession was demonstrably false – is wholly flawed.

20  He has not demonstrated prejudice by counsel's failure to pursue such a line of defense.

21      Ground 5(b)(2), which is not argued by habeas counsel in the federal reply, does not

22  provide a basis for federal habeas relief.

23          ***Ground 5(c):  Stipulation to Competency of Child Victim***

24      In Ground 5(c), petitioner alleges that he was denied effective assistance when trial

25  counsel stipulated to the competency of the victim.

26

27  ────────────────

28  [69](...continued)
    testimony as to what child told her when she first questioned her).

1      Defense counsel sought and obtained a hearing when the case was called for the first

2 morning of the trial, prior to *voir dire*, as to the victim's competency.  Following testimony by

3 the victim outside the presence of the jury venire, discussed further below, defense counsel

4 stated:  "I think she's competent, based on what I saw, so I'll submit it."[70]

5      The Supreme Court of Nevada rejected the corresponding claim presented to that

6 court on the following grounds:

7         . . . [A]ppellant claimed that his trial counsel was ineffective
for stipulating to the competency of the minor child victim.
8 Appellant argued that the short answers that the victim gave at
trial indicate that she was not competent to testify. Appellant
9 failed to demonstrate that his trial counsel was deficient or that he
was prejudiced.  Prior to trial, the district court held a hearing to
10 determine if the minor child victim was competent to testify.
Following the questioning of the victim, appellant's trial counsel
11 stipulated that the victim was competent to testify. "Tactical
decisions [of counsel] are virtually unchallengeable absent
12 extraordinary circumstances" and appellant failed to demonstrate
any such circumstances.  Further, when the testimony of the
13 victim is viewed as a whole, there is nothing to indicate that she
was incompetent. Therefore, the district court did not err in
14 denying this claim.

15 #24, Ex. 82, at 4-5 (citation footnote omitted).

16      The state high court's rejection of the claim presented to that court was neither contrary

17 to nor an unreasonable application of *Strickland* or other clearly established federal law.

18      Petitioner relies upon excerpts from the victim's testimony not from the competency

19 hearing but instead from the preliminary hearing and trial.

20      With regard to the child's preliminary hearing testimony, as discussed above regarding

21 Ground 5(a), petitioner quotes only selectively from the preliminary hearing testimony where

22 the prosecutor sought to establish for the record that the child understood the difference

23 between the truth and a lie.[71]   Petitioner omits the responses indicating that the child

24 understood the difference.  Petitioner in particular drops out the critical final responses where

25

26           

      [70]See #22, Ex. 16, at 2-5 & 119-132.

27

28      [71]Petitioner not only quotes selectively, petitioner further misquotes the child's preliminary hearing
testimony, albeit not necessarily always to petitioner's advantage.  Compare #20, at 40-41, with #21, at 80-81.

1    the adult lawyer finally made a definitive connection with the child witness on the point in

2    terms that she could relate to, and the child affirmed that she would tell the judge only what

3    really happened and would not make anything up.[72]

4         Petitioner, as noted, does not address the child's testimony at the competency hearing,

5    which was the testimony that defense counsel's challenged statement immediately followed.

6    In that testimony, *inter alia*, the child affirmed, with no difficulty, that she would "promise that

7    while you're in this room that you'll only tell things that really happened," that a lie was a "bad

8    thing," and that the truth was a "good thing."[73]

9         With regard to trial testimony, defense counsel of course did not have the benefit of

10   a transcript of the child's trial testimony – which had not occurred yet – when he submitted

11   the competency issue on the first day of trial.  In any event, the child again affirmed in her trial

12   testimony that she would promise to tell the truth.[74]

13        Petitioner otherwise relies upon selected excerpts from the child's preliminary hearing

14   and trial testimony (the latter of which, again, trial counsel did not have the benefit of at the

15   competency hearing) where she did not know or recall the answer to a question and/or gave

16   an inadequate response.  As the Court has stated previously herein, it is not persuaded that

17   the then eight-year-old child victim's testimony was rendered wholly unreliable by the selected

18   responses isolated from her full testimony.  The child provided definitive testimony, at both

19   the preliminary hearing and trial, on a number of specific points regarding the sexual assault.

20   Selectively presenting responses where she did not know or recall the answer or otherwise

21   gave an inadequate response does not establish that she was not competent to testify.

22

23        [72]#21, Ex. 4, at 80-82.

24
          [73]#22, Ex. 16, at 127-31.  The Court would note, in comparing the child's preliminary hearing and
25   competency hearing testimony, that it is not always easy for an adult examiner initially to immediately speak
     to a child witness in terms that that particular child can relate to and understand.  It of course is difficult for
26   lawyers on occasion to speak to even adult witnesses in terms that the witness can relate to and understand.
     The prosecutor here had the benefit of her prior, ultimately successful, efforts at the preliminary hearing to
27   relate to the child in terms that she individually could understand when she examined her later in the case.

28        [74]#22, Ex. 18, at 12-13.

1    In this regard, petitioner seeks to establish prejudice on the basis that he was unable

2    to effectively cross-examine the victim in violation of the Confrontation Clause.  As discussed

3    regarding Ground 2,[75] "'[t]he Confrontation Clause includes no guarantee that every witness

4    called by the prosecution will refrain from giving testimony that is marred by forgetfulness,

5    confusion, or evasion.'"  *Romo-Chavez*, 681 F.3d at 961 (quoting prior Supreme Court

6    authority).  The fact that petitioner was able to explore such matters in cross-examination

7    wholly mitigated any such alleged prejudice in this regard.

8    Neither tactical decisions of trial counsel – nor decisions by reviewing courts – are

9    made based upon only selected excerpts from a transcript, much less from a transcript of trial

10   testimony that had not even been received at the time of counsel's decision.  The state

11   supreme court's rejection of this claim based upon selective presentation of excerpts from the

12   child's testimony was neither contrary to nor an unreasonable application of clearly

13   established federal law.  When the entirety of the child's testimony is considered, including

14   her responses affirming that she would testify truthfully to what happened, it is abundantly

15   clear that there was not a reasonable probability that a competency objection to her testifying

16   would have been sustained.  Moreover, the state supreme court found, twice, that the child

17   was competent to testify, first on direct appeal and a second time on state post-conviction

18   review.[76]  Petitioner's selective presentation cannot overcome that finding.

19   Ground 5(c) therefore does not provide a basis for federal habeas relief.

20   ***Ground 5(d):  Admission of Victim's Underwear and Blood and DNA Evidence***

21   In Ground 5(d), petitioner alleges that he was denied effective assistance when trial

22   counsel: (1) did not object to the admission of the victim's underwear as irrelevant and

23   prejudicial; and (2) stipulated that it was the victim's blood and DNA on her underwear.

24   The Supreme Court of Nevada held as follows regarding the corresponding claims

25   presented to that court:

26   _____

27   [75]See text, *supra*, at 13-14.

28   [76]122 Nev. at 482, 138 P.3d at 790 (direct appeal); #24, Ex. 82, at 5 (post-conviction appeal).

. . . [A]ppellant claimed that his trial counsel was ineffective for stipulating that the DNA and blood of the victim were on the victim's undergarments, for failing to conduct an independent DNA test on the victim's underwear to determine if the blood was actually that of the victim, and for failing to force the State to reveal evidence concerning the underwear that appellant claimed was exculpatory.  Appellant failed to demonstrate that his trial counsel was deficient or that he was prejudiced. The victim's mother found undergarments belonging to the victim which had a dark stain. A test performed by a nurse following an examination of the victim determined that the stain was blood. Appellant failed to identify any reason why the blood on the victim's undergarments would not have come from the victim. Further, tactical decisions of counsel are virtually unchallengeable absent extraordinary circumstances and appellant failed to demonstrate any such circumstances. In addition, as there was overwhelming evidence of appellant's guilty [sic] due to his confession the victim's testimony and corroborating physical evidence, appellant failed to demonstrate that there was a reasonable probability of a different outcome of the trial had his counsel not stipulated that the blood was that of the victim. Therefore, the district court did not err in denying this claim.

#24, Ex. 82, at 5 (citation footnote omitted).

### *Ground 5(d)(1)*

The state supreme court did not expressly address a claim corresponding to the claim identified as Ground 5(d)(1) herein, *i.e.*, that counsel was ineffective for failing to object to the admission of the victim's underwear.  For the reasons discussed below, this claim does not present a basis for habeas relief even if a *de novo* rather than a deferential standard of review *arguendo* is applied.

The underwear in question was admitted as part of the "Rape Kit" or "Sexual Assault Kit" preserved as part of the sexual assault examination.

As initial background, as discussed below, it was the mother's discovery of a pair of panties that prompted her initially to question the child victim, and it thereafter was the discovery of a second pair of panties that served as a catalyst for her telling her husband.

As also discussed as to Ground 5(a), according to the testimony at trial, the incident occurred on Saturday, May 3, 2003, but the victim's mother did not first learn of the incident until five days later on Thursday, May 8, 2003, when she found stained panties while doing laundry and questioned the victim.  She then found blood-stained panties after having finished

1    the rest of the laundry on the Friday.  She then told the father on the Saturday, now
2    approximately a full week after the incident, and the sexual assault medical examination and
3    police investigation thereafter ensued.[77]

4         The physician who conducted the sexual assault examination, Dr. Theresa Vergara,
5    M.D., testified in pertinent part as follows.  In the more typical context where a patient
6    presented within 72 hours of the incident and did so with panties, the examination team
7    merely would collect the panties in the rape kit for possible later police examination.  Dr.
8    Vergara stated that in that context: "I wouldn't touch those."  In this instance, however, it was
9    nearly a week later, and there were "several panties that the mother was collecting these past
10   days prior to my examination."  Dr. Vergara selected one pair of panties and tested it with an
11   emergency room bedside test for the presence of blood.  There were "several pairs of
12   panties," and "they had various dark stains, all of them, that the mom presented to me, and
13   I just randomly took one and tested that one."  The test result was "[p]ositive for blood."  The
14   panties that were tested then were placed in the rape kit.[78]

15        Later in the trial, the sexual assault kit, with the panties, was admitted into evidence
16   without objection at the same time that the parties stipulated as to the victim's blood and DNA
17   being on the panties.[79]

18        On both state[80] and federal post-conviction review, petitioner has claimed that trial
19   counsel provided ineffective assistance by not objecting to the admission of the panties as
20   irrelevant and prejudicial.  Petitioner contends: (a) that "other than [the victim's] statement,"
21   there was no evidence presented that she wore the underwear on or after the date of the
22   alleged incident; (b) that it was "just as likely" that she instead wore the underwear prior to the

23

24        [77]#22, Ex. 18, at 33-36 & 39-47; *id.*, Ex. 19, at 9-12.  The testimony about finishing the laundry on
25   Friday is at 40 in Ex. 18.  See also text, *supra*, at 42 (similar discussion as to Ground 5(a)).

26        [78]#22, Ex. 22, at 37-39.

27        [79]*Id.*, at ii & 94.

28        [80]See #24, Ex. 61, at 33-35.

1  incident and placed them in the laundry basket prior to that time; (c) that the blood on her

2  underwear could have been due to her own alleged poor hygiene as per medical testimony

3  at trial; (d) that the presence of stains on several pairs of underwear supports "the theory" that

4  the stains were due to poor hygiene, not sexual assault; (e) that counsel's stipulation allegedly

5  prevented the jury from learning that there were multiple pairs of stained underwear; (f) that

6  the jury instead was led to believe that the underwear in evidence was worn on the day of the

7  incident and that the presence of the blood proved the assault; and (g) that admission of the

8  evidence thus was prejudicial because the presence of the blood allegedly tended to prove

9  that there had been digital penetration.[81]

10      The Court, applying *de novo* review *arguendo*, is not persuaded.

11      The fact that petitioner must qualify the argument with the phrase "other than the

12  [victim's] statement" is telling.  The victim testified that after Pantano put his finger inside her

13  "kiki":

14

15              . . . .  Then I went to the bathroom and I saw my blood in
           my panty.  Then I felt a nail in my "kiki."

16  #22, Ex. 18, at 18.  The child testified that it hurt.  *Id.*[82]

17      Petitioner cannot simply disregard the victim's testimony in assessing whether other

18  potentially corroborative evidence is probative and admissible.  The child testified that she

19  sustained a bleeding injury from Pantano's assault, and the recovery of panties after the

20  incident with blood stains tended to corroborate her testimony.  Petitioner urges that it was

21  "just as likely" that she instead wore the underwear in evidence prior to the incident, but there

22

23      ─────────────

        [81]#20, at 43-45; #46, at 29-30.

24

25      [82]See also #21, Ex. 4, at 88-92 (substantially consistent preliminary hearing testimony).  As the Court
    has indicated previously, the child's testimony was not simply an assemblage of nonresponsive answers.

26  There were, to be sure, lapses in her recollection in her trial testimony, including as to what she did with her
    panties after the incident, but she nonetheless provided definitive testimony on a number of points.

27      As discussed in the text previously, the victim's mother also testified that she found the panties while
    doing the laundry on the Thursday following the Saturday incident.  There was no testimony that she found

28  similarly stained panties while doing the laundry prior to the incident.

-60-

1   was no testimony that she was bleeding or had sustained injury prior to the assault.  Petitioner

2   was free to argue to the jury that it was just as likely that the panties were worn prior to the

3   incident, but petitioner could not rule out the victim's testimony as a basis for establishing

4   relevancy in admitting the panties into evidence.  If no blood-stained panties had been

5   recovered after the assault, petitioner no doubt would have been seeking to draw a favorable

6   inference from that fact.  Instead, multiple pairs of stained panties were recovered.  The lack

7   of rock-solid chain of custody evidence establishing specifically when the particular panties

8   in evidence were worn and placed in the laundry went to the weight of the evidence, not its

9   admissibility.

10       In this regard, petitioner posits poor hygiene as an alternate theory for the stains,

11  allegedly pursuant to medical testimony at trial.

12       With respect to this contention, prosecution witness Dr. Vergara testified as follows in

13  pertinent part.  When she examined the victim – a full week after the assault – there was only

14  a non-tender localized area of redness in a posterior or six o'clock position.  This finding was

15  "at least consistent" with something having been inserted into the vagina, as there could be

16  localized redness a week after a trauma, but it also "just could be her hygiene."  The type of

17  tissue involved healed quickly.  It was possible with such tissue for a finger to cause a

18  scratching injury with bleeding and for there to not be evidence of that one week later.  There

19  was no medical condition extant at the time of the examination that would cause bleeding.[83]

20       Dr. Vergara provided absolutely no testimony that the *stains,* and in particular the *blood*

21  stains -- as opposed to the localized area of redness that she observed -- resulted or possibly

22  resulted from hygiene.  The representative sample stain that she randomly tested was

23  positive for blood, and the child did not have a bleeding injury at the time of the exam seven

24  days after the assault.  The physician, again, provided absolutely no medical testimony that

25  such a blood stain resulted from poor hygiene rather than a bleeding injury.

26       / / / /

27  _____

28       [83] #22, Ex. 20, at 23-25 & 32-35.

1    The non-examining defense expert, Dr. Lawrence Ricci, M.D., in truth testified

2  substantially the same as Dr. Vergara on several points, albeit with different emphasis.  He

3  testified that a localized area of redness could result either from a penetrating trauma or from

4  hygiene.  However, he found it unlikely that the redness observed would have been caused

5  by a trauma from a week prior, given the rapid healing of the involved tissue.  He accordingly

6  also testified, as Dr. Vergara had, that, with such tissue, a scratching injury from a finger with

7  bleeding likely would have been completely healed one week later, leaving no sign.[84]

8    Like Dr. Vergara, Dr. Ricci provided absolutely no testimony that the *stains,* and in

9  particular the *blood* stains -- as opposed to the localized area of redness that the examining

10  physician observed -- resulted or possibly resulted from hygiene.  Dr. Ricci provided no

11  testimony that such a blood stain would have resulted from hygiene rather than from a

12  traumatic bleeding injury, an injury that both expert witnesses testified no longer would have

13  been evident at the time of the exam conducted seven days after the incident.

14    There thus was no medical testimony – at all - supporting petitioner's lay "theory" that

15  the blood stain on the underwear resulted from poor hygiene.  Rather, the fact that there were

16  multiple stained pairs of panties consistent with a bleeding injury that no longer was evident

17  on exam -- and that per all medical testimony presented no longer *would* be evident on an

18  exam seven days after the incident -- supported an entirely permissible corroborating

19  inference that the stains resulted from the injury testified to by the child, before it healed.

20    Moreover, no stipulation entered by counsel either prevented the jury from learning that

21  there were multiple pairs of stained underwear or led the jury to believe that the underwear

22  in evidence was the underwear worn on the day of the incident.  The jury heard clear

23  testimony from the stand from Dr. Vergara that the mother presented her with multiple pairs

24  of stained underwear, that the physician then "just randomly took one and tested that one,"

25  and that that, randomly-selected, pair of panties was the pair that was placed in the rape kit

26  that was received in evidence.  It is axiomatic that how and what the lawyers argue is not

27

28    [84]#22, Ex. 20, at 48-51.

1   evidence.  Whatever the lawyers for both sides may or may not have argued in the case, Dr.

2   Vergara's testimony clearly established that the panties received in evidence in the rape kit

3   were only a randomly selected pair of panties and not necessarily the panties worn at the time

4   of the assault.[85]  The stipulation entered by counsel that the blood found on the panties was

5   the victim's blood in no sense precluded the jury from learning what they already had heard

6   from the witness stand in open court.

7          In sum, the panties were neither irrelevant, unfairly prejudicial, nor inadmissible as

8   evidence.  The situation presented is a classic instance of petitioner's arguments as to

9   probative value going to the weight rather than the admissibility of the evidence.  The victim

10  testified to injury and bleeding thereafter, the medical testimony as to an examination

11  conducted seven days after the incident at least was not inconsistent with her account, and

12  the discovery of stained panties after the incident tended to establish a permissible

13  corroborating inference for the jury's consideration.  Each piece of evidence tendered for

14  admission need not establish, standing alone and in and of itself, a particular factual inference

15  beyond a reasonable doubt to be admissible in the first instance.  Here, there was not a

16  reasonable probability that an objection to the admission of the rape kit with the panties either

17  would have been successful or altered the outcome at trial, particularly given the victim's

18  testimony and petitioner's confession.  Petitioner thus cannot establish prejudice on this claim,

19  even assuming, *arguendo*, first, the application of *de novo* review and, second, deficient

20  performance.

21         Ground 5(d)(1) therefore does not provide a basis for federal habeas relief.

22                 ***Ground 5(d)(2)***

23         In Ground 5(d)(2), petitioner alleges that counsel provided ineffective assistance when

24  he stipulated that it was the victim's blood and DNA on her underwear.

25         The state supreme court's rejection of this claim was neither contrary to nor an

26  unreasonable application of *Strickland* or other clearly established federal law.  Trial counsel

27  ───────────────

28         [85]See text, *supra*, at 59.

did not stipulate that the blood and DNA was that of the victim without the benefit of any forensic examination whatsoever.  Counsel so stipulated only after the lab results from the police lab both confirmed Dr. Vergara's preliminary emergency room test result reflecting that the stain was a blood stain and further established that the blood was the victim's blood.[86] Petitioner has not identified any flaw in the police lab's methodology or results that would have provided defense counsel with a viable basis for objecting to and excluding testimony presenting the lab results.  The state supreme court's conclusion that petitioner could not demonstrate a reasonable probability of a different outcome at trial had his counsel not stipulated to the presence of the victim's blood on her underwear was not an objectively unreasonable application of *Strickland* or other Supreme Court precedent.

Ground 5(d)(2) does not provide a basis for federal habeas relief.

### Ground 5(e):  Failure to Obtain Exculpatory Evidence

In Ground 5(e), petitioner alleges, in the main, that he was denied effective assistance when trial counsel failed to obtain exculpatory evidence allegedly in possession of the State.

On this claim, petitioner points to argument by defense counsel in support of a continuance request stating that "I believe that there could be some exculpatory evidence which might belie some of what happened" in terms of Pantano's confession.[87]  Counsel did not identify what the exculpatory evidence was that he "believed" "might" belie "some" of what happened.  Petitioner nonetheless asserts:  (a) that "the physical exculpatory evidence referred to by counsel is *the* underwear, allegedly worn by the victim, *admitted to trial* by the prosecution;" (b) that "the" underwear failed "to contain any traces of his semen, sperm, or other DNA evidence;" (c) that "the" underwear thus supported his claim that his confession was not supported by physical evidence; and (d) that the alleged absence of semen on "the" panties therefore "support[ed] his request for counsel to investigate and file a motion to suppress  his false statement to investigators."  #20, at 45-46 (emphasis added).

_____

[86]#22, Ex. 20, at 94.

[87]#21, Ex. 10, at 7.

-64-

The state supreme court's rejection of this claim, in the passage quoted in the discussion of Ground 5(d)(1),[88] together with other related claims, was neither contrary to nor an unreasonable application of *Strickland* or other clearly established federal law.

At the very outset on this claim, there was no actual evidence presented at trial that the underwear in evidence was the underwear that the victim was wearing at the time of the assault.  As discussed at length above as to Ground 5(d)(1), the victim's mother brought multiple pairs of stained panties to the physician conducting the sexual assault examination a full week after the assault, the physician randomly selected one pair of panties and performed an emergency room test for the presence of blood, and the randomly-selected pair of panties then was placed in the rape kit.[89]  *Arguendo* testing the randomly-selected panties that were in evidence and establishing that there was no semen on those panties would have had virtually nil probative value.  That is, proving that panties that very well may have been worn by the victim at another point in time after the assault had no semen on them would have established nothing, for lack of actual evidence that the panties in question were "the" panties as baldly asserted by petitioner on post-conviction review.  The examining physician's testimony clearly belied any claim that it was established, or even could have been established, that the panties in the rape kit admitted into evidence at trial were "the" panties worn by the victim during Pantano's sexual assault.

Further, as discussed in regard to his multiple prior related claims, Pantano's statement to the detective – in a context where he had a potential motive to exaggerate to try and explain away the potential presence of his semen where it should not be – that he ejaculated "all over" does not necessarily establish that his semen covered any and all surfaces that thereafter might be tested.[90]  The absence of semen in sufficient quantity for forensic examination on a particular surface, such as panties (much less panties not actually

---

[88]See text, *supra,* at 58.

[89]See text, *supra,* at 59-63.

[90]See text, *supra,* at 42-43 & n.45; 52-53 & n.65.

1   established to have been worn by the victim during the assault), would not have necessarily

2   disproved Pantano's confession.  As noted as to prior similar claims, it is entirely speculative

3   that such testing would have been marginally exculpatory – based upon the absence of a

4   semen on a particular surface – rather than instead directly inculpatory in the event that the

5   panties in evidence not only were the panties worn at the time but also had semen on them.[91]

6           Petitioner has made affirmative declarative assertions that the panties in evidence

7   were the panties worn by the victim during the assault and that no semen would have been

8   detected on the panties.  However, these bald allegations in truth are based upon nothing

9   other than sheer, unbridled speculation.  Defense counsel's unsworn argument in support of

10  a continuance that he "believed" that there "might" be exculpatory evidence as to "some" of

11  what happened has no evidentiary value whatsoever.

12          In any event, petitioner's moving premise that his confession was admissible only if

13  every jot and tittle of his statement to the police was proved true is fundamentally flawed.[92]

14          Moreover, as discussed as to Ground 5(b)(1), it was Pantano who personally insisted

15  on invoking the 60-day statutory speedy trial period after being informed that doing so

16  necessarily precluded pursuit of a motion and writ to suppress his confession.  Given that his

17  own personal election on the record necessarily precluded pursuit of a writ to suppress his

18  confession, it is subject to some question as to whether petitioner can now claim prejudice

19  based upon his counsel's failure to challenge the admission of his confession.[93]

20          In all events, the state supreme court's holding that petitioner had not presented a

21  viable claim of prejudice on this wholly speculative claim was neither contrary to nor an

22

---

23      [91] Also, as noted previously, what defense counsel instead did was argue that the State's failure to

24  introduce evidence of the sheets and panties having semen on them undercut the State's case, closing with
    the assertion that "[i]f there was sperm DNA all over those panties, I wouldn't be standing here right now."

25  #22, Ex. 22, at 27-28.  Even if petitioner *arguendo* could establish prejudice, which he cannot, such a tactical
    decision to pursue the issue instead in that manner virtually is unassailable on the independent performance

26  prong under the *Strickland* standard, whether on deferential review or instead on *de novo* review.

27      [92] See text, *supra*, at 54.

28      [93] See text, *supra*, at 46-47.

1  unreasonable application of clearly established federal law.  Ground 5(e) therefore does not

2  provide a basis for federal habeas relief.[94]

3         **Ground 5(f):  Failure to Adequately Cross-Examine**

4        In Ground 5(f), petitioner alleges that he was denied effective assistance when trial

5  counsel failed to adequately cross-examine witnesses.  He alleges in particular that counsel

6  failed to impeach the testimony of the child victim and her mother and father with prior

7  inconsistent statements, thereby allegedly failing to subject the State's case to adversarial

8  testing.

9        The Supreme Court of Nevada rejected the claim presented to that court on the

10  following grounds:

11            . . . [A]ppellant claimed that his trial counsel was ineffective
          for failing to properly cross-examine witnesses. Specifically,
12            appellant claimed that his trial counsel did not question the
          State's witnesses concerning prior inconsistent statements.
13            Appellant failed to demonstrate that he suffered prejudice. The
          inconsistencies appellant cited were minor and given the
14            overwhelming evidence of appellant's guilt, appellant failed to
          demonstrate a reasonable probability of a different outcome of
15            the trial had the witnesses been questioned concerning these
          minor inconsistencies. Therefore, the district court did not err in
16            denying this claim.

17  #24, Ex. 82, at 6.

18        The state supreme court's rejection of this claim was neither contrary to nor an

19  unreasonable application of *Strickland* or other clearly established federal law.

20        In the federal reply, petitioner does not provide any specific argument regarding any

21  of the alleged inconsistencies but instead merely refers *in globo* to the alleged inconsistencies

22  set forth in the amended petition.   On the largely conclusory and formulaic argument

23  presented, the Court is not persuaded that the state supreme court unreasonably applied

24  *Strickland* when it held that there was not a reasonable probability that the failure to bring out

25

26  ───────────────

27      [94]To the extent that petitioner claims under Ground 5(e) that counsel was ineffective for delaying
petitioner's speedy trial, the discussion as to Ground 5(a) applies fully here as well.  To the extent that
28  petitioner claims that the State withheld exculpatory evidence in this regard, the claim similarly is grounded
completely on speculation.

the inconsistencies alleged in the amended petition would have altered the outcome at trial. For example, there was not a reasonable probability of a different outcome at trial simply because counsel did not bring out the fact that the child did not testify at trial specifically when the assault occurred, in contrast to her stating in her police statement that it occurred at nighttime.[95] Petitioner confessed to the sexual assault with corroborating testimony by the child that he inserted his finger into her vagina.  There was not a reasonable probability that parsing over inconsistent or incomplete statements as to sundry details – which hardly are uncommon in witness' accounts over time – would have altered the outcome at trial.

Ground 5(f) therefore does not provide a basis for federal habeas relief.

**Ground 5(g):  Failure to Confer, File Pretrial Motions, and Put Forth a Defense**

In Ground 5(g), petitioner alleges that he was denied effective assistance when trial counsel failed to confer with him, failed to file appropriate pretrial motions, and failed to put forth a proper defense.  The underlying particulars of the claim, many of which are the subject of other claims, are noted in the discussion below.  Petitioner alleges that counsel failed to confer with him "and meet his demands," including demands in letters that Pantano allegedly sent to counsel.

The Supreme Court of Nevada held as follows as to this claim:

> . . . [A]ppellant claimed that his trial counsel was ineffective for failing to sufficiently meet with him to discuss trial strategy, including discussing witnesses to call in his defense, inconsistencies in the State's witnesses' stories, which defense strategy to use, and how to question the State's witnesses. Appellant failed to demonstrate that he was prejudiced. As there was overwhelming evidence of appellant's guilt due to his confession, the victim's testimony and corroborating physical evidence, appellant failed to demonstrate a reasonable probability of a different outcome had his trial counsel met further with appellant to discuss these issues. Therefore, the district court did not err in denying this claim.

#24, Ex. 82, at 6.

---

[95]Of course, not testifying to a factual detail does not render a prior statement that includes the detail inconsistent.  Counsel first would have had to elicit testimony at trial on the detail that was inconsistent with the prior statement to impeach the trial testimony.  Otherwise, the prior statement could be referenced only in an effort to refresh the witness' recollection.

-68-

1    The state supreme court's rejection of this claim was neither contrary to nor an
2 unreasonable application of *Strickland* or other clearly established federal law.

3    On this claim as well, petitioner provides only cursory supporting argument in the
4 federal reply, largely incorporating *in globo* the list in the amended petition of particular
5 alleged failures, which list basically was copied virtually verbatim from petitioner's *pro se* state
6 court filing.[96]

7    On the largely conclusory argument made, the Court is not persuaded that the state
8 supreme court unreasonably applied *Strickland* when it held that there was not a reasonable
9 probability of a different outcome at trial had counsel instead proceeded as Pantano allegedly
10 had requested.

11    *First*, petitioner contends that he requested counsel to call his sister to testify as to
12 "coaching" of the child victim's testimony by her mother.  The Court is not persuaded that
13 petitioner can demonstrate the requisite prejudice under *Strickland* for the reasons discussed
14 *infra* as to the parallel claim in Ground 5(l).

15    *Second*, petitioner contends that he requested counsel to call his mother to testify to
16 the falsity of the child's mother's testimony concerning a prior bad act.  The Court is not
17 persuaded that petitioner can demonstrate the requisite prejudice under *Strickland* for the
18 reasons discussed *infra* as to the parallel claim in Ground 5(j).

19    *Third*, petitioner contends that he requested counsel to call an alibi witness.  The Court
20 is not persuaded that petitioner can demonstrate the requisite prejudice under *Strickland* for
21 the reasons discussed *infra* as to the parallel claim in Ground 5(h).

22    *Fourth*, petitioner contends that he requested counsel to obtain testing of the victim's
23 underwear and other materials to refute Pantano's statement that he ejaculated "all over," in
24 order to support a motion to suppress his confession as being uncorroborated and/or
25 contradicted by other evidence.  The Court is not persuaded that petitioner can demonstrate
26 the requisite prejudice under *Strickland* for the reasons assigned in the discussion as to the

27

28    [96]Compare #20, at 51-52, with #24, Ex. 61, at 47-48.

-69-

multiple parallel claims in Ground 5(a), at pages 41-42, *supra*; Ground 5(b)(2), at pages 52-53, *supra*; and Ground 5(e), at pages 64-67, *supra*.

*Fifth*, petitioner contends that he requested counsel to investigate and interview the victim's father because he indicated in his police statement that he had returned home at approximately 7:30 a.m. on May 3, 2003, and that Pantano was not at the residence until 9:00 a.m.

The Court is not persuaded that petitioner can demonstrate the requisite prejudice under *Strickland* in this regard.

When the father testified for the time in the case at trial, he testified that he worked the graveyard shift from 11:00 p.m. until 7:00 a.m., that he came home on the Saturday morning in question and went straight to bed, and that he did not know even that Pantano was in the house until he woke up in the afternoon.  The following Saturday, the child's mother told him what had happened, he questioned the child, and then he later spoke with the police at the hospital after they reported the incident.[97]

Petitioner attached with his state post-conviction filings what appears to be only a single page from a police report.  Whoever wrote the page stated that the father "advised that . . . [he] remembers that [Pantano] had arrived at approximately 0900 hours in the morning and left about 2200 hours."[98]  Yet petitioner attached another single page from either the same or a different report that instead stated:

> Demetrice [the father] said Angelo [Pantano] was at their house on the 3rd and he is unaware of what time he arrived, but Angelo was there when he woke up.  Demetrice said he works graveyard and was uncertain as to when Angelo got there.  When I asked Leticia [the mother] when Angelo arrived at their house, she said that he got there at approximately 0900 hours in the morning, after Demetrice had gone to sleep, and he left at about 2200 hours.

#24, Ex. 61, Exhibit #3 thereto.

---

[97]#22, Ex. 20, at 61-66.

[98]#24, Ex. 61, Exhibit #4 thereto.

1    The Court is unable to discern anything of substance in the foregoing that would lead
2    to a reasonable probability of a different outcome at trial.  Perhaps an officer misstated in the
3    first segment quoted above what the mother instead actually said as being what the father
4    said.  Perhaps the father merely was repeating secondhand what he just had heard the
5    mother say.  The report of what the father said in the second segment quoted above indeed
6    lines up fully with his trial testimony.  In all events, as discussed as to Ground 5(b)(2), a
7    statement by the father and/or mother that Pantano was at the residence from 9:00 a.m. until
8    10:00 p.m. hardly rules out his being present to commit the offense during nighttime.[99]  And
9    the existence of a prior statement that Pantano arrived at 9:00 a.m. rather than at 5:30 a.m.
10   as he maintained initially during his confession would not have rendered his confession
11   inadmissible.  The potential existence of other inconsistent evidence on one point or another,
12   or even on several points, did not render his confession inadmissible.

13   *Sixth*, petitioner contends that he requested counsel to investigate the tactics used by
14   the interviewing detective to coerce him into making an involuntary statement, "specifically the
15   'thumping' noises as indicated"[100] on the transcript of the statement.  The Court is not
16   persuaded that petitioner can demonstrate the requisite prejudice under *Strickland* for the
17   reasons discussed *supra* as to the parallel claim in Ground 5(b)(1).[101]

18   *Seventh*, petitioner contends that he requested counsel to put forth a defense "based
19   on the facts of Pantano's statement to police being coerced, involuntary, and not corroborated
20   by the physical or testimonial evidence offered by the prosecution."[102]  The Court is not
21   persuaded that petitioner can demonstrate the requisite prejudice under *Strickland* for the
22   reasons discussed *supra* as to the parallel claims in Grounds 5(b)(1) and 5(b)(2), *supra*, at
23   pages 43-54.

24   _____

25   [99]See text, *supra*, at 51.

26   [100]#20, at 51.

27   [101]See text, *supra*, at 43-46.

28   [102]#21, at 51.

-71-

*Eighth*, petitioner contends that he requested counsel "to investigate [the father's] preliminary hearing statement that he was in the 'room' with his kids at the time and date Pantano allegedly committed the instant offenses."[103]  Petitioner does not provide a record citation for this factual contention.

The record citation given in Pantano's state post-conviction papers is to preliminary hearing testimony by the *mother*, not the father.[104]   In the testimony in question, the prosecutor is asking questions of the mother about both Pantano and the father -- with both the prosecutor and the witness referring to both Pantano and the father as "he" during the questioning.  The prosecutor asks the mother "was the defendant still at your home" when the father came home at 7:30 a.m., and she responded "yes."  The prosecutor asks the mother "what does he do" when the father come home, and she responded "nothing."  The prosecutor asks her "does he go to bed," and she responds that "[h]e was there at the bedroom with the kids."[105]

The Court is not persuaded that petitioner can demonstrate the requisite prejudice under *Strickland* in this regard.  It appears that what the mother was actually testifying -- in testimony lacking immediate clarity when taken out of context because of the use of the indefinite pronoun "he" -- was that *Pantano* did "nothing" when the father came home because he "was there at the bedroom with the kids."  Indeed, the mother explicitly so testifies on the very next page of the preliminary hearing transcript, specifically that *Pantano* was in the children's bedroom with the children "the whole time."  The actual testimony cited by petitioner therefore not only is not by the father but further does not state what petitioner maintains that it states.  Even if the testimony *arguendo* had reflected – which it did not – that the children instead were with the father at one point, that would not establish that Pantano did not have access to the children at other times, such as later during the evening.  Such strained, if not

---

[103]#20, at 51-52.

[104]Compare #24, Ex. 61, at 48, with #21, Ex. 4, at 41, lines 16-17.

[105]#21, Ex. 4, at 41.

1   in truth wholly illusory,  inconsistencies are not the stuff of which acquittals, or reversals on

2   deferential AEDPA review, are made.

3       *Ninth*, overlapping the first contention above, petitioner contends that he requested

4   counsel "to put forth a defense based on the complaining witness being subjected to overly

5   suggestive and repetitive leading interrogation by [the mother] with amounted to 'coaching.'"[106]

6   The Court is not persuaded that petitioner can demonstrate the requisite prejudice under

7   *Strickland* for the reasons discussed *infra* as to the parallel claim in Ground 5(l).

8       Ground 5(g) accordingly does not provide a basis for federal habeas relief.

9       **Ground 5(h):  Failure to Investigate and Present Alibi Defense**

10      In Ground 5(h), petitioner alleges that he was denied effective assistance when trial

11  counsel failed to investigate and present an alleged alibi defense.

12      The Supreme Court of Nevada held as follows as to this claim:

13          . . . [A]ppellant claimed that his trial counsel was ineffective
            for failing to investigate alibi witnesses and failing to call
14          additional witnesses to testify in his defense. Appellant claimed
            that an investigation would have revealed witnesses that would
15          have testified that he was with them at the time the incident was
            alleged to have occurred. Appellant further claimed that multiple
16          other witnesses should have been called to testify concerning the
            victim and her family members' motives for fabricating their
17          stories. In addition, appellant claimed that an expert witness
            should have been retained to refute the testimony of the State's
18          expert witnesses and to perform an independent psychological
            examination of the victim. Appellant failed to demonstrate that he
19          was prejudiced. Appellant confessed that he sexually assaulted
            the victim. Appellant failed to demonstrate that testimony from
20          any additional witnesses had a reasonable possibility of altering
            the outcome of the trial under the circumstances. Therefore, the
21          district court did not err in denying this claim.

22  #24, Ex. 82, at 6.

23      The state high court's rejection of the claim presented to that court was neither contrary

24  to nor an unreasonable application of *Strickland* or other clearly established federal law.

25      Petitioner alleged in the state court that trial counsel failed to investigate and present

26  the alibi testimony of Jeric Asuncion "and others."  According to petitioner, the State's alleged

27  _____

28      [106]#20, at 52.

-73-

1   theory was that he was at the victim's residence from 9:00 a.m. until 10:00 p.m. on May 3,

2   2003.   Petitioner asserted that Asuncion "and others" would testify that he was "in the

3   presence of" Asuncion and others from 5:30 p.m. that date until the early morning hours of

4   the next day.  He maintained that he therefore could not have been present for the "nighttime"

5   sexual assault referred to by the victim in her statement to police.  Petitioner referred to a

6   purported supporting affidavit of Asuncion attached as "Exhibit 12" to his state papers.[107]

7         However, according to the record presented to this Court, no such purported Asuncion

8   affidavit was presented to the state courts.  The exhibits attached with Pantano's state

9   memorandum include cover sheets for Exhibit 12 and certain other exhibits, but no such

10  exhibits.[108]  The record thus reflects that the state courts were presented only with the bald

11  unsupported allegation that Asuncion "and others" would testify that Pantano was in their

12  presence on from 5:30 p.m. on May 3, 2003, through the early hours of the following morning.

13        Even taken at face value, the purported alibi testimony would not have eliminated the

14  possibility of Pantano committing the sexual assault at "nighttime" as stated by the victim.

15  Pantano told the police that he was in the residence from the early morning hours of May 3,

16  2003.  The testimony would not rule out Pantano committing the sexual assault during the

17  early morning hours before arising, which the child easily also might consider nighttime.[109]

18        In all events, even if the purported alibi testimony would have sought to eliminate all

19  time that potentially could be regarded as "nighttime," petitioner cannot establish the requisite

20  prejudice on this claim.  Pantano confessed to inserting his finger into the vagina of a seven-

21  year-old child, with corroborating testimony by the victim as to the sexual assault.  The state

22  supreme court's determination that there was not a reasonable probability that presenting

23

24        [107]#24, Ex. 61, at 57-59.

25        [108]See #24, Ex. 61, at electronic docketing pages 133-34 & 144-48.  See also *id.*, at 149 (Pantano
26  states that not all of the alleged affidavits referred to in the memorandum were filed with the memorandum).

27        [109]Pantano initially stated during the police interview that he was at the apartment from "like four, five,
    three, four o'clock in the morning."  #24, Ex. 85, at 19-21.  Petitioner's argument that the children were in
28  another room at least after the father arrived home from the graveyard shift is addressed *supra*, at 72-73.

1   alleged alibi testimony from a friend "and others" that he instead was elsewhere on the

2   evening of May 3, 2003, would have altered the outcome a trial was neither contrary to nor

3   an objectively unreasonable application of *Strickland.*

4        Ground 5(h) does not provide a basis for federal habeas relief.

5        **Ground 5(i):  Failure to Present Testimony on Alleged Motive to Fabricate**

6        In Ground 5(i), petitioner alleges that he was denied effective assistance when trial

7   counsel failed to investigate and present testimony by Pantano's sister, Maria Pantano

8   (Rosero), that the victim's mother and father had a motive to fabricate their testimony.

9   According to the amended petition, Pantano's sister would have testified that the victim's

10  parents owed Pantano money and had refused to repay him a portion of the money only a

11  few hours prior to the alleged incident.[110]

12       The Supreme Court of Nevada held as follows as to this claim:

13

14            . . . [A]ppellant claimed that his trial counsel was ineffective
             for failing to present evidence concerning witnesses' motives for
             fabricating their testimony. Appellant claimed that the mother of

15           the victim owed him money and that she coached the victim's
             testimony so that she would not have to repay appellant.

16           Appellant failed to demonstrate that he was prejudiced. In light of
             appellant's confession that he sexually assaulted the victim,

17           appellant failed to demonstrate that this testimony would have
             had a reasonable possibility of altering the outcome of the trial.

18           Therefore, the district court did not err in denying this claim.

19  #24, Ex. 82, at 7.

20       The state high court's rejection of the claim presented to that court was neither contrary

21  to nor an unreasonable application of *Strickland* or other clearly established federal law.

22       At the very outset on this claim, the state court exhibits referenced in the federal

23  amended petition do not state what petitioner states that they do.  The sister did not state

24  either in the affidavit or in the statement reported by the defense investigator either that the

25  parents owed money to Pantano in particular or that they refused to repay him only hours

26  before the alleged incident.  The sister instead stated in her 2007 affidavit that the mother

27  _____

28       [110]#22, at 55.

1    "owed numerous persons in our family money due to her extensive gambling habits" and that

2    "she was going to testify at Angelo Pantano's trial for the prosecution because she was afraid

3    she was going to have to pay for hospital bills she did not have funds for."[111]  In this same

4    vein, the defense investigator's November 25, 2003, report states:

5        Maria would later state that [the victim's] mother . . . [was]
         sorry that this had to happen, but if they did not go through with
6        this, they would have to pay the medical bill [referring to the
         medical bill from the examination one week after the assault] and
7        get in trouble if they did not cooperate.  The doctor was the one
         pressing the charges.  Maria also stated [that the victim's] mother
8        and father are going through financial problems.

9    #24, Ex. 61, Exhibit 16 thereto (at electronic docketing page 143).

10        Nowhere in either the affidavit or the investigator's report does the sister state that the

11   victim's parents owed *Pantano* money.  Nowhere in either the affidavit or the report does the

12   sister state that the victim's parents had refused to repay Pantano only hours before the

13   alleged incident.  Further, a concern over a payment of the medical bill from the May 10,

14   2003, sexual assault examination does not provide a basis for fabricating a story about the

15   May 3, 2003, sexual assault in the first instance.

16        In all events, petitioner cannot establish the requisite prejudice on this claim.  Again,

17   Pantano confessed to inserting his finger into the vagina of a seven-year-old child.  The state

18   supreme court's determination that there was not a reasonable probability that presenting

19   testimony from a hardly disinterested witness seeking to establish that the victim's parents

20   had a motive to fabricate their testimony because they allegedly owed Pantano money would

21   have altered the outcome a trial was neither contrary to nor an objectively unreasonable

22   application of *Strickland.*

23        Ground 5(i) does not provide a basis for federal habeas relief.

24        ***Ground 5(j):  Failure to Present Mother's Testimony to Refute Prior Bad Act***

25        In Ground 5(j), petitioner alleges that he was denied effective assistance when trial

26   counsel failed to investigate and present testimony by his mother to refute testimony by the

27

28        [111]#24, Ex. 61, Exhibit 2 thereto, at 3 (at electronic docketing page 104).

                                           -76-

1    victim's mother regarding an alleged prior bad act.  The background circumstances regarding

2    the victim's mother's testimony are summarized in the discussion of Ground 4(d).[112]

3            The Supreme Court of Nevada held as follows as to this claim:

4

5                    . . . [A]ppellant claimed that his trial counsel was ineffective
             for failing to present his mother's testimony to refute claims that
             his mother was afraid of him. At trial, the victim's mother testified
6            that appellant's mother was afraid of him. Appellant included an
             affidavit from his mother in which she stated that she was not
7            afraid of appellant. Appellant failed to demonstrate that his trial
             counsel was deficient or that he was prejudiced. Following an
8            objection to the victim's mother's statement regarding appellant's
             mother, the district court admonished the jury to disregard the
9            statement concerning appellant's mother's fear. As stated earlier,
             there was overwhelming evidence of appellant's guilt. Thus, he
10           failed to demonstrate that testimony concerning his mother's
             feelings towards him would have changed the outcome of the
11           trial. Therefore, the district court did not err in denying this claim.

12   #24, Ex. 82, at 7.

13           The state supreme court's rejection of the claim presented to that court was neither

14   contrary to nor an unreasonable application of *Strickland* or other clearly established federal

15   law.

16           At the outset on this claim, there clearly was no pretrial investigation that reasonably

17   could have been conducted by trial counsel with regard to this particular point.  As discussed

18   as to Ground 4(d), the state court record, including an express defense concession, reflects

19   that the prosecutor did not intentionally elicit the testimony.  It would have taken a prescience

20   beyond that required by *Strickland* for defense counsel to investigate the point before trial.

21           In any event, petitioner cannot demonstrate prejudice on this claim.  The victim's

22   mother's testimony in this regard was stricken and the jury was instructed to disregard the

23   testimony.  Over and above the points noted by the state supreme court, it was improbable

24   to the extreme that the state trial court would have permitted the defense to present testimony

25   to respond to  testimony on a collateral matter that had been stricken in the first instance.  In

26   all events, Pantano confessed to inserting his finger into the vagina of a seven-year-old child,

27   _____

28           [112]See text, *supra*, at 33-35.

with corroborating testimony by the victim as to the sexual assault.  The state supreme court's determination that there was not a reasonable probability that presenting testimony from his mother that she was not afraid of Pantano would have altered the outcome a trial was neither contrary to nor an objectively unreasonable application of *Strickland*.

Ground 5(j) does not provide a basis for federal habeas relief.

### Ground 5(k):  Failure to Present Evidence of Alleged Lack of a Cell Phone

In Ground 5(k), petitioner alleges that he was denied effective assistance when trial counsel failed to investigate and present testimony establishing that he allegedly did not have a cell phone.  The background circumstances regarding this claim are summarized in the discussion of Ground 5(b)(2).[113]

The Supreme Court of Nevada held as follows as to this claim:

> . . . [A]ppellant claimed that his trial counsel was ineffective for failing to investigate whether appellant possessed a cell phone at the time of the incident. Appellant claimed that he lied to the police about having a cell phone with him during the incident; therefore, his trial counsel should have investigated to show that appellant did not have a cell phone at the time of the assault and that would have shown his confession was false. Appellant failed to demonstrate that he was prejudiced. Appellant confessed to the police that during the sexual assault, he distracted the victim's brother by allowing the brother to play a game on his cell phone. In light of his confession, the victim's testimony and the physical evidence, appellant failed to demonstrate that such an investigation would have resulted in a reasonable probability of a different outcome at trial.  Therefore, the district court did not err in denying this claim.

#24, Ex. 82, at 7-8 (citation footnote omitted).

The state supreme court's rejection of the claim presented to that court was neither contrary to nor an unreasonable application of *Strickland* or other clearly established federal law.

As discussed in more detail as to Ground 5(b)(2), petitioner cannot establish prejudice from trial counsel's failure to pursue what would have been a pointless exercise.  There in

---

[113]See text, *supra*, at 48-49.

1    truth was no way for counsel to conclusively prove the negative that Pantano did not have at

2    least a borrowed cell phone or other cell phone not in his name in May 2003, whether by

3    presenting cell phone carrier testimony or the testimony of friends.  Even if Pantano himself

4    had taken the stand, which he did not do at trial, to testify that he did not a cell phone, he

5    essentially would have been testifying: "My confession demonstrably was false because I lied

6    to the police about the collateral detail of having a cell phone, but I am not lying now when I

7    state, facing conviction for a serious crime, that I did not have a cell phone."  All to support

8    the strained inference that because Pantano, allegedly, lied to the police about the collateral

9    point of having a cell phone he therefore lied to the police about inserting his finger into the

10   vagina of a seven-year-old child.  Nor has petitioner cited apposite case law establishing that

11   he would have been able to prevent introduction of his confession at trial based on this

12   strained argument.  The state supreme court's holding that petitioner could not demonstrate

13   prejudice from counsel's failure to pursue such a pointless avenue of defense was neither

14   contrary to nor an unreasonable application of *Strickland*.

15        Ground 5(k) does not provide a basis for federal habeas relief.[114]

16        ***Ground 5(l):  Failure to Present Evidence of Alleged Coaching of Testimony***

17        In Ground 5(l), petitioner alleges that he was denied effective assistance when trial

18   counsel failed to investigate and present testimony establishing that the victim's parents

19   coached her testimony.

20        The Supreme Court of Nevada addressed this claim within the context of the claim

21   pertaining to fabrication discussed as to Ground 5(i) above, holding that petitioner could not

22   demonstrate prejudice.  The state supreme court's rejection of the claim presented to that

23   court was neither contrary to nor an unreasonable application of *Strickland* or other clearly

24   established federal law.

25

26   _____

27        [114]As also discussed as to Ground 5(b)(2), Pantano's statement that he had a cell phone was not
     uncorroborated as petitioner contends on post-conviction review.  The child victim also testified – both at the

28   preliminary hearing and at trial – that Pantano gave his cell phone to her brother to play with during the sexual
     assault. #21, Ex. 4, at 87;  #22, Ex. 18, at 19.

1    Petitioner alleges on this claim:  (a) that the victim's mother spoke to a number of

2    relatives and others about the alleged incident prior to telling the victim's father about the

3    incident one week later; (b) that "[i]t is believed" that this occurred within the hearing of the

4    child; (c) that the victim's mother owed Pantano $1200 and he sought repayment on the

5    morning of May 3, 2003; and (d) that Pantano's then roommates – Bernard Pangalia and

6    LaLain Nicolas – knew of the monies owed by the victim's mother to Pantano, as allegedly

7    reflected in Exhibits 17 and 18 to Exhibit 61 in the record in this Court.

8        In principal part, the foregoing allegations in federal court, including what the victim's

9    mother allegedly said in particular to whom during the week after the incident, are based upon

10   bald, unsupported allegations in Pantano's state post-conviction papers.[115]  The exhibits

11   attached with Pantano's state memorandum included a cover sheet for Exhibits 17 and 18,

12   but no such exhibits.[116]  Moreover, it is not difficult to discern that there potentially may have

13   been hearsay issues with regard to alleged testimony by Pangalia and Nicolas regarding an

14   alleged debt owed by the mother to Pantano, even if the alleged testimony otherwise were

15   admissible.  There further clearly were hearsay issues – at the very least as to the truth of the

16   matter asserted – with regard to the testimony outlined in the 2007 affidavit of Pantano's

17   sister, who asserts that she would have testified that the victim's mother said to her that she

18   rehearsed the child's account with the victim before she spoke with the child's father.[117]

19       In all events on this claim, petitioner cannot demonstrate the requisite prejudice based

20   upon such an in large part speculative claim of coaching based upon such problematic

21   evidence – perhaps even nonexistent evidence in certain respects.  Pantano confessed to

22   inserting his finger into the vagina of the seven-year-old child.  The state supreme court's

23

24       [115]Compare #20, at 57-59, with #24, Ex. 61, at 63-66.

25       [116]See #24, Ex. 61, at electronic docketing pages 144-48.  See also *id.*, at 149 (Pantano states that
     not all of the alleged affidavits referred to in the memorandum were filed with the memorandum).  Federal
26   habeas counsel repeated essentially verbatim the allegations of the *pro se* state court filing citing to alleged
     supporting exhibits in the state court record that the record in this matter reflects were not actually in the state
27   court record.  Rule 11 of the Federal Rules of Civil Procedure requires more of counsel.

28       [117]See #24, Ex. 61, Exhibit 2 thereto, at 2.

1  determination that there was not a reasonable probability that presenting testimony as to

2  alleged coaching that not one of the alleged witnesses in question themselves observed

3  would have altered the outcome a trial was neither contrary to nor an objectively

4  unreasonable application of *Strickland.*

5      Ground 5(l) does not provide a basis for federal habeas relief.

6      ***Ground 5(m): Failure to Object to Jury Instruction***

7      In Ground 5(m), petitioner alleges that he was denied effective assistance when trial

8  counsel failed to challenge a jury instruction stating that the victim's testimony, if believed

9  beyond a reasonable doubt, was sufficient and that no corroboration of the victim's testimony

10  was required in that circumstance.  Petitioner contends that the instruction shifted the burden

11  of proof from the State to Pantano, in violation of the due process requirement recognized

12  under *In re Winship*, 397 U.S. 358 (1970), that every element of a state criminal offense must

13  be proved beyond a reasonable doubt.

14      The jury instruction challenged stated:

15              There is no requirement that the testimony of an alleged
          victim of sexual offenses be corroborated, and her testimony
16          standing alone, if believed beyond a reasonable doubt, is
          sufficient to sustain a verdict of guilty.
17
   #22, Ex. 23, Instruction No. 9.
18
       The charges to the jury included instructions stating, *inter alia*, that the State was
19
   required to prove every element of the crime charged beyond a reasonable doubt, that the
20
   defendant was presumed innocent until the contrary was proved, and that the instructions
21
   were to be considered as a whole, along with instructions regarding assessing the credibility
22
   of witnesses.[118]
23
       The Supreme Court of Nevada held as follows as to this claim:
24
                 . . . [A]ppellant claimed that his trial counsel was ineffective
25          for allowing a jury instruction to shift the reasonable doubt burden
          to the defense. Appellant failed to demonstrate that his trial
26          counsel was deficient. A proper reasonable doubt instruction was

27  ────────────────────

28      [118]#22, Ex. 23, Instructions Nos. 2, 12 & 14.

                              -81-

1    used at trial.[FN14] Therefore, the district court did not err in
2    denying this claim.

3          [FN14] NRS 175.211; see, e.g., Chambers
      v. State, 113 Nev. 974, 982–83, 944 P.2d 805, 810
4    (1997); Milton v. State, 111 Nev. 1487, 1492, 908
      P.2d 684, 687 (1995).

5  #24, Ex. 82, at 9.

6          The state supreme court's rejection of the claim presented to that court was neither

7  contrary to nor an unreasonable application of *Strickland* or other clearly established federal

8  law.

9          Petitioner – who has the burden of persuasion on federal habeas review – has not

10  cited an apposite decision of the United States Supreme Court holding that a jury instruction

11  as was used in this case shifts the burden of proof to the defendant and violates the rule of

12  *In re Winship*.  Significantly, the Ninth Circuit held in its July 19, 2004, decision in *Bruce v.*

13  *Terhune*, 376 F.3d 950 (9th Cir. 2004), applying consistent prior Circuit authority, that a

14  California state court decision rejecting a substantially identical challenge to a substantially

15  identical California charge was neither contrary to nor an unreasonable application of *Winship*

16  or other clearly established federal law.  376 F.3d at 954-56.  Given *Bruce*, and the prior Ninth

17  Circuit decisions cited therein, the December 17, 2008, decision of the Supreme Court of

18  Nevada rejecting a substantially identical challenge in this case indisputably was neither

19  contrary to nor an unreasonable application of *Winship*, *Strickland*, or other clearly

20  established federal law as determined by the United States Supreme Court.

21          Moreover, consideration of counsel's performance under the deficient performance

22  prong of *Strickland* must be evaluated from trial counsel's perspective at the time.  *E.g.,*

23  *Harrington*, 131 S.Ct. at 779.  At the time of the February 2004 trial, there was no apposite

24  Supreme Court jurisprudence supporting petitioner's argument under *Winship*, and there were

25  multiple Ninth Circuit, Supreme Court of Nevada, and other state court decisions rejecting

26  substantially the same or similar arguments.  *See Bruce, supra; Gaxiola v. State*, 121 Nev.

27  638, 647-50, 119 P.3d 1225, 1231-33 (2005)(collecting prior state cases).  Particularly under

28  the "doubly deferential" standard of review applicable to this context, petitioner simply cannot

1   establish that the state supreme court's 2008 decision holding that trial counsel's performance
2   in 2004 was not deficient was either contrary to or an unreasonable application of clearly
3   established federal law.[119]

4       Ground 5(m) therefore does not provide a basis for federal habeas relief.

5       **Ground 5(n): Failure to Object to Alleged Vouching by State Expert**

6       In Ground 5(n), petitioner alleges that he was denied effective assistance when trial
7   counsel failed to object to alleged vouching for the credibility of the victim's mother's
8   testimony by the physician who performed the sexual assault examination.

9       Petitioner alleges that the second question and answer in the following exchange
10  during the physician's testimony constituted such objectionable and impermissible vouching:

11      Q:    Were you able to appropriately do your
12            examination?

        A:    Yes.
13
        Q:    Okay.  How about the mother?  You indicated that
14            the mother was there.  What was her demeanor?

15      A:    Very concerned for her daughter.  She, too, was
              quiet; not shocked, but she knows she's there for
16            her – with a daughter being abused.

17  #22, Ex 20, at 20.

18      The Supreme Court of Nevada held as follows as to this claim:

19
                    . . . [A]ppellant claimed that his trial counsel was ineffective
20          for failing to object when Dr. Vergara vouched for the credibility

21  _____

22      [119]Petitioner urges that the challenged instruction suggested that none of the alleged deficiencies in
    the child victim's testimony mattered and that the jury thereby was allowed to ignore expert testimony and
23  alleged inconsistencies in the testimony of prosecution witnesses.  Even if this matter were being reviewed
    *de novo*, which it is not, petitioner's argument glosses over the fact that the instruction stated that the victim's
24  testimony was sufficient "*if believed beyond a reasonable doubt.*"  In all events, the Ninth Circuit's *Bruce*
    decision establishes beyond any good faith argument to the contrary that the state supreme court's decision
25  was neither contrary to nor an unreasonable application of clearly established federal law.

26      It would appear that petitioner's argument is grounded on the contention that the instruction was
    subject to objection solely under federal law.  Of course, if the challenge instead were premised upon a
27  contention that the instruction was subject to objection also under state law, the state supreme court's
    rejection of any such state law component to the claim would be the end of the matter on federal habeas
28  review in that regard.

1
2
3
4
5
6
7

of the victim. Appellant claimed that Dr. Vergara's testimony concerning the examination of the victim improperly vouched for the credibility of the victim. Appellant failed to demonstrate that his trial counsel was deficient or that he was prejudiced. Statements amounting "to an opinion as to the veracity of a witness in circumstances where veracity might well have determined the ultimate issue of guilt or innocence" are improper. Dr. Vergara simply testified that the examination of the victim revealed injuries that were consistent with sexual assault. As such, Dr. Vergara's testimony was proper and appellant failed to demonstrate that any objection would have had a reasonable probability of changing the outcome at trial. Therefore, the district court did not err in denying this claim.

8   #24, Ex. 82, at 9 (citation footnote omitted).

9        The state supreme court's rejection of the claim presented to that court was neither

10  contrary to nor an unreasonable application of *Strickland*.

11       Petitioner's core premise on this claim is fundamentally flawed.  The physician stated

12  that the mother's demeanor reflected that "she knows she's there for her – with a daughter

13  being abused."  Petitioner urges that the physician thereby "testified that [the victim] had in

14  fact been abused and this opinion as to the ultimate issue of guilt was improper."[120]  The

15  physician was responding to a question about the demeanor of the mother and her apparent

16  state of mind reflected thereby.  Nothing in the statement in truth constituted an opinion by

17  the physician herself on the ultimate issue of guilt or a vouching for the credibility of the

18  mother's testimony.  It simply was testimony by the physician as to the mother's demeanor

19  and apparent state of mind – as to the mother presenting to the physician as being concerned

20  for a daughter believed by the mother to have been abused.  The state supreme court's

21  holding that there was not a reasonable probability that the failure to object to this in truth

22  largely innocuous testimony would have altered the outcome of the trial was neither contrary

23  to nor an unreasonable application of *Strickland*.[121]  While petitioner points to an alleged

24

25       [120]#46, at 40.

26

27       [121]Petitioner relies upon a number of federal appellate decisions regarding improper expert witness vouching in federal criminal trials.  See #46, at 47-48.  Even if the Court were to assume *arguendo*, that the cases were on point and apposite to the facts of the case at hand, which they are not, the Supreme Court of Nevada is not bound to follow federal court of appeals decisions.  This is not *de novo* review.

28

-84-

1    absence of corroborating physical evidence, Pantano confessed to inserting his finger into the

2    vagina of the seven-year-old child.  He cannot demonstrate prejudice under *Strickland* based

3    on the failure to object to the physician's testimony.

4          Ground 5(n) therefore does not provide a basis for federal habeas review.

5          ***Ground 5(o): Failure to Obtain Psychological Examination of Child Victim***

6          In Ground 5(o), petitioner alleges that he was denied effective assistance when trial

7    counsel failed to obtain an independent psychological examination of the child victim to

8    assess her propensity for veracity.

9          The Supreme Court of Nevada held as follows as to this claim:

10               [A]ppellant claimed that his trial counsel was ineffective for
           failing . . . to call additional witnesses to testify in his defense. . .
11         . .  In addition, appellant claimed that an expert witness should
           have been retained to refute the testimony of the State's expert
12         witnesses and to perform an independent psychological
           examination of the victim. Appellant failed to demonstrate that he
13         was prejudiced. Appellant confessed that he sexually assaulted
           the victim. Appellant failed to demonstrate that testimony from
14         any additional witnesses had a reasonable possibility of altering
           the outcome of the trial under the circumstances. Therefore, the
15         district court did not err in denying this claim.

16   #24, Ex. 82, at 6.

17         The state supreme court's rejection of the claim presented to that court was neither

18   contrary to nor an unreasonable application of *Strickland*.

19         Initially on this claim, it is subject to substantial question whether a motion for a

20   psychological examination of the victim would have been granted in the first instance.

21         A psychological examination of a sexual offense victim is required neither by the

22   federal constitution nor Nevada statutory law, and the procedure instead has arisen in Nevada

23   as a matter of what has been frequently changing state decisional law.  *See,e.g.,  State v.*

24   *Eighth Judicial District Court (Romano)*, 120 Nev. 613, 619-20 & 621 n.26, 97 P.3d 594, 598

25   & 599 n.26 (2004)(modifying rule in 2000 *Koerschner* decision which in turn had overruled

26   prior authority); *see also Abbott v. State*, 122 Nev. 715, 138 P.3d 462 (2006)(later overruling,

27   after the trial in this case, *Romano* and reinstating *Koerschner* test).

28         / / / /

                                              -85-

1    At the time of Pantano's February 2004 trial, the defendant was required to prove a

2    compelling need for the examination.  *See Koerschner v. State*, 116 Nev. 1111, 13 P.3d 451,

3    (2000).  In determining whether a compelling need had been demonstrated, the state courts

4    looked to a number of factors, including whether the State was calling or benefitting from a

5    psychiatric or psychological expert, whether there was corroborating evidence over and above

6    the child's testimony, and whether there was a reasonable basis to believe that the child's

7    mental or emotional state may have affected her veracity.  *Id.*

8    In Pantano's case, the State was not calling or benefitting from a psychiatric or

9    psychological expert,[122] the child's testimony was corroborated by Pantano's own confession,

10   and it is subject to substantial question whether the defense could have established under the

11   then-applicable case law that there was a reasonable basis to believe that the child's mental

12   or emotional state may have affected her veracity.[123]  It thus is subject to substantial question

13   whether a defense motion for a psychological examination would have been granted.[124]

14   In all events, however, given Pantano's confession to inserting his finger into the

15   vagina of the seven-year-old child, the state supreme court's holding that petitioner could not

16   establish a reasonable probability of a different outcome at trial but for counsel's performance

17   in this regard was neither contrary to nor an unreasonable application of *Strickland*.

18   Ground 5(o) therefore does not provide a basis for federal habeas relief.

19   _____

20   [122]*Cf. Koerschner*, 116 Nev. at 1117, 13 P.3d at 455 (fact that State did not elicit psychological
     evidence or use psychological evidence weighed against grant of defense request for victim psychological

21   examination); *Chapman v. State*, 117 Nev. 1, 4-5, 16 P.3d  432, 434 (2001)(similar).

22   [123]*Cf. Chapman*, 117 Nev. at 5, 16 P.3d at 434 (the facts of an ugly divorce between the victim's
     parents and animosity between the victim's father and the defendant were insufficient grounds to believe that

23   the victim's mental or emotional state may have affected her veracity); *Koerschner*, 116 Nev. at 1117, 13
     P.3d at 456 (although the child-victim had experienced a very tragic and stressful childhood, there was no

24   indication in the record that her veracity was affected to any particular degree by her mental or emotional
     state).

25

26   [124]Petitioner urges that an examination would have been required because the victim allegedly was
     coached, but this coaching allegation in truth is based on nothing more than supposition and hearsay that

27   likely was inadmissible for the truth of the matter asserted.  See text, *supra*, at 79-81.  This discussion further
     necessarily assumes *arguendo* that Pantano's insistence – personally on the record – on being tried within

28   the state statutory law sixty-day speedy trial period allowed sufficient time for such a motion and then a
     psychological examination of the child victim.  *Cf.* the discussion as to Ground 5(b)(1), *supra*, at 46-47.

1  ***Ground 6: Alleged Ineffective Assistance of Appellate Counsel***

2       In Ground 6, petitioner alleges that he was denied effective assistance of appellate

3  counsel in violation of the Sixth and Fourteenth Amendments.  He alleges three distinct claims

4  of alleged ineffective assistance of appellate counsel, which are described in more detail

5  below.

6       When evaluating claims of ineffective assistance of appellate counsel, the performance

7  and prejudice prongs of the *Strickland* standard partially overlap.  *E.g., Bailey v. Newland*, 263

8  F.3d 1022, 1028-29 (9th Cir. 2001); *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989).

9  Effective appellate advocacy requires weeding out weaker issues with less likelihood of

10  success.  The failure to present a weak issue on appeal neither falls below an objective

11  standard of competence nor causes prejudice to the client for the same reason – because the

12  omitted issue has little or no likelihood of success on appeal.  *Id.*

13  ***Ground 6(a):  Transcript and Audio Recording of Confession***

14       In Ground 6(a), petitioner alleges that he was denied effective assistance when

15  appellate counsel failed to include the audio recording and transcript of his confession into

16  the record before the state supreme court on direct appeal.

17       The background to this claim is outlined in the discussion of Ground 3, *supra*.[125]

18       On state post-conviction review, the Supreme Court of Nevada held as follows:

19
20         [A]ppellant claimed that his appellate counsel was ineffective for failing to include the audiotape or a certified transcript of his police interview with the appendix for his direct

21  appeal. Appellant failed to demonstrate that he was prejudiced. At trial, a noncertified transcript was used so that the jury could

22  follow along with an audiotape of the interview. The noncertified transcript was not admitted into evidence. Appellant failed to

23  demonstrate that the transcript of the interview that was used at trial was substantially different from the audiotape. Thus,

24  appellant failed to demonstrate that the result of the direct appeal would have been different if this transcript had been included.

25  Therefore, the district court did not err in denying this claim.

26  #24, Ex. 82, at 10 (footnote omitted).

27  _____

28      [125]See text, *supra*, at 17-24.

1    The state supreme court's rejection of the claim presented to that court was neither
2    contrary to nor an unreasonable application of *Strickland*.

3    In the federal reply, petitioner contends, first, that "unlike the audiotape, the transcript
4    contained Pantano's confession that he touched [the victim's] butt."[126]  At the outset in this
5    regard, review under § 2254(d)(1) is limited "to the record that was before the state court that
6    adjudicated the claim on the merits." *Pinholster*, 131 S.Ct. at 1388.  Here, it does not appear
7    that a copy of either the audio recording or the transcript was in the record before the
8    Supreme Court of Nevada on the *post-conviction* appeal.[127]  Federal habeas review thus is
9    restricted under § 2254(d)(1) to the same record presented to the state supreme court when
10   it adjudicated the claim on the merits on the state post-conviction appeal.[128]  Petitioner's
11   assertions as to what was or was not contained in the audio recording as compared to the
12   transcript constitute nothing more than bald assertions vis-à-vis the record actually before the
13   state court that adjudicated the claim on the merits.

14   Moreover, as discussed as to Ground 3, petitioner successfully prevailed upon the
15   state district court to dismiss the lewdness charge, which was the charge based upon the
16   alleged touching of the victim's buttocks.  Pantano achieved this result despite the fact that
17   another portion of the transcript that was not challenged as containing material not contained
18   in the audio recording in truth also referenced the touching that supported the lewdness
19   charge.[129]  Pantano thus arguably obtained more relief on this basis than he was entitled in
20   the first instance, and his claim of prejudice as to the remaining sexual assault charge is
21   questionable at best.  Particularly on the record presented to the state supreme court on the
22   state post-conviction appeal, the rejection of the  claim of prejudice in this regard was not an
23   unreasonable application of *Strickland*.

24
25   [126]#46, at 43-44.

26   [127]See #24, Ex. 61.  Indeed, the audio recording is not even in the federal record in this matter.

27   [128]See also note 9, *supra*.

28   [129]See text, *supra*, at 23-24.

1    Petitioner contends, second, that "without the transcript, the court was unable to

2  properly review the additional inaccuracies and blanks and omissions."[130]  Again, the record

3  presented to the state supreme court on state post-conviction review also did not include

4  either the audio recording or the transcript.  Moreover, as discussed as to Ground 3, *supra*,

5  the alleged inaccuracies identified by petitioner are belied by the transcript.  And, as with

6  Ground 3, even on an *arguendo de novo* review, the Court has no difficulty at all holding that

7  the jury's possession of a transcript with such allegedly "excessive" omissions and blanks

8  while they listened to the audio recording itself did not "violate those fundamental conceptions

9  of justice which lie at the base of our civil and political institutions."[131]  Particularly on the

10  record presented on state post-conviction review, the rejection of the claim of prejudice in this

11  regard as well was not an unreasonable application of *Strickland*.

12    Ground 6(a) does not provide a basis for federal habeas review.

13    **Ground 6(b):  Alleged False Statements in Confession**

14    In Ground 6(b), petitioner alleges that he was denied effective assistance when

15  appellate counsel failed to inform the state supreme court on direct appeal that his statements

16  to police investigators were false and not supported by corroborating facts.

17    The background circumstances pertaining to this claim are outlined in the discussion

18  of Ground 5(b)(2), *supra*.[132]

19    The Supreme Court of Nevada held as follows as to this claim:

21        [A]ppellant claimed that his appellate counsel was
ineffective for failing to include assertions that appellant's
statements to police, including his confession, were false.
Appellant failed to demonstrate that his appellate counsel was
deficient or that he was prejudiced. As discussed above,
appellant's confession was voluntary and appellant did not
identify any additional grounds upon which his confession should
have been suppressed. Appellant failed to demonstrate that any

26  [130]#46, at 44.

27  [131]See text, *supra*, at 21-24.

28  [132]See text, *supra*, at 48-54.

1
2

> claim regarding the veracity of his confession would have had a
> reasonable probability of success on appeal. Therefore, the
> district court did not err in denying this claim.

3  #24, Ex. 82, at 10-11.

4          The state supreme court's rejection of the claim presented to that court was neither

5  contrary to nor an unreasonable application of *Strickland*.

6          As discussed exhaustively above as to Ground 5(b)(2), the factual, logical, and legal

7  underpinnings of petitioner's core claim that he was entitled to relief because his confession

8  allegedly was demonstrably false all are fundamentally flawed.  There was not a reasonable

9  probability either that he would have been able to exclude his confession from evidence on

10  this basis or that he would have been able to obtain a different outcome at trial based on this

11  argument.  The state supreme court's rejection of the parallel claim that appellate counsel

12  should have pursued this factually, logically, and legally flawed argument on appeal clearly

13  was neither contrary to nor an unreasonable application of *Strickland*.

14          Ground 6(b) therefore does not provide a basis for federal habeas relief.

15          ***Ground 6(c):  A Failure to Communicate***

16          In Ground 6(c), petitioner alleges that he was denied effective assistance when

17  appellate counsel failed to communicate and confer with him regarding the issues to be

18  pursued on appeal.

19          The Supreme Court of Nevada held as follows as to this claim:

20
21
22
23
24

> [A]ppellant claimed that his appellate counsel was
> ineffective for failing to communicate with him while preparing his
> direct appeal. Appellant failed to demonstrate that he was
> prejudiced. Appellant failed to identify any issues, other than the
> claim relating to his confession, which he wished to raise, but
> were not raised due to his lack of communication with his
> appellate counsel. Therefore, the district court did not err in
> denying this claim.

25  #24, Ex. 82, at 11.

26          The state supreme court's rejection of the claim presented to that court was neither

27  contrary to nor an unreasonable application of *Strickland* or other clearly established federal

28  law.

1    The preceding discussion as to an inability to demonstrate prejudice under *Strickland*

2    as to Grounds 6(a) and 6(b) applies here as well.[133]

3    Ground 6(c) therefore does not provide a basis for federal habeas relief.

4    ***Ground 7: Alleged Cumulative Error***

5    In Ground 7, petitioner alleges that he was denied rights to due process and a fair trial

6    due to the cumulative effect of the alleged trial errors raised on direct appeal combined with

7    the alleged instances of ineffective assistance of counsel raised on state post-conviction

8    review.

9    The Supreme Court of Nevada held as follows:

10
11    [A]ppellant claimed that the cumulative errors of his trial
      and appellate counsel caused them to be ineffective. Appellant
      failed to demonstrate that he was prejudiced. As appellant failed
12    to demonstrate any error for the reasons discussed previously,
      appellant failed to demonstrate cumulative error. Therefore, the
13    district court did not err in denying this claim.

14    #24, Ex. 82, at 11.

15    This Court held previously in this matter that it would review this ground *de novo*

16    because the state supreme court reviewed the claim solely as one based on the cumulative

17    effect of the alleged ineffective assistance of counsel without considering the claim as also

18    based on the cumulative effect of alleged trial error therewith.[134]

19    On *de novo* review, the Court is not persuaded, for substantially the reasons assigned

20    previously as to the preceding claims, that petitioner has demonstrated the presence of

21    constitutional error in isolation.  The Court notes in this regard that petitioner in truth has not

22    demonstrated constitutional error – as opposed to state law error – on his claims of

23    prosecutorial misconduct under Ground 4.  Nor has he demonstrated a basis for constitutional

24    _____

25    [133]Under established law, a defendant does not have a constitutional right to have appointed counsel
      on direct appeal present every nonfrivolous issue requested by the defendant.  *See Jones v. Barnes*, 463
26    U.S. 745 (1983).  The mere fact that counsel did not pursue an issue that petitioner would have wanted him
      to pursue thus does not establish prejudice in and of itself.  Petitioner instead must demonstrate a reasonable
27    probability of a different outcome on appeal from the failure to pursue the particular issue in question.

28    [134]See #34, at 5-6.

-91-

1   error on any of his claims related directly to the admission of either his own confession or the

2   corroborating testimony of the child victim.[135]   Particularly given his confession and the

3   corroborating testimony of the child victim, the Court is not persuaded that any *arguendo*

4   constitutional error claimed herein – which has not been established – so infected petitioner's

5   trial with unfairness as to make the resulting conviction a denial of due process, whether any

6   such *arguendo* error claimed herein is considered singly or in the aggregate.  In all events,

7   the Court, having found no constitutional error in isolation, holds on *de novo* review that the

8   conviction is not infirm based upon alleged cumulative error.  *See,e.g., Hayes v. Ayers*, 632

9   F.3d 500, 524 (9th Cir. 2011)("Because we conclude that no error of constitutional magnitude

10  occurred, no cumulative prejudice is possible.").

11          Ground 7 therefore does not provide a basis for federal habeas relief.

12                                  ***Evidentiary Hearing Request***

13          Petitioner's request for an evidentiary hearing is denied, as review under AEDPA is

14  restricted to the record presented to the state court that adjudicated the merits of the claims.

15  *See Pinolster,* 131 S.Ct. at 1398-1401.  Petitioner otherwise has not demonstrated a basis

16  for a federal evidentiary hearing under the applicable standards for same.

17          ***Consideration of Possible Issuance of a Certificate of Appealability***

18          Under Rule 11 of the Rules Governing Section 2254 Cases, the district court must

19  issue or deny a certificate of appealability (COA) when it enters a final order adverse to the

20  applicant.

21          As to the claims rejected by the district court on the merits, under 28 U.S.C. § 2253(c),

22  a petitioner must make a "substantial showing of the denial of a constitutional right" in order

23  to obtain a certificate of appealability.  *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000);

24  _____

25          [135]To the extent that this Court has denied relief on preceding claims under the deferential review
    standard without assigning additional factual or legal reasons over and above those assigned by the Supreme

26  Court of Nevada, this Court denies relief on a *de novo* review for substantially the reasons assigned by the
    state supreme court.  Applying *de novo* review to petitioner's claims, singly as well as in the aggregate, the

27  Court is not persuaded that petitioner was denied a fundamentally fair trial or that his conviction otherwise is
    constitutionally infirm.  The reasons supporting this conclusion have been adequately canvassed herein in the

28  discussion of the prior claims.

1   *Hiivala v. Wood*, 195 F.3d 1098, 1104 (9th Cir. 1999).  To satisfy this standard, the petitioner

2   "must demonstrate that reasonable jurists would find the district court's assessment of the

3   constitutional claim debatable or wrong."  *Slack*, 529 U.S. at 484.

4          The Court denies a certificate of appealability as to all claims, for the reasons noted

5   below.  The length of this order does not signify that the any of the multiple claims presented

6   would be found to be debatable by jurists of reason.  On federal habeas review, petitioner has

7   repeated numerous claims from his *pro se* state papers that were flawed factually, logically

8   and/or legally.  Additional discussion was required in this order on multiple claims literally to

9   set the record straight and to put petitioner's arguments in proper context.

10  ***Ground 1***

11         In Ground 1, petitioner alleges that he was denied rights to confrontation, due process,

12  and a fair trial because the state statute allowing admission of prior statements of a child

13  sexual offense victim allegedly is unconstitutionally "overbroad." He alleges that the statute

14  is overbroad essentially because the statute allegedly provides for the admission of hearsay

15  in some circumstances that allegedly would violate the Confrontation Clause under the

16  standards set forth in *Crawford v. Washington, supra.*  Such "overbreadth" challenges are

17  restricted to challenges to statutes restricting freedom of speech protected by the First

18  Amendment.  Accordingly, even on an *arguendo de novo* review, the amorphous "facial

19  challenge" for "overbreadth" presented in Ground 1 would be at best surplusage and at worst

20  frivolous.  If the evidence actually admitted at petitioner's trial was admitted in violation of the

21  Confrontation Clause, then a "facial" challenge to the statute is surplusage vis-à-vis the

22  challenge to his own particular conviction.   If, on the other hand, the evidence actually

23  admitted at petitioner's trial was *not* introduced in violation of the Confrontation Clause, then

24  there is no nonfrivolous federal constitutional claim by which the otherwise constitutional

25  admission of the evidence is rendered unconstitutional because the evidentiary statute

26  allegedly would permit the unconstitutional admission of other evidence in other situations in

27  other trials.  Reasonable jurists therefore would not find debatable or wrong this Court's

28  conclusion rejection of this claim. **See text, *supra*, at 4-11.**

-93-

1    ***Ground 2***

2    In Ground 2, petitioner alleges that he was denied rights to confrontation, due process,

3    and a fair trial because allegedly testimonial out-of-court statements by the child victim to her

4    father and to a detective were admitted at trial.  Petitioner contends principally: (a) that the

5    child was "unavailable" for purposes of the Confrontation Clause analysis under *Crawford*

6    because her responses in her trial testimony allegedly were so vague and inadequate that

7    effective cross-examination was not possible, allegedly thereby rendering her "unavailable;"

8    and (b) that the child's statements not only to the investigating detective but also to her father

9    were "testimonial" statements for purposes of Confrontation Clause protection under

10   *Crawford*.

11   On the "availability" issue, there are no Supreme Court decisions intimating, much less

12   holding, that a witness may be "unavailable" for Confrontation Clause purposes even though

13   they actually take the stand and testify, albeit allegedly too vaguely to allow allegedly effective

14   cross-examination.  *Crawford* instead states apparently categorically that the Confrontation

15   Clause places "no constraints at all" on the use of a declarant's prior testimonial statements

16   when the declarant testifies at trial, which the child did in this case.  Any alleged vagueness

17   in the testimony of a witness on the stand is matter to be highlighted on cross-examination.

18   An adverse ruling on the "availability" issue undercuts the entire claim, including as to

19   the victim's statements to the investigating detective.   Moreover, on the "testimonial

20   statement" issue with regard to the child's statements to her father, the Supreme Court not

21   only has not fully defined "testimonial statement," it expressly has declined to establish

22   whether and when statements made to someone other than law enforcement personnel are

23   "testimonial."  Given this express reservation of the issue, petitioner cannot establish that the

24   state supreme court's rejection of the claim as to the child's statement to her father was an

25   unreasonable application of clearly established federal law.

26   Reasonable jurists therefore would not find debatable or wrong this Court's conclusion

27   that the state supreme court's rejection of this claim was neither contrary to nor an

28   unreasonable application of clearly established federal law.  **See text, *supra*, at 11-16.**

-94-

*Ground 3*

In Ground 3, petitioner alleges that he was denied rights to confrontation, due process and a fair trial because the jury was given copies of a transcript of his confession in spite of a trial court ruling that the transcript, as distinguished from an audio recording of the statement played at trial, was not admissible.   At the outset, neither the transcript nor the audio recording was presented to the state supreme court in the record on appeal, such that AEDPA review herein is restricted to the record before that court when it decided the merits. Given that the statements in question were Pantano's own statements, a holding that the Confrontation Clause was not implicated was not contrary to clearly established federal law. A state court conclusion that the jury having access to the transcript in the circumstances of the case did not violate a general due process standard, which requires a violation of those "fundamental conceptions of justice which lie at the base of our civil and political institutions," was not an unreasonable application of such a generalized standard.   Further, on an alternative *arguendo de novo* review, the actual transcript in question directly belies two of petitioner's central factual allegations in support of the claim.  As to the third factual allegation, this Court has no difficulty at all holding that the jury's possession of a transcript with allegedly "excessive" omissions and blanks did not "violate those fundamental conceptions of justice which lie at the base of our civil and political institutions."   Reasonable jurists therefore would not find debatable or wrong this Court's rejection of this claim.  **See text, *supra*, at 17-24.**

*Grounds 4(a) and 4(b)*

In Grounds 4(a) and (b), petitioner alleges that he was denied rights to due process and a fair trial because of prosecutorial misconduct, contending in particular:  (a) that the prosecutor inappropriately sought to inflame the jury and appeal to their passions and emotions by urging jurors to convict Pantano to make the victim's parents "feel better" and improperly injected her personal opinion into the argument; and (b) that the prosecutor inappropriately argued evidence that was never admitted which implied Pantano's guilt, disparaged defense counsel and the defense, talked about religious characters, and again injected her personal opinion.

1        Petitioner proceeds essentially on the premise that the state supreme court's holding

2    that the prosecutor's comments were improper equated to a holding that the comments

3    violated due process, and he then challenges the court's conclusion that the error constituted

4    harmless error.  However, a conclusion that prosecutorial argument was improper under

5    federal decisions based on the exercise of supervisory power in federal criminal trials, state

6    court decisions applying state law standards, and/or the ABA Standards for Criminal Justice

7    does not necessitate a conclusion that the improper argument violated rights to due process

8    or a fair trial.  In the present case, a number of factors counsel strongly against a conclusion

9    that the prosecutor's improper argument so infected the trial with unfairness as to make the

10    resulting conviction a denial of due process.  First, the state trial court immediately sustained

11    defense objections to the argument, and the court expressly instructed the jury to disregard

12    the comments vis-à-vis making the victim's parents feel better.  Second, while the prosecutor

13    made undisputedly improper argument appealing to emotion, referring to her personal

14    opinion, and disparaging defense counsel, she – contrary to petitioner's assertions - did not

15    misstate the evidence.  Third, the evidence of guilt on the sexual assault charge was

16    compelling.  Pantano confessed to the crime, and the child victim corroborated his confession

17    to the sexual assault of which he stands convicted.  The clear impropriety of the prosecutor's

18    statements under nonconstitutional standards applicable to federal and state prosecutors,

19    again, does not equate to a due process violation in and of itself.  Reasonable jurists thus

20    would not find debatable or wrong this Court's rejection of these claims. **See text, *supra*, at**

21    **24-30.**

22        ***Ground 4(c)***

23        In Ground 4(c), petitioner alleges that he was denied rights to due process and a fair

24    trial because of prosecutorial misconduct, contending that the prosecutor improperly elicited

25    testimony from a State witness that lying to a suspect is legal, in an alleged effort to bolster

26    the witness' credibility.  Petitioner at bottom has failed to present authority on this claim

27    establishing that the state supreme court's rejection of the claim was contrary to or an

28    unreasonable application of clearly established federal law as determined by the United

1    States Supreme Court applying federal constitutional standards.  The Court is not sanguine

2    that it would overturn a conviction on the basis of the challenged testimony even on a *de novo*

3    review.  What the prosecutor sought to establish in the testimony is indisputably true – a

4    police officer can lie to a suspect in an effort to ferret out the truth and elicit a confession.  It

5    is highly questionable whether the testimony – to which no objection was made as to

6    substance – was objectionable in the first instance.  What it was not was a matter that so

7    infected the trial with unfairness as to make the resulting conviction a denial of due process,

8    even without also taking into account the fact that Pantano confessed to the sexual assault

9    with corroborating testimony by the then eight-year-old child victim on that offense.

10   Reasonable jurists thus would not find debatable or wrong this Court's rejection of this claim.

11   **See text, *supra*, at 30-33.**

12            ***Ground 4(d)***

13            In Ground 4(d), petitioner alleges that he was denied rights to due process and a fair

14   trial because of prosecutorial misconduct, contending that the prosecutor  improperly elicited

15   testimony referencing a prior bad act.  The victim's mother testified that petitioner's mother

16   said that she was afraid of him, and the state trial court struck the testimony and instructed

17   the jury to disregard it.  The only possibly applicable substantive standard on this claim is the

18   general standard of fundamental fairness under the Due Process Clause.  There is no

19   indication in the record that the prosecutor intentionally elicited the testimony in question, and

20   every indication instead is to the contrary.  Moreover, there is no clearly established law in

21   Supreme Court jurisprudence establishing that the introduction of propensity evidence denies

22   a defendant due process of law.  Particularly against the backdrop of the substantial evidence

23   of petitioner's guilt of sexual assault, including his confession and corroborating testimony by

24   the then eight-year-old child victim, the state supreme court's rejection of this claim was

25   neither contrary to nor an unreasonable application of clearly established federal law.

26   Reasonable jurists thus would not find debatable or wrong this Court's rejection of this claim.

27   **See text, *supra*, at 33-35.**

28            / / / /

*Ground 5(a)*

In Ground 5(a), petitioner alleges that he was denied effective assistance when trial counsel allegedly failed to protect his constitutional and statutory rights to a speedy trial.  At the outset, while petitioner frames the claim as one of a failure to protect Pantano's state and federal speedy trial rights, he presents no apposite authority establishing that  either his state or federal constitutional speedy trial rights in fact were violated.  Petitioner in essence claims that he was denied effective assistance because trial counsel did not secure a quicker trial setting after he had invoked his state statutory speedy trial right, albeit without a showing of an actual state or federal constitutional speedy trial violation in and of itself.  Petitioner's claim that he was prejudiced because the child victim was coached prior to the trial is based on a selective presentation of the child's testimony and further on speculation.  His claim that he was prejudiced because a later trial setting resulted in exculpatory evidence being destroyed is based on wholly flawed logic and speculation.  Reasonable jurists would not find debatable or wrong this Court's rejection of this claim.  **See text,** *supra***, at 36-43.**

*Ground 5(b)(1)*

In Ground 5(b)(1), petitioner alleges that he was denied effective assistance when trial counsel failed to seek to suppress his confession on the ground that it was involuntary.   The record in this Court belies, rather than tends to support, petitioner's bald self-serving *post hoc* assertion that the investigating detective banged on the table and held his fist inches from Pantano's face during the interview.  There was no probability that a motion to suppress premised upon such allegations would have led to the suppression of petitioner's confession or to a different result at trial.  Petitioner's reliance upon the detective's subterfuge regarding the other evidence that the police had as a basis for suppressing his confession flies in the face of long-established  law to the contrary.  Further, petitioner's late-breaking reliance for the first time in the federal reply on the fact that he was not given *Miranda* warnings ignores the fact that the interview indisputably was a noncustodial interview.  Moreover, as discussed in Ground 5(a), it was petitioner who personally elected on the record to invoke his state statutory speedy trial right in lieu of pursuing a motion and writ seeking to suppress his

1    confession, which was a clear either/or choice under Nevada procedure.  In all events, the
2    state supreme court's holding that petitioner could not establish prejudice was neither contrary
3    to nor an unreasonable application of clearly established federal law.  Reasonable  jurists
4    would not find this Court's rejection of this claim to be debatable or wrong. **See text, *supra*,**
5    **at 36-47.**

6         ### Ground 5(b)(2)

7         In Ground 5(b)(2), petitioner alleges that he was denied effective assistance when trial
8    counsel failed to bring forth evidence to demonstrate that his statements to the police were
9    not corroborated by other physical and testimonial evidence.  This claim, which was repeated
10   nearly verbatim on federal habeas review from petitioner's *pro se* state papers, is flawed
11   factually, logically and legally.  Petitioner's underlying contention that his confession was
12   subject to exclusion and/or was suspect because it was demonstrably false underlies many
13   of his claims.  However, petitioner' claim in this regard is completely without merit, as the
14   Court exhaustively details in the discussion of the claim.  Reasonable jurists would not find
15   this Court's rejection of the claim to be debatable or wrong. **See text, *supra*, at 48-54.**

16        ### Ground 5(c)

17        In Ground 5(c), petitioner alleges that he was denied effective assistance when trial
18   counsel stipulated to the competency of the victim.  Petitioner relies upon excerpts from the
19   victim's testimony from the preliminary hearing and trial, not the competency hearing, which
20   occurred prior to *voir dire*.  Petitioner's selective presentation omits the responses indicating
21   that the child understood the difference between telling the truth and lying.  When the entirety
22   of the child's testimony is considered, including her responses affirming that she would testify
23   truthfully to what happened, it is abundantly clear that there was not a reasonable probability
24   that a competency objection to her testifying would have been sustained.  Moreover, the state
25   supreme court found, twice, that the child was competent to testify, first on direct appeal and
26   a second time on state post-conviction review.  Petitioner's selective presentation cannot
27   overcome that finding.  Reasonable jurists would not find this Court's rejection of the claim
28   to be debatable or wrong. **See text, *supra*, at 54-57.**

1          *Ground 5(d)(1)*

2          In Ground 5(d)(1), petitioner alleges that he was denied effective assistance when trial

3  counsel did not object to the admission of the victim's underwear as irrelevant and prejudicial

4  because it was not established to be the underwear that she wore during the sexual assault,

5  contending that it was just as likely that the underwear in evidence had been worn by the

6  victim prior to the incident.  On an *arguendo de novo* review, a sufficient foundation for the

7  introduction of the underwear in evidence was established by the victim's testimony that she

8  felt a "nail" in her vagina and bled after the assault, the mother's testimony that she found

9  stained panties when she was doing the laundry several days after the assault, and the

10  examining physician's testimony that she field tested one of several similar pairs of panties

11  brought by the mother with a positive result for blood.  The field-tested panties were the

12  panties placed in, and introduced in evidence as part of, the police sexual assault kit.

13  Petitioner's speculation that the underwear in evidence could have been from prior to the

14  incident went at best to weight, not admissibility.  Petitioner's assertion that the medical

15  evidence established that the stain on the underwear could have resulted from poor hygiene

16  in fact was not supported by the actual medical evidence at trial.  The lack of objection to

17  introduction of the underwear did not prevent the jury from learning that there were multiple

18  pairs of stained underwear because the examining physician testified from the stand to this

19  very fact.  The probative value of the evidence accordingly was not substantially outweighed

20  by a danger of unfair prejudice.  Reasonable jurists therefore would not find this Court's

21  rejection of the claim to be debatable or wrong.  **See text,** *supra***, at 57-63.**

22          *Ground 5(d)(2)*

23          In Ground 5(d)(2), petitioner alleges that he was denied effective assistance when trial

24  counsel stipulated that it was the victim's blood and DNA on her underwear.  Counsel so

25  stipulated only after the police lab results confirmed that the blood on the underwear was the

26  victim's blood, and petitioner has not identified any viable basis for challenging, objecting to

27  and/or excluding testimony presenting the lab's results.  Reasonable jurists would not find this

28  Court's rejection of the claim to be debatable or wrong.  **See text,** *supra***, at 63-64.**

1
     ***Ground 5(e)***

2        In Ground 5(e), petitioner alleges, in the main, that he was denied effective assistance

3 when trial counsel failed to obtain exculpatory evidence allegedly in possession of the State.

4 He contends – directly opposite to his claim in Ground 5(d)(1) – that the underwear in

5 evidence instead *was* the underwear worn by the victim and that testing would have shown

6 no semen on the underwear, allegedly belying his confession that he ejaculated "all over"

7 during the assault.  However, as discussed with regard to Ground 5(d)(1), the actual evidence

8 at trial did not establish that the underwear necessarily was the underwear worn by the victim

9 during the assault as opposed to underwear potentially worn thereafter with evidence of

10 *sequelae* from her injury.  The examining physician's testimony clearly belied any claim that

11 it was established, or even could have been established, that the panties in the sexual assault

12 kit admitted into evidence at trial were "the" panties worn by the victim during Pantano's

13 sexual assault.  Petitioner's factual predicate for this claim thus was undercut by the actual

14 trial evidence from the very outset.  Further, as is discussed in regard to multiple claims

15 herein, Pantano's statement to the detective – in a context where he had a potential motive

16 to exaggerate to try and explain away the potential presence of his semen where it should not

17 be – that he ejaculated "all over" does not necessarily establish that his semen covered any

18 and all surfaces that thereafter might be tested.  As noted as to such similar claims, it is

19 entirely speculative that such testing would have been marginally exculpatory – based upon

20 the absence of a semen on a particular surface – rather than instead directly inculpatory in

21 the event that the panties in evidence not only were the panties worn at the time but also had

22 semen on them.  Moreover, petitioner's underlying legal premise that his confession was

23 admissible only if every jot and tittle of his statement to the police was corroborated or proved

24 true is fundamentally flawed.  Reasonable jurists therefore would not find this Court's rejection

25 of the claim to be debatable or wrong.  **See text, *supra*, at 64-67.**

26
     ***Ground 5(f)***

27        In Ground 5(f), petitioner alleges that he was denied effective assistance when trial

28 counsel failed to adequately cross-examine witnesses.  In the federal reply, petitioner does

1   not provide any specific argument regarding any of the alleged inconsistencies but instead
2   merely refers *in globo* to the alleged inconsistencies set forth in the amended petition.  On the
3   largely conclusory and formulaic argument presented, in a case where petitioner confessed
4   to inserting his finger into the vagina of a seven-year-old child, reasonable  jurists would not
5   find this Court's rejection of the claim to be debatable or wrong.  **See text, *supra*, at 67-68.**

6           ***Ground 5(g)***

7           In Ground 5(g), petitioner alleges that he was denied effective assistance when trial
8   counsel failed to confer with him, failed to file appropriate pretrial motions, and failed to put
9   forth a proper defense.  As discussed in detail herein, petitioner's claims in Ground 5(g) either
10  duplicate other claims in the amended petition and/or present claims that are belied by the
11  actual state court record.  Reasonable jurists would not find this Court's rejection of the claims
12  in Ground 5(g) to be debatable or wrong.  **See text, *supra*, at 68-73.**

13          ***Ground 5(h)***

14          In Ground 5(h), petitioner alleges that he was denied effective assistance when trial
15  counsel failed to investigate and present an alleged alibi defense.  On federal habeas review,
16  petitioner cites to a purported affidavit in the state court record that it does not appear ever
17  in fact was presented in state court in support of the bald assertions in petitioner's state
18  papers.  Moreover, the purported alibi testimony would not exclude all of the time period in
19  which the offense potentially could have been committed.  In all events, there was not a
20  reasonable probability that testimony by a friend or friends seeking to establish that petitioner
21  was not present at the victim's residence after a particular time would have altered the
22  outcome at trial – given Pantano's confession to inserting his finger into the vagina of a
23  seven-year-old child, with corroborating testimony by the victim as to the sexual assault.
24  Reasonable jurists would not find this Court's rejection of this claim to be debatable or wrong.
25  **See text, *supra*, at 73-75.**

26          ***Ground 5(i)***

27          In Ground 5(i), petitioner alleges that he was denied effective assistance when trial
28  counsel failed to investigate and present testimony by Pantano's sister, Maria Pantano

-102-

1   (Rosero), that the victim's mother and father had a motive to fabricate their testimony based
2   on their allegedly owing money to Pantano.  At the outset, the state court exhibits referenced
3   in the federal amended petition do not state what petitioner states that they do.  In all events,
4   petitioner cannot establish the requisite prejudice on this claim.  There was not a reasonable
5   probability that such alleged fabrication testimony would have altered the outcome at trial,
6   given Pantano's confession to inserting his finger into the vagina of a seven-year-old child.
7   Reasonable jurists would not find this Court's rejection of this claim to be debatable or wrong.
8   **See text,** *supra*, **at 75-76.**

9          ***Ground 5(j)***

10          In Ground 5(j), petitioner alleges that he was denied effective assistance when trial
11   counsel failed to investigate and present testimony by his mother to refute testimony by the
12   victim's mother regarding an alleged prior bad act.  The claim pertains to the testimony
13   discussed as to Ground 4(d) wherein the victim's mother testified that petitioner's mother said
14   that she was afraid of him.  The state trial court struck the testimony and instructed the jury
15   to disregard it.  It of course would have taken considerable prescience for defense counsel
16   to investigate this unanticipated testimony before trial.  Petitioner in any event cannot
17   demonstrate prejudice.  It was improbable to the extreme that the state trial court would have
18   permitted the defense to present testimony to respond to  testimony on a collateral matter that
19   had been stricken in the first instance.  Even if such testimony were allowed, there was not
20   a reasonable probability of a different outcome at trial given Pantano's confession and the
21   victim's corroborating testimony.  Reasonable jurists would not find this Court's rejection of
22   this claim to be debatable or wrong.  **See text,** *supra*, **at 76-78.**

23          ***Ground 5(k)***

24          In Ground 5(k), petitioner alleges that he was denied effective assistance when trial
25   counsel failed to investigate and present testimony establishing that he allegedly did not have
26   a cell phone.  As discussed in rejecting a virtually identical claim under Ground 5(b)(2), it
27   would have impossible for defense counsel to conclusively prove the negative that Pantano
28   did not have at the very least a borrowed phone or other phone not in his name in May 2003.

1  All to support the strained inference that because Pantano, allegedly, lied to the police about

2  the collateral point of having a cell phone he therefore lied to the police about inserting his

3  finger into the vagina of a seven-year-old child.  Moreover, petitioner's statement to the police

4  in this regard was not uncorroborated because the victim testified that Pantano handed a cell

5  phone with games to her brother to play with during the sexual assault.  Nor has petitioner

6  cited apposite case law establishing that he would have been able to prevent introduction of

7  his confession at trial based on this strained argument.  Reasonable jurists thus would not find

8  this Court's rejection of this claim to be debatable or wrong.  **See text, *supra*, at 78-79.**

9      **Ground 5(l)**

10     In Ground 5(l), petitioner alleges that he was denied effective assistance when trial

11 counsel failed to investigate and present testimony establishing that the victim's parents

12 coached her testimony.  In principal part, the allegations in federal court are based upon bald,

13 unsupported allegations in Pantano's state post-conviction papers.  The purported affidavits

14 cited on federal review in fact were not attached with Pantano's state papers.  The purported

15 testimony that is described in petitioner's state memorandum in any event would have been

16 subject to substantial hearsay issues.  None of the purported testimony was based on

17 personal observation of such alleged coaching.  Petitioner cannot demonstrate prejudice

18 based upon what in truth was a speculative claim of coaching based on such hearsay, given

19 that Pantano confessed to inserting his finger into the vagina of the seven-year-old child.

20 Reasonable jurists thus would not find this Court's rejection of this claim to be debatable or

21 wrong.  **See text, *supra*, at 79-81.**

22     **Ground 5(m)**

23     In Ground 5(m), petitioner alleges that he was denied effective assistance when trial

24 counsel failed to challenge a jury instruction stating that the victim's testimony, if believed

25 beyond a reasonable doubt, was sufficient and that no corroboration of the victim's testimony

26 was required in that circumstance.  The Ninth Circuit has held that a substantially identical

27 California jury instruction does not violate due process.  Petitioner cannot establish under the

28 doubly deferential standard of review of *Strickland* claims under AEDPA that counsel's failure

1   to challenge the instruction in the February 2004 trial provides a basis for federal habeas

2   relief.   Reasonable jurists thus would not find this Court's rejection of this claim to be

3   debatable or wrong.  **See text, *supra*, at 81-83.**

4       ***Ground 5(n)***

5       In Ground 5(n), petitioner alleges that he was denied effective assistance when trial

6   counsel failed to object to alleged vouching for the credibility of the victim's mother's

7   testimony by the physician who performed the sexual assault examination.  Petitioner's core

8   premise on this claim is fundamentally flawed, as the physician's testimony did not vouch for

9   the credibility of any witness.   Petitioner cannot demonstrate the requisite prejudice,

10  particularly given his confession to the sexual assault.  Reasonable jurists would not find this

11  Court's rejection of this claim to be debatable or wrong.  **See text, *supra*, at 83-85.**

12      ***Ground 5(o)***

13      In Ground 5(o), petitioner alleges that he was denied effective assistance when trial

14  counsel failed to obtain an independent psychological examination of the child victim to

15  assess her propensity for veracity.  It is subject to substantial question at the very outset

16  whether a motion for a psychological examination would have been successful under the

17  applicable Nevada state case law at the time.  In all events, however, given Pantano's

18  confession to inserting his finger into the vagina of the seven-year-old child, the state

19  supreme court's holding that petitioner could not establish a reasonable probability of a

20  different outcome at trial but for counsel's performance in this regard was neither contrary to

21  nor an unreasonable application of *Strickland*.  Reasonable jurists would not find this Court's

22  rejection of this claim to be debatable or wrong.  **See text, *supra*, at 85-86.**

23      ***Ground 6(a)***

24      In Ground 6(a), petitioner alleges that he was denied effective assistance when

25  appellate counsel failed to include the audio recording and transcript of his confession into

26  the record before the state supreme court on direct appeal.  These items similarly were not

27  presented to the state supreme court in the record presented on state post-conviction review,

28  and the federal record is restricted to what was presented on state review.  In all events, as

1   discussed as to Ground 3, petitioner cannot demonstrate prejudice.  First, the transcript itself

2   and state court record belies petitioner's principal factual contentions.  Second, allegedly

3   "excessive" blanks in the transcript – with respect to an audio recording that the jury heard at

4   trial – did not give rise to a due process violation.  Reasonable jurists would not find this

5   Court's rejection of this claim to be debatable or wrong.  **See text, *supra*, at 87-89.**

6       ### Ground 6(b)

7       In Ground 6(b), petitioner alleges that he was denied effective assistance when

8   appellate counsel failed to inform the state supreme court on direct appeal that his statements

9   to police investigators were false and not supported by corroborating facts.  As the Court

10  noted with respect to Ground 5(b)(2), the underlying substantive claim is flawed factually,

11  logically and legally.  Appellate counsel's failure to pursue such a completely meritless claim

12  was not a deprivation of effective assistance of counsel.  While petitioner has sought to base

13  a number of his claims on the premise that his confession was false, this meritless argument

14  is the weakest link in, not the strength of, his petition.  Reasonable jurists would not find this

15  Court's rejection of the claim to be debatable or wrong.  **See text, *supra*, at 89-90.**

16      ### Ground 6(c)

17      In Ground 6(c), petitioner alleges that he was denied effective assistance when

18  appellate counsel failed to communicate and confer with him regarding the issues to be

19  pursued on appeal.  The discussion as to Grounds 6(a) and 6(b) demonstrates that petitioner

20  cannot demonstrate prejudice on this claim as well.  A defendant of course does not have a

21  right to have appellate counsel present every nonfrivolous claim that he would wish to pursue.

22  Reasonable jurists would not find this Court's rejection of the claim to be debatable or wrong.

23  **See text, *supra*, at 90-91.**

24      ### Ground 7

25      In Ground 7, petitioner alleges that he was denied rights to due process and a fair trial

26  due to the cumulative effect of the alleged trial errors raised on direct appeal combined with

27  the alleged instances of ineffective assistance of counsel raised on state post-conviction

28  review.  On *de novo* review, including as to the underlying individual claims, petitioner has not

-106-

demonstrated, substantially for the reasons noted previously, the presence of constitutional error in isolation.  Reasonable jurists would not find the rejection of his cumulative error claim to be debatable or wrong.  **See text, *supra*, at 91-92.**

A certificate of appealability thus will be denied as to all claims herein.

IT THEREFORE IS ORDERED that the petition is DENIED on the merits and that this action shall be DISMISSED with prejudice.

IT FURTHER IS ORDERED that a certificate of appealability is DENIED as to all claims.  **See text, *supra*, at 92-107.**

The Clerk of Court shall enter final judgment accordingly in favor of respondents and against petitioner, dismissing this action with prejudice.

DATED:    September 5, 2012

_____
EDWARD C. REED
United States District Judge